IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



JANET AVILES,
1173 Clydesdale Lane
Virginia Beach, VA 23464

JAMIEKA BROWN,
1709 Hodges Ferry Road
Portsmouth, VA 23701

ANN MARIE CUTRELL,
638 River Divied Road, Apt. 1
Sevierville, TN 37876

KIMBERLY DAVIS,
3612 Ahoy Drive
Chesapeake, VA  23321

ALFREDA DUPREE,
1005 Boundary Drive
Suffolk, VA 23434

SHEILA FIELDS,
112 Grayson Street, Apt. 13
Norfolk, VA 23523

RITA HOBBS,
226 Bracey Street
Franklin, VA  23851

STEPHANIE JACKSON,
1609 Belafonte Drive
Portsmouth, VA  23701

and

KEL SHARPE,
3716 Kecoughtan Road, Suite C
Hampton, VA  23664

> On behalf of themselves and
> all others similarly situated,

|

CLASS ACTION COMPLAINT

CASE NO.: 2:13CV418

**JURY TRIAL DEMANDED**

1

Plaintiffs,

vs.

BAE Systems Norfolk Ship Repair, Inc.,
        a wholly owned subsidiary of BAE Systems, Inc.,

        Defendant.

SERVE:      CT Corporation System, Registered Agent
                 4701 Cox Road, Suite 301
                 Glen Allen, Virginia 23060

## COMPLAINT

Plaintiffs Janet Aviles, Jamieka Brown, Ann Marie Cutrell, Kimberly Davis, Alfreda Dupree, Sheila Fields, Rita Hobbs, Stephanie Jackson, and Kel Sharpe, on behalf of themselves and all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, violations of Title VII of the Civil Rights Act and the Equal Pay Act as follows:

## INTRODUCTION

1.      Plaintiffs allege claims on behalf of a class of current and former female BAE Systems Norfolk Ship Repair (hereinafter "BAE") employees who have been subjected to gender discrimination as a result of specific policies and practices at BAE's Norfolk, Virginia facilities. Plaintiffs allege gender discrimination as follows:

a.      Hostile work environment on the basis of sex, female

b.      Hostile work environment due to sexual harassment

c.      Denial of equal opportunities for advancement and promotion

d.      Denial of equal pay

e.      Denial of equal access to overtime work

f.      Retaliation as a result of protected activity

2

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

2.     On or about July 31, 2008, Plaintiff Janet Aviles filed a Charge of Discrimination on behalf of herself and a class of similarly situated women against BAE with the Norfolk Local Office of the United States Equal Employment Opportunity Commission ("EEOC"), charging Defendant with unlawful sex discrimination, and stating that she "and other females have been denied promotion to a higher Class....because of our sex, female."

3.     Following an investigation, the EEOC found reasonable cause to believe discrimination had occurred.

4.     In 2011, Plaintiff Aviles and BAE signed an EEOC Conciliation Agreement.

5.     Pursuant to the agreement, BAE "agree[d] not to engage in any discriminatory employment practice." It agreed that "it shall fully comply with Title VII of the Civil Rights Act of 1964, as amended" and that "there shall be no discrimination or retaliation of any kind against any person because of opposition to any practice declared unlawful under Title VII..." *See* Exhibit 1.

6.     BAE agreed that "appropriate action will be taken and measures adopted to ensure that there will be no recurrence of the violations of the law found in this matter." *See* Id.

7.     Because it has continued to engage in discrimination on the basis of sex, Defendant BAE has failed to comply with and is in violation of the terms of the Conciliation Agreement.

8.     On or about a date no later than April 16, 2012, Plaintiff Rita Hobbs filed a Charge of Discrimination against BAE with the Richmond Local Office of the EEOC, which was transferred to the Norfolk EEOC office, charging Defendant with unlawful sex discrimination. *See* Exhibit 2.

9.     A Notice of Right to Sue was issued and rescinded by the EEOC in November 2012. *See* Exhibit 3.

10.    The EEOC issued a Notice of Right to Sue on April 30, 2013, which Plaintiff Hobbs received in the mail in May 2013.  *See* Exhibit 4.

11.    On or about June 4, the EEOC rescinded the April 30, 2013 Notice, and re-issued it on June 5, 2013. *See* Exhibit 5.

12.    On or after June 6, 2013, Plaintiff Hobbs received in the mail a copy of a revised Notice of Right to Sue indicating that the EEOC would continue to process her Charge. *See* Exhibit 6.

13.    On or about October 2, 2012, Plaintiff Kimberly Davis filed a Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant with unlawful sex discrimination and retaliation on behalf of herself and a class of similarly situated women. *See* Exhibit 7.

14.    The EEOC issued a Notice of Right to Sue on April 30, 2013, which Plaintiff Davis received in the mail in May 2013. *See* Exhibit 8.

15.    On or about June 4, the EEOC rescinded the April 30, 2013 Notice of Right To Sue, and re-issued it on June 5, 2013. On or after June 6, 2013, Plaintiff Davis received in the mail a copy of a revised Notice of Right to Sue indicating that the EEOC would continue to process her Charge. *See* Ex. 9.

16.    On or about October 2, 2012, Plaintiff Sheila Fields filed a Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant with unlawful sex discrimination and retaliation on behalf of herself and a class of similarly situated women. *See* Exhibit 10.

17     The EEOC issued a Notice of Right to Sue on April 30, 2013, which Plaintiff Fields received in the mail in May 2013. *See* Exhibit 11.

18.     On or about June 4, the EEOC rescinded the April 30, 2013 Notice, and re-issued it on June 5, 2013. *See* Exhibit 12.

19.     On or after June 6, 2013, Plaintiff Fields received in the mail a copy of a revised Notice of Right to Sue indicating that the EEOC would continue to process her Charge. *See* Exhibit 13.

20.     On or about March 23, 2012, Plaintiff Stephanie Jackson filed a Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant with unlawful sex discrimination. *See* Exhibit 14.

21.     On or about October 2, 2012, Plaintiff Stephanie Jackson filed a second Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant with unlawful sex discrimination and retaliation on behalf of herself and a class of similarly situated women. *See* Exhibit 15.

22.     The EEOC issued a Notice of Right to Sue on April 30, 2013, which Plaintiff Jackson received in the mail in May 2013. *See* Exhibit 16.

23.     On or about June 4, the EEOC rescinded the April 30, 2013 Notice, and re-issued it on June 5, 2013. *See* Exhibit 17.

24.     On or after June 6, 2013, Plaintiff Jackson received in the mail a copy of a revised Notice of Right to Sue indicating that the EEOC would continue to process her Charge. *See* Exhibit 18.

25.     On or about October 2, 2012, Plaintiff Jamieka Brown filed a Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant

with unlawful sex discrimination and retaliation on behalf of herself and a class of similarly situated women. *See* Exhibit 19.

26.     The EEOC issued a Notice of Right to Sue on April 30, 2013, which Plaintiff Brown received in the mail in May 2013. *See* Exhibit 20.

27.     On or about June 4, the EEOC rescinded the April 30, 2013 Notice, and re-issued it on June 5, 2013. *See* Exhibit 21.

28.     On or after June 6, 2013, Plaintiff Brown received in the mail a copy of a revised Notice of Right to Sue indicating that the EEOC would continue to process her Charge. *See* Exhibit 22.

29.     On or about October 16, 2012, Plaintiff Ann Marie Cutrell filed a Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant with unlawful sex discrimination  and retaliation on behalf of herself and a class of similarly situated women. *See* Exhibit 23.

30.     The EEOC issued a Notice of Right to Sue on April 30, 2013, which Plaintiff Cutrell received in the mail in May 2013. *See* Exhibit 24.

31.     On or about June 4, the EEOC rescinded the April 30, 2013 Notice, and re-issued it on June 5, 2013. *See* Exhibit 25.

32.     On or after  June 6, 2013, Plaintiff Cutrell received in the mail a copy of a revised Notice of Right to Sue indicating that the EEOC would continue to process her charge. *See* Exhibit 26.

33.     On or about October 2, 2012, Plaintiff Janet Aviles filed a new Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant with unlawful sex discrimination and retaliation on behalf of herself and a class of similarly

situated women. *See* Exhibit 27.

34.     The EEOC issued a Notice of Right to Sue on April 30, 2013, which Plaintiff Aviles received in the mail in May 2013. *See* Exhibit 28.

35.     On or about June 4, the EEOC rescinded the April 30, 2013 Notice, and re-issued it on June 5, 2013. *See* Exhibit 29.

36.     On or after June 6, 2013, Plaintiff Aviles received in the mail a copy of a revised Notice of Right to Sue indicating that the EEOC would continue to process her Charge. *See* Exhibit 30.

37.     This lawsuit has been timely filed within 90 days of the issuance of the April 30 and June 6, 2013 Notices of Right to Sue and within 90 days of Plaintiffs Davis, Fields, Jackson, Brown, Aviles, Cutrell, and Hobbs's receipt of the EEOC's April 30 and June 6, 2013 Notices of Right to Sue.

## CLASS MEMBERSHIP PERIOD

38.     The class membership period commences on October 5, 2007, 300 days prior to the earliest class EEOC charge by a class member (July 31, 2008). In the alternative, the class membership period commences on approximately June 21, 2011, 300 days prior to the EEOC charge filed by Plaintiff Hobbs in or about April 21, 2012. In the alternative, the class membership period commences on December 7, 2011, 300 days prior to the class EEOC charges filed by Plaintiffs Davis, Fields, Jackson, Brown, and Aviles.

39.     Based on interviews with class members, and publicly available information, Plaintiffs allege that the challenged practices, and therefore the class period, continues to the present.

40.     Plaintiffs allege that Defendant maintained a pattern or practice of gender

discrimination in compensation and promotion, and that its compensation and promotion policies and practices had a disparate impact not justified by business necessity on its female employees whose claims arise in BAE's Norfolk, Virginia facilities. Plaintiffs allege that Defendant maintained a sexually hostile work environment. Plaintiffs allege that Defendant maintained a hostile work environment based on gender. Plaintiffs allege that Defendant maintained a policy of retaliation against women for engaging in protected activity and against women in response to protected activity engaged in on their behalf.

41.     This action seeks an end to BAE's discriminatory policies and practices, make whole relief for the class and individual Plaintiffs, punitive damages and attorneys' fees and costs.

## JURISDICTION AND VENUE

42.     Plaintiffs' claims arise under 42 U.S.C. § 2000(e) ("Title VII") and 29 U.S.C. § 206(d) (the Equal Pay Act "EPA").

43.     This court has jurisdiction pursuant to 42 U.S.C. Sec. 2000e-5(f)(3), 28 U.S.C. 1331 and 1343(a)(4).

44.     Venue is proper in this district pursuant to 42 U.S.C. Sec. 2000e-5(4)(3) and 28 U.S.C. Sec. 1391(b). The Defendant is located in this District, and the acts complained of herein arose in this District

## PARTIES

45.     Plaintiff Janet Aviles is a woman and resident of Virginia Beach, Virginia.  She is currently employed by BAE in Norfolk, Virginia.

46.     Plaintiff Jamieka Brown is a woman and resident of Portsmouth, Virginia.  She is currently employed by BAE in Norfolk, Virginia.

8

47.     Plaintiff Ann Marie Cutrell is a woman and resident of Sevierville, Tennessee. She was employed by BAE in Norfolk, Virginia until December 2012.

48.     Plaintiff Kimberly Davis is a woman and resident of Chesapeake, Virginia. She is currently employed by BAE in Norfolk, Virginia.

49.     Plaintiff Alfreda Dupree is a woman and resident of Suffolk, Virginia. She is currently employed by BAE in Norfolk, Virginia.

50.     Plaintiff Sheila Fields is a woman and resident of Norfolk, Virginia. She is currently employed by BAE in Norfolk, Virginia.

51.     Plaintiff Rita Hobbs is a woman and resident of Franklin, Virginia. She is currently employed by BAE in Norfolk, Virginia.

52.     Plaintiff Stephanie Jackson is a woman and resident of Portsmouth, Virginia. She is currently employed by BAE in Norfolk, Virginia.

53.     Plaintiff Kel Sharpe is a woman and resident of Hampton, Virginia. She is currently employed by BAE in Norfolk, Virginia.

54.     Defendant BAE Systems Norfolk Ship Repair Inc. ("BAE") is a Virginia corporation, and a wholly owned subsidiary of BAE Systems, Inc. Its corporate headquarters is located in Norfolk, VA. BAE operates a 109-acre facility providing ship repair, modernization, conversion and overhaul services to customers including the U.S. Navy fleet, cruise ship owners, liquefied natural gas tanker owners, ferries, and commercial cargo ships.

## ORGANIZATIONAL STRUCTURE OF THE BAE NORFOLK VIRGINIA FACILITIES

55.     BAE employees in the Norfolk, Virginia shipyard work in "shops" or departments organized by trade, in dry docks, alongside piers, and on board BAE customers' vessels.

56.     BAE maintains 22 shops, as follows:  Plate Shop, Welding Shop, Blacksmith

Shop, Boiler Shop, Sheetmetal Shop, Labor Department, Inside Machine Shop, Outside Machine Shop, Pipe Shop, Rigger Shop, NIE, Facilities Department, Dock Department, Storeroom, Transportation Department, Crane Department, Environmental Department, Quality Assurance Department, Insulation Shop, Paint Shop, Carpenter Shop, and Electric Shop.

57.     The International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO, and its Local Lodge 684 (hereinafter "the union"), represents all BAE production and maintenance employees for the purposes of collective bargaining.

58.     Pursuant to the collective bargaining agreement between BAE and the union, jobs within BAE's shops are subdivided into specific classifications, such as Boilermaker, Pipefitter, Sheet Metal Worker, and other titles. The complete list of classifications is attached hereto as Exhibit 31.

59.     Within the majority of job classifications, employees may hold one of four ascending ranks: Third Class, Second Class, First Class, or Specialist, with Specialist being the highest rank.

60.     Certain job classifications, such as Leadperson or Quality Inspector, are solely considered Specialist titles and are paid at only one rate.

61.     Other job classifications, such as Truck Driver or Ventilation Mechanic, are subdivided into Third through First Class, but have no corresponding Specialist rank.

62.     Helpers and Handypersons work throughout multiple shops.

63.     An employee may progresses upward through the classifications of Helper and Handyperson prior to attaining classification as a Pipefitter, Machinist, or other skilled trade. Employees who have attained such a classification are commonly referred to as "Mechanics."

64.     For example, an employee hired as a Second Class Helper in the Pipe Shop would

10

progress through the classifications of First Class Helper, Third Class Handyperson, Second Class Handyperson, and First Class Handyperson prior to attaining the "Mechanic" rank in her trade. At that stage, the employee would be alternately referred to as a "Pipefitter, Third Class," or as a "Third Class Mechanic."

65.    Employees' pay rate is determined by their job classification, and their rank within that classification, according to a bargained-for pay schedule. *See* Exhibit 31.[1]

66.    All shops within BAE's Norfolk, Virginia facilities operate under a single set of personnel, human resources, and promotion policies.

67.    Bill Clifford is President of defendant BAE Systems Norfolk Ship Repair, Inc., a position he has held since 2005, when the shipyard was acquired by BAE.

68.    Russell "TJ" Tjepkema is the General Manger of BAE's Norfolk shipyard, and Vice President of defendant BAE Systems Norfolk Ship Repair, Inc.

69.    There are approximately seven Craft Managers, each of whom supervises approximately three shops.

70.    The highest-level supervisor in each shop is the Craft Shop Supervisor.

71.    Beneath its Craft Shop Supervisor, each shop has an Assistant Craft Shop Supervisor.

72.    Beneath the Assistant Craft Shop Supervisor are Supervisors steps 1, 2, and 3, in order of descending authority.

73.    Supervisors 3 are also referred to as Leadpersons, and they are members of the union bargaining unit.

74.    Supervisors wear hats bearing stripes so that their position is readily ascertainable.

---

1    Some additional factors, such as a shift differential paid to employees working on the second or third shift, may affect an employee's ultimate compensation rate. However, the table contained in the union's Collective Bargaining Agreement is the foundation of an employee's pay rate.

75.     Non-managerial positions with some supervisory authority include Leadperson, Crew Leader, Labor Coordinator, and Apprentice Instructor.

76.     In or about early fall of 2012, there were only one or two female supervisors in all of Defendant's 22 shops. On information and belief, Defendant became aware that the Named Plaintiffs intended to bring this lawsuit in the fall of 2012, and in response, made additional women supervisors, and promoted some of the Named Plaintiffs in rank.

## CLASS ALLEGATIONS

77.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of: a) all women who are currently employed or will be employed in BAE's Norfolk, Virginia facilities ("Injunctive Relief Class") and b) all women employed at BAE's Norfolk, Virginia facilities at any time from July 31, 2008, or in the alternative April 21, 2011 or in the alternative December 7, 2011, to present ("Monetary Relief Class"), who have been or may be subject to the following policies and practices:

Denial of equal pay;

Denial of equal opportunity for promotion;

Denial of equal opportunities for overtime work;

Maintaining a hostile environment on the basis of sexual harassment;

Maintaining a hostile environment on the basis of female sex.

78.     The proposed classes do not include women employed as supervisors or managers.

79.     Plaintiffs are members of the classes they seek to represent.

80.     The members of the classes are sufficiently numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe that the Injunctive Relief Class and the

Monetary Relief Class each exceed 100 women.

81.     There are questions of law and fact common to the classes and these questions predominate over individual questions.  Such questions include, without limitation:

(a)     Whether Defendant, through its Norfolk, Virginia managers, including the President Bill Clifford, and Vice President and General Manger Russell Tjepkema, has engaged in or been negligent with respect to sexual harassment and harassment on the basis of female sex, of class members, at the BAE Norfolk Shipyard;

(b)     Whether Defendant has engaged in a pattern or practice of discrimination in pay and promotions against its female employees in its Norfolk, Virginia facilities;

(c)     Whether there are statistical patterns adverse to female employees in pay and promotions in Defendant's Norfolk, Virginia facilities;

(d)     Whether Defendant's policies in its Norfolk, Virginia facilities have an adverse impact upon the classes and, if so, whether this impact can be justified by business necessity; and

(e)     Whether injunctive relief and punitive damages for the classes are warranted.

82.     The claims alleged by the Plaintiffs are typical of the claims of the classes.  Each Plaintiff has worked in BAE's Norfolk, Virginia facilities and has been subjected to the discriminatory policies and practices alleged.

83.     The named Plaintiffs will fairly and adequately represent and protect the interests of the classes. Plaintiffs have retained counsel competent and experienced in class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the classes.

84.     The Injunctive Relief Class is properly maintainable under Federal Rule of Civil Procedure Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally

applicable to this class, thereby making appropriate final injunctive relief or corresponding declarative relief with respect to this class as a whole.

85.     The Monetary Relief Class is properly certified under Rule 23(b)(3) because questions of law and fact common to the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

86.     Alternatively, class-wide liability and punitive damages liability under the theories advanced in this action are properly certified under Rule 23(c)(4) for both classes because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## COMPENSATION AND PROMOTION DISCRIMINATION

87.     Under the union contract, employees are to be evaluated annually for the time period of August 1 through July 31, and the evaluation process is to be completed prior to December 15 of each year. *See* Exhibit 32.

88.     The supervisor conducting the evaluation is required to inform the employee of "areas of which improvement can be made in order to become eligible for the next level of advancement. These areas shall be noted on an Employee's evaluation sheet." Id.

89.     Employees may enter the Trainee Program when ranked First Class Helper or below, with a "recommendation from the Department or Shop Manager (satisfactory work performance and attendance)." The program provides for raises every 3 months and promotions up to the level of Handyperson Second Class. *See* Exhibit 33.

90.     Because pay level corresponds to job classification and rank, employees' pay level increases with a promotion in rank or a change to a higher-paid job classification.

91. For an employee to obtain a promotion, she must approach her Craft Shop Supervisor. If the Craft Shop Supervisor supports her application, he sends notice to the Craft Manager. If the Craft Manager approves the promotion, it is sent to personnel to be put into effect.

92. With the exception of the Trainee Program, described *supra*, nothing in the Collective Bargaining Agreement between the union and BAE generally requires managers to use job related criteria such as job performance or experience in making promotion decisions.

93. Women working in the BAE Norfolk, Virginia facilities have been regularly promoted more slowly than similarly-situated men, or have been denied promotions for which they are well qualified, resulting in correspondingly lower pay.

94. Additional requirements to be eligible for promotion, which do not exist in writing, such as obtaining written recommendations from supervisors, turning in work notes, or completing classes and training booklets, are regularly imposed upon women but not upon similarly situated male employees.

95. Female employees are regularly told they must attain a particular skill to be eligible for promotion, even though male employees who had attained the promotion lacked the same skill.

96. Female employees are regularly told they will not be eligible for promotion until there is an opening at the next highest job rank, whereas such a limitation is not imposed upon male employees.

97. Female employees are regularly told they must wait a set period, e.g. one year, before becoming eligible for promotion to the next job rank, whereas such a requirement is not imposed upon male employees.

98.   Female employees are regularly required to file union grievances to obtain promotions for which they are qualified, whereas similarly situated male employees are not.

99.   BAE regularly fails to post job vacancies on bulletin boards in its facilities, preventing female employees from learning of and applying for higher-paying positions.

100.   When positions are posted, less qualified males are regularly pre-selected to fill the positions.

101.   BAE's compensation and promotion policies, including its failure to require supervisors to base promotion decisions for individual employees on job related criteria such as experience or documented performance, have had an adverse impact upon its female employees.

102.   In the absence of job-related compensation and promotion criteria, BAE supervisors rely upon discriminatory stereotypes and biased views about women in making promotion decisions.

103.   For example, Plaintiff Fields witnessed weld supervisor Albert White state that "women should be home cooking my dinner while I'm out working."

104.   Apprentice Instructor Tom Ehret told Plaintiff Davis "you don't look like a pipe fitter, you look like a secretary."

105.   Luther Sutton, one of Plaintiff Aviles's supervisors, made offensive "jokes" regarding where women's "place needs to be," implying that women do not belong in the workplace.

106.   Male employees were hired in to BAE at a higher job classification and rank (and corresponding pay grade) than similarly situated female employees with equivalent or greater work experience.

107.   BAE is aware of, and condones the policy of compensation and promotion

discrimination. Female employees have complained of discriminatory practices based on sex/gender to Bill Clifford, former President of BAE, Vice President Russell Tjepkema, Michael Patterson, Union President (which pursuant to the Collective Bargaining Agreement constitutes notice to BAE), Labor Relations Manager Rusnak, Labor Relations Manager Walker, Human Resources representatives, and multiple supervisors and managers.

## DISCRIMINATION IN ACCESS TO OVERTIME WORK

108.    Pursuant to the union's Collective Bargaining Agreement with BAE, BAE intends "as far as practicable, to use the Employees assigned to work that continues into or requires overtime work." However, where this is not the case, "Management will make a reasonable effort to divide overtime in each three (3) months' period....as equally as possible, consistent with efficient operations, among Employees in each seniority unit in each department." Management "may consider the skill, ability and attendance records of Employees and the desirability of continuity on a particular job." *See* Exhibit 34.

109.    The union's Collective Bargaining Agreement further provides that BAE "shall make a reasonable effort to seek volunteers [to work overtime], as far as practicable. The Company shall post a "Weekend Overtime Volunteer List" for Employees to sign on a weekly basis[,]" which is required to be uniform for all shops. Id.

110.    It additionally provides that "Contractors' employees (i.e. non-BAE Systems Norfolk Ship Repair employees hired through a labor broker) shall be allowed to work overtime in emergencies or when a qualified regular Company Employee is not available." Id.

111.    In spite of the CBA, BAE regularly provides male employees with access to more overtime hours than female employees.

112.    Overtime is distributed inequitably even where female employees have signed up

17

on posted overtime volunteer lists.

113.    At times male "Contractors' employees" are given access to overtime work while female BAE employees are denied that overtime work.

114.    BAE's policy of giving preference to male employees over female employees in distribution of overtime work has had an adverse impact upon its female employees.

115.    BAE is aware of and condones the policy of overtime discrimination. Female employees have complained of discriminatory practices based on sex/gender to Vice President Russell Tjepkema, Michael Patterson, Union President (which pursuant to the Collective Bargaining Agreement constitutes notice to BAE), Labor Relations Manager Rusnak, Labor Relations Manager Walker, Human Relations representatives, and multiple supervisors and managers.

## SEXUAL HARASSMENT

116.    Female employees are subjected to frequent offensive sexual comments made by male employees and contractors, throughout BAE'S Norfolk, Virginia facilities.

117.    Some female employees are subjected to offensive sexual touching, and offensive sexual actions such as males exposing themselves.

118.    Female employees are additionally subjected to frequent offensive comments based upon their female sex, such as comments regarding women not belonging in the workplace.

119.    Some BAE supervisors participate in making offensive discriminatory comments.

120.    Vice President and General Manager Russell Tjepkema participated in making offensive sexual comments.

121.    Plaintiffs hear the offensive comments in the shop they are working in, elsewhere

in the shipyard, and when working on ships.

122.    Offensive comments include men discussing their sexual conduct with women, e.g., what they did the night before, what they plan on doing with women, unwanted vulgar invitations to engage in sexual conduct, and sexually oriented observations about the bodies of the women with whom they work.

123.    When not made directly by supervisors, supervisors are frequently within hearing range of the sexual comments made by coworkers and contractors and take no action in response.

124.    Female employees regularly complain of discriminatory practices based on sex/gender, including to Bill Clifford, former President of BAE, Vice President Russell Tjepkema, Michael Patterson, Union President (which pursuant to the Collective Bargaining Agreement constitutes notice to BAE), Labor Relations Manager Rusnak, Labor Relations Manager Walker, Human Relations representatives, and multiple supervisors and managers.

125.    BAE allows the harassment to continue.

## GENDER-BASED HARASSMENT

126.    Female employees are subjected to frequent offensive comments based on their female sex, such as comments disparaging women in the workplace and denigrating women, made by male employees and contractors throughout BAE'S Norfolk, Virginia facilities.

127.    Some BAE supervisors participate in making offensive discriminatory comments.

128.    Plaintiffs hear the offensive comments in the shop they are working in, elsewhere in the shipyard, and when working on ships.

129.    Offensive comments include by way of example, men stating that: women do not belong in the workplace, "you don't look like a pipefitter, you look like a secretary," "the only place for women is to be pregnant, home and in the kitchen," "women should be home cooking

my dinner while I'm out working" and "jokes" about where "women's place needs to be."

130.    When not made directly by supervisors, supervisors are frequently within hearing range of the gender-based comments made by coworkers and contractors and take no action in response.

131.    Female employees regularly complain of discriminatory practices based on sex/gender, including to Bill Clifford, former President of BAE, Vice President Russell Tjepkema, Michael Patterson, Union President (which pursuant to the Collective Bargaining Agreement constitutes notice to BAE), Labor Relations Manager Rusnak, Labor Relations Manager Walker, Human Relations representatives, and multiple supervisors and managers.

132.    BAE allows the gender-based harassment to continue.

## APPROPRIATENESS OF CLASS TREATMENT AFTER DUKES v. WALMART

133.    Plaintiffs' claims that the decision makers at Defendant share a bias against women, that business necessity cannot justify the disparate impact on women of Defendant's policies, and that management has been negligent in dealing with sexual and gender-based harassment, are appropriate for class treatment. Plaintiffs have evidence that the common unifying factor among these claims is the belief that women do not belong at the shipyard, which is shared by a homogeneous all male management culture at Defendant.

a) The President of defendant, Bill Clifford, has shown that he is indifferent to employment discrimination and sexual harassment directed against women at the shipyard, and personally does not view it as his responsibility. Plaintiff Aviles made an appointment with Mr. Clifford to discuss sexual and gender based harassment directed against her in her shop. When she described the harassment, Mr. Clifford stopped Ms. Aviles, stating that he could not do anything because the company had a union.

b) Plaintiff Kim Davis had the same experience. She met with Mr. Clifford and told him she was not being trained by her trainer—who had told her she looked like a secretary—while men in her shop received training. Mr. Clifford told Ms Davis to speak to Ms Kight, in Human Resources, that it was not his job to respond to employment discrimination complaints. She did speak to Ms Kight, and after her

complaint, she was required to take anger management counseling. The counselor informed BAE that Ms. Davis was being discriminated against and should not be in anger management classes. Ms. Davis was removed from the EAP program on December 8, 2006.

c) In 2007 Ms Davis made a written complaint to Mr. Clifford, explaining that she was still not receiving training, while her male colleagues were. Again, he did not respond. Ms Kight did: she claimed she would do an investigation, however nothing changed.

d) Russell "TJ" Tjepkema, holds the position of Vice President of Business Operations, and General Manager, of defendant shipyard. He is responsible for its day-to-day operation. As plaintiff Cuttrell was ascending stairs, before a group of employees, Tjepkema said loudly, "Ann Marie, Ann Marie, shake it!"

e) After Ms Cuttrell made formal complaint, and Human Resources was allegedly investigating, Ms. Cutrell told Tjepkema "don't ever stop me going to my car, or in the yard, or on the sidewalk. If you want to talk to me, go to HR and tell them you want to have a meeting with me, and I'll be at the table." Tjepkema became extremely angry, and stated "Ann Marie, this conversation is over! You need to look for other employment!"

f) When Ms Cuttrell was being sexual harassed on a ship, rather than attempting to stop the harassment, Director of Labor Relations Alan Walker, ordered that she be accompanied by a male, and not be allowed to work alone, suggesting he believed that discrimination was too ingrained to stop.

g) Walker stated to Ms. Cutrell "so you pretty much appreciated being around civilized people, right?" in reference to her three months in Facilities Temp Services on light duty, acknowledging that management was well aware of the discrimination women face at the shipyard.

h) Albert White, a weld Supervisor, was talking about women and men working in the shipyard. He stated "women should be home cooking my dinner while I'm out working."

i) Pipe shop Supervisor James Christian stated to male coworkers that "the only place for women is to be pregnant, home and in the kitchen."

j) Luther Sutton, Plates Supervisor, makes offensive "jokes" regarding where women's "place needs to be," implying that women do not belong in the workplace.

k) The manager who hired Plaintiff Davis commented, "we're not hiring you for your looks."

l) In or about 2005 or 2006, Apprentice Instructor Tom Ehret told Ms. Davis, "you don't look like a pipe fitter, you look like a secretary." Ms. Davis reported this comment to supervisor Aaron Brown, who took no action.

m) A supervisor told BAE employee Ms. Payton "well, if you get laid off now you can get a job cleaning septic tanks." Ms. Payton complained of the assignment to Ms. Jackson in her role as union shop steward. Ms. Jackson reported the incident

21

to Supervisor Bazemore.  He stated that he did not see anything wrong with it.

n) The use of offensive female stereotypes is a constant throughout all of the shops and on board ships. Ms Aviles made a written complaint October 2012 to the Director of Employee Relations, Alan Walker, and her all of the Supervisors in her shop, including the Craft Supervisor, concerning offensive sexist and sexual language: "The word Bitch is used as common as the word hello" in her shop. In January 2013 Ms Aviles made another written complaint, to Human Resources, about the same exact offensive language being used in her shop: "I want my coworkers to be informed that they can't make offensive sexist remarks at work."

o) When asked when Ms Jackson would be promoted, Bazemore stated "she needs to crawl before she walks." Alan Walker head of Labor Relations, stated "oh, he means you aren't seasoned." After 25 years with the shipyard.

p) Bazemore told Ms. Hobbs that he "needed someone for office work, so that's what I'm hiring you in for." helping with office paperwork, assisting with timesheets, and entering data into the computer. These tasks were unrelated to work as an electrician, and therefore did not build her skills in the trade.

q) Supervisor Barnes commented in regards to the women's restroom: "that was MY office before BAE had to go hire women in Shop 10."

r) Supervisor Stokes told Ms. Cutrell that she was "stupid" in front of her male coworkers, and told her that she "is nothing and will never be anything."

s) Supervisor Stokes told Ms. Cutrell: "Ann Marie, women are second class citizens. They shouldn't even have a right to vote!" Some of Ms. Cutrell's male coworkers including Allman, Armistead, Johnson, and others were present.  Ms. Cutrell responded, "well how did you get here then?  Your mom was a woman." Ms. Cutrell's male coworkers snickered and laughed about Stokes's comment.

t) Alan Walker, Director of Employee Relations, told Ms Cuttrell: "it's really a blue collar world over there [in the shipyard].  People are going to say things." Ms. Cutrell told him, "that's why I am here, for you to counsel me." Walker simply said that "people are different than we are [in the shipyard]."

u) Ms. Aviles was repeatedly told that she could not be promoted because there needed to be an opening at the next level, and she had to wait one year before becoming eligible for promotion to First Class Handyperson, which are not required of men, regularly.

v) Ms. Sharpe's supervisor "Barry" (Shop 27) has pretended to be a "pimp" requesting money from Ms. Sharpe, who he pretends is a prostitute working for him.

w) Supervisor Bazemore pre-selected Mirabel for the Apprentice Instructor position, pre-cleared his  instantaneous Second to First Class Mechanic promotion with Alan Walker, Labor Relations, recalled Mirabel back to the Electric shop to sign up for the position even though he had been loaned out to work in Quality Assurance, just to deny Ms Jackson the promotion, a more qualified female candidate.

x) Supervisors in the Pipe Shop make sexually offensive comments to female subordinates, suggest they can obtain valuable benefits, by dating them and make unwanted propositions.

y) Supervisors Carson, Pesck, Marvin, and Wickams heard monthly complaints from Ms Aviles about sexual harassment in the Plate shop, yet failed to stop it.

z) Supervisor Aaron Brown displayed pictures of women in bikinis and thongs on his work computer screen.

aa) James Jones, one of Ms. Hobbs's supervisors, listens to her male coworkers while they comment sexually on women in groups, and he laughs along or joins in with the comments.

bb) Ms. Hobbs told her supervisor Andre Turner that her coworker Butler was making sexual comments regarding what he was going to do to her. Turner stated, "he's always doing stuff." Ms. Hobbs told Turner, "that's why I'm coming to you, because you're a supervisor." Turner told Ms. Hobbs that if it was a continuing problem for her, "maybe you need to go ahead and file charges or do what you need to do."

cc) John Pesck, Supervisors, took pictures of young women he stated he had gotten to accompany him to a hotel, and posted them on his locker. Pesck was caught physically engaged with a woman in 2001-2002.

dd) Supervisors Paul Stokes and Bill Scold were present. Olah stated, "oh, you mean a wife tasting!"

ee) Olah was bragging to Ms. Cutrell's male coworkers about having sex with his family's 13-year-old babysitter. Supervisor Stokes was "joking" with Olah on this subject, and the two were laughing. Bill Scold and Trevor Allman were also present. Olah laughed and stated, "well she wanted it!"

ff) Ms. Cutrell's male supervisors and coworkers showed each other sexual photos on their cell phones, while snickering. Individuals who participated in this included supervisor Stokes, Scold, Olah, Johnson, Zack Mix, and Bertrell Jones.

This evidence is discussed in greater detail in the individual allegations of the Named Plaintiffs, below.

## INDIVIDUAL ALLEGATIONS

### I. JANET AVILES

134. Janet Aviles is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a Specialist Shipfitter in the Plate Shop. Ms. Aviles was hired in or about 1987. Ms. Aviles is supervised by Timmy Spruill, Craft Shop Supervisor for the Plate

Shop. Other supervisors in the shop include John Pesck, Billy Wickams, Harold Marvin, Alan Carson, and Luther Sutton.

A.    Hostile Environment

135.    When she was hired by BAE in 1987 Ms. Aviles began work as a part time Firewatcher. She became full time in or about 1988.

136.    During her time in the Fire Watch Shop, Ms. Aviles heard offensive sexual language and experienced frequent offensive conduct from male coworkers including, but not limited to, Ms. Aviles's coworker Mr. Cross grabbed her rear end while she was in a passageway on a Navy ship. She complained to her supervisor, Mr. Sullivan, who spoke with Cross about the complaint. Cross admitted he had done it. Cross received thirty days off, and then returned. Cross continues to engage in the same behavior now.

137.    BAE's Fire Watch shop was merged into the Labor Shop in 2001. Ms. Aviles therefore began working in the Labor Shop, under the supervision of Mr. Lynch. While in the Labor Shop Ms. Aviles learned that workers in the trades earned better benefits and higher pay. She therefore sought and received a transfer to the Pipe Shop in or about 2001-2002.

138.    Ms. Aviles's supervisor in the Pipe Shop was Craft Shop Supervisor Dave Byrum. During approximately one year working in the Pipe Shop, Ms. Aviles heard offensive sexual language and experienced offensive conduct from male workers approximately daily. Male workers in Ms. Aviles's shop used the words "bitch" and "whore" to refer to women, made offensive sexual remarks regarding women, and talked about what they did sexually with women.

139.    In 2006 Ms. Aviles transferred to the Plate Shop. Ms. Aviles's supervisors in the Plate Shop included Mr. Sullivan, John Pesck, Lindsey Copeland, Billy Wilkins, Steve Roberts,

and Timmy Spruill.

140.    While working in the Plate Shop, Ms. Aviles heard offensive sexual language and experienced offensive conduct from male coworkers and contractors approximately daily, including, but not limited to, the following:

a.    Male employees daily make offensive sexual remarks regarding women, such as "man I fucked that bitch last night," "she ain't nothing but a whore," "this bitch she got five babies," "I'm trying to do what I can to her," "send the bitch packing," and talk about what they did sexually with women, including graphic descriptions of oral sex.

b.    Supervisors such as Billy Wilkins are regularly walking past while men make offensive sexual comments regarding women.  Ms. Aviles would tell him, "did you hear that?"

c.    Ms. Aviles has been working at a station near the men's restroom.  Males constantly stand around near the restroom and make offensive comments regarding women, such as "bitches ain't nothing but gold diggers," and "all they want to do is get their hair and nails done."

d.    In or about early September 2012, a female apprentice named Helena Brown reported to Ms. Aviles that a male welder, "JR," had approached her in the locker room and told her he "wanted to fuck her."

e.    In or about mid-2012, a male worker commented that he was going to "go home and eat his bitch" while walking past Ms. Aviles.

f.    John Pesck, one of Ms. Aviles's supervisors, took pictures of young women he stated he had gotten to accompany him to a hotel, and posted them on his locker.  Pesck was caught physically engaged with a woman in 2001-2002.

g.    Approximately two times per month, Luther Sutton, one of Ms. Aviles's

25

supervisors, makes offensive "jokes" regarding where women's "place needs to be," implying that women do not belong in the workplace.

h.   Rick Acres regularly makes comments about what he likes to do with women.

141.   Ms. Aviles regularly complained to her supervisors regarding the offensive sexual language and conduct she experienced in the shop. Beginning in or about 2006, Ms. Aviles complained at least once a month to her supervisors Carson, Pesck, Marvin, or Wickams, in their office. She would make requests to the effect of, "can you talk to the guys about how they are talking, about what they are doing sexually and how? Nobody wants to hear that mess. I don't want to hear every day about their women." The supervisors would tell Ms. Aviles they would talk to her male coworkers. However, her coworkers continued engaging in the same behavior.

142.   Ms. Aviles filed two grievances on or about January 11, 2006, on the basis of sexual harassment and lack of just cause for the discipline imposed upon her. *See* Exhibit 35. The sexual harassment included but was not limited to her supervisor coming into the rest room when she was undressed. She was the only female in her department. She would find dead mice left in the microwave by men, which was another form of gender harassment.

143.   By letter of March 6, 2006, Labor Relations Manager Ron Rusnak deemed the grievance settled, stating that:

> In review of the information presented the Company does not find where Ms. Aviles was
> sexually harassed. However, in discussions during the Step 3 meeting it was agreed that
> additional precaution would be taken when it was necessary for the ladies' bathroom in
> building 620 to be entered by a male....

*See* Exhibit 36.

144.   In or about 2006, Ms. Aviles made an appointment with Bill Clifford, BAE President. She told his secretary she wished to discuss the way she was treated as the only female in her shop. Union shop steward Joe Tatum and Human Resources representative Sandra

26

Kight attended the meeting.

145. Mr. Clifford had stated at meetings that he had an "open door policy," which Ms Aviles understood as an encouragement to speak to him personally about important issues, where his input would be beneficial.

146. At the meeting, Ms. Aviles complained to Clifford regarding the microwave incident. She told Clifford that she was the only female, and that her boss had walked in while she was changing clothes.

147. Clifford stopped Ms. Aviles, stating that he could not do anything because the company had a union.

148. On or about July 31, 2008, Ms. Aviles filed an EEOC Charge alleging harassment on the basis of her sex:

> ...For three years with the last incident being July 23, 2008, I have been harassed through negative actions such as leaving a mouse in the microwave, the theft of my work shoes, falsely accused of having missing tools in my ocker, disciplined for nodding my head, males being told not to help her lift material that it takes two males to lift and invasion of the female locker room by the Lead Mechanic....

> ....During April 2008, I complained to Sandra Knight [sic], the Human Resources Manager about my compliant [sic] of sex discrimination. She told me that I should leave thing in the past. I had complained about the actions of Harold Marvin, the Lead Mechanic over the years with the most recent complaint being July 23, 2008....

*See* Exhibit 37.

149. A grievance meeting was held on or about August 13, 2008. By letter dated October 21, 2008, Allan Walker sustained Ms. Aviles's complaint of discrimination, stating: "The Company recognizes that Aviles was treated inappropriately in regards to the communication of work assignments. Supervision has received training for "Respect in the Work Place" from an external trainer." *See* Exhibit 38.

150. In or about 2008 or 2009, Ms. Aviles wrote a letter to Ian King, Chief Executive

of BAE Systems, containing the same complaints she had voiced to Clifford. She received no response.

151. Ms. Aviles continued to file grievances for discrimination under Article IV, and harassment, on or about April 21, 2010; May 27, 2010; August 20, 2010; May 18, 2011; February 14, 2012; February 15, 2012; and March 23, 2012.

152. On or about September 17, 2012, Ms. Aviles filed a grievance complaining of ongoing harassment, noting of relief sought: "[d]o what you have to do it needs to stop!!!" *See* Exhibit 39.

153. On or about October 26, 2012, Ms. Aviles complained in writing of ongoing harassment:

> On behalf of all of the female employees of [shop] 620, there is an issue of profound and obscene language being used in an excessive manner. There are several incidents stemming from profanity to obscene jokes. The word Bitch is used as common as the word hello. This language is offensive and disrespectful not only to the women but to all subject to hearing these words. This is a place of business and offensive language and behavior shouldn't have to be tolerated.

*See* Exhibit 40. The complaint was copied to multiple supervisors: Pesck; Wilkins; Carson; Sutton; Spruill; Rick Scott; Michael Patterson (Union President); Mark Holt; and Walker.

154. Following the complaint, in or about November 2012, Ms. Aviles returned to her car in the same space she usually parks in the BAE lot, and found someone had let the air out of two of her tires. On January 3, 2013, Ms. Aviles parked her van in the same spot. When she returned, she found it had been keyed. Ms. Aviles filed a statement with Human Resources requesting access to security video be made available so that she could determine who was damaging her vehicles. *See* Exhibit 41.

155. On or about January 15, 2013, Ms. Aviles filed another written complaint concerning gender based harassment:

On January 3, 2013 I was on the job, and a new male employee who recently came into the shop started talking with me. I don't know his name, but he is a contractor. He started using all kinds of offensive language like "bitches." I told him I don't want him to say those things. He said, you can't tell people what to say out their mouth. I told him yes you can, because there is a policy against saying those things. I want my coworkers to be informed that they can't make offensive sexist remarks at work. I have already complained on several occasions about hearing offensive statements about women at work. For example, On October 26, 2012 I submitted a written complaint about employees using discriminatory sexist language like the word "bitch," making obscene jokes, and making other statements which are disrespectful to women. Despite my complaints nothing has changed and I still hear discriminatory things just as frequently as before. I do not want to have to hear these things in the workplace anymore.

*See* Exhibit 42.

156.    In or about April 2013, Ms. Aviles filed a written complaint concerning harassment, including specific actions by her coworker Kenneth Adams:

My name is Janet Aviles....I have been an employee of BAE....systems (Norfolk) ship repair over 25 years and this my formal written complaint on these issue discrimination harassment and a hostile working environment, to which I have been subjected to. [W]orking here at BAE I have file numerous complaints about the way I'm treated here only because I'm a female. My latest complaint was on 3-28-13. And it was or is on co-worker Kenneth ("Sam") [A]dams.... Sam don't like to work with female....I ask Sam had he been using my lines, he said yes, I ask him if he could put them back once he's done with them and if that's not possible please lower them so I can reach them. He told me to get a ladder. I said no shouldn't have to they are my lines. I said Sam just work with me he said "ok." The next morning I notice all my lines had been cut down even the hooks that held them up were cut off. I informed John Pecsek & William Wilkins ("Bam")....[who are t]he shop supervisors what was going on. They said that they would have a talk with him.

[] The next morning which was 3-29-13 I ask Bam (Mr. Wilkins) had they talk to Sam. He said yes. He was told to stay out of my work area. I told Bam I guess he did not get it because my lines were down my ID ring, chair and jacket was missing my welding line was also disconnected. I would like to note [that] Kim Davis from 07 shop had walk with me to the shop (620) on this morning and I showed Kim what Sam had been doing to me I showed her how he cut the hooks on my side. [emphasis original] I then again I informed John & Baz. Bam response was I don't [know] why Sam is doing that to you and that it's between you and Sam. [emphasis original] I ask Bam was he for real. I'm coming to you as my supervisor. I could not believe he said that my supervisor wanted me to solve the problem myself. I look at John and he told me not to talk with Sam that he would....

[] I guess the talk [with] John wasn't enough because this man was back in my work area.

29

I talk with Bam. Sam told him that my stuff was in his way. Bam told Sam if it's in his way then he could cut it down. Again I ask Bam are you for real what's in his way. That's when I called Mike Patterson Union President Local 684. I ask him if he could come to 620 Mike then called Allen Walker & Terry from Human Resource. [emphasis original] I have spoken to the proper supervision and nothing has been done to this man. I had no other choose [sic] but to file a grievance. The answer I get back from grievance was no violation. This has cause emotional strain on my heart as before and to make matter worst Sam has a petition going around saying bad things about me and asking my coworker to sign it when will it end. No one should have to endure this type of abuse at their work place.

See Exhibit 43. The letter was copied to Craft Shop Manager Spruill, Alan Walker, Patterson, and BAE Systems Headquarters.

157.   The grievance Ms. Aviles described in her complaint was filed on April 3, 2013, and the decision finding no violation was issued by Pesck on April 8. See Exhibits 44, 45.

B.   Failures to Promote

158.   When Ms. Aviles began working in the Plate Shop in December 2000 as a First Class Helper, she had barely progressed within BAE since her hire in 1988 as a Second Class Laborer. She had been stuck in the lower echelon so long that she had maxed out her pay scale.

159.   She approached her supervisor Pesck and asked him what she needed to do to move to the next step. Pesck outlined training Ms. Aviles needed to undergo. Ms. Aviles completed all of the training Pesck had listed, and again sought a promotion.

160.   However, Pesck once more told her she did not qualify. Pesck told Ms. Aviles that someone had to recommend her for a raise, and stated that no one had ever done so.

161.   Ms. Aviles was also repeatedly told that she could not be promoted because there needed to be an opening at the next level. However, Ms. Aviles's male coworkers regularly received promotions regardless of openings at the next level.

162.   In or about 2003 Ms. Aviles applied to become a First Class Handyperson. Her request for promotion was denied. Ms. Aviles was told she had to wait one year before becoming

eligible for promotion to First Class Handyperson.

163.    However, her male coworkers were not required to wait a full year.  For example, Ms. Aviles's male coworker Todd Wells was promoted from Third to First Class Handyperson over a period of six months. That same advancement would take Ms. Aviles two and a half years.

164.    It became clear to Ms Aviles. that she was not going to be promoted because she was a woman. BAE mangers openly stated that women belonged at home, not in the shipyard. All BAE managers and supervisors were men. And she needed a recommendation from one of them; meeting the skills requirements was not enough.

165.    When she finally had a chance to bring her concerns to the head of BAE, Bill Clifford, BAE's President, in sum and substance he told her he wouldn't help her.

166.    Ms. Aviles adopted a strategy of forcing Defendant to defend its bigoted promotion practices though the grievance process, and later before the EEOC. Like her co-Plaintiffs, she found that the only way a woman could advance was by placing the relevant facts in glaring daylight, and effectively shaming her employer. Over the years, Ms. Aviles realized that there was no requirement in the Collective Bargaining Agreement that candidates for promotion obtain a supervisor's recommendation. She made this point in every grievance hearing, and eventually she was successful, but BAE managers continued to use this non-existent requirement as a pretext to deny her and others promotions.

167.    In or about 2004 Ms. Aviles was a First Class Handyperson. She asked Lindsey Copeland, then-foreman of her shop, what she must do to be promoted to Third Class Mechanic, and eventually First Class.  Copeland told Ms. Aviles to enter the apprenticeship program. Ms. Aviles told Copeland that she did not want to go back to school, and should not have to do so to be eligible for promotion.

168.    Ms. Aviles was aware that Mr. Rollins in her shop, who had been a First Class Mechanic for years, could not read blueprints. To this day there are male fitters who cannot read blueprints. Nonetheless, on September 27, 2004, Ms. Aviles began the apprenticeship program her employer required that she take in order to advance. She was promoted to Apprentice upon entering the class.

169.    On July 25, 2005, BAE demoted her to First Class Handyperson, purportedly because she had failed academically. In fact, Ms. Aviles was already reading blueprints before she started the class.

170.    On August 3, 2005, Ms. Aviles filed a grievance alleging that she was qualified to be promoted to Second Class Mechanic. *See* Exhibit 46.  On September 26, 2005, while her grievance was pending, BAE promoted her to Third Class Mechanic, conceding that her demotion, rather than promotion, was unwarranted.  By letter dated October 5, 2005, BAE claimed Third Class Mechanic was the appropriate rank for Ms. Aviles, and denied her grievance. *See* Exhibit 47.

171.    So went her long struggle against gender discrimination at Defendant. Every advance had to be won through a grievance, or an EEOC filing, and all the while, she watched less qualified men promoted ahead of her, by an exclusively male management. As a result of BAE's refusal to evaluate her based on her abilities, she was forced to take a confrontational approach to promotion with the all male supervisors who had the power to promote her. Consequently, she was unable to muster the required subjective recommendations that BAE arbitrarily requires, which further hindered her progress.

172.    Notwithstanding her obvious ambition and drive to improve herself, after 25 years of service, Ms. Aviles has yet to achieve even a low level supervisory position, while dozens of

less ambitious men who were hired after her are now supervising her, and others.

173.    On or about October 9, 2006, Ms. Aviles filed a grievance based on the company's failure to promote her From Third to Second Class Mechanic. *See* Exhibit 48. A hearing of Ms. Aviles's promotion grievance was held on or about January 11, 2007. By letter of January 16, 2007, Labor Relations Manager Ron Rusnak ruled upon the grievance. He claimed that Ms. Aviles had "failed to successfully complete the [apprenticeship] program [in 2004] due to unsatisfactory academics." *See* Exhibit 49. He further wrote that "the biggest area of concern expressed in a meeting in 2005 was in Ms. Aviles' ability to read blueprints. It was shared in this meeting that she had taken a college course on the subject and had failed to make a passing grade." *Id.* Rusnak concluded that Ms. Aviles would be given a 90 day trial period performing the tasks of a Second Class Mechanic, and that "[a] satisfactory evaluation will result in promotion to 2nd Class at the completion. Failure to perform satisfactorily during this 90 day period will require Ms. Aviles to remain at the classification of 3rd Class for at least a year from that date." *Id.*

174.    On or about July 31, 2008, Ms. Aviles filed an EEOC Charge alleging, inter alia:

...I believe I was harassed and denied equal overtime and shift assignments in violation of Title VII of the Civil Rights Act, and the Virginia Human Rights Act....because of my sex, female and I believe I was retaliated against....because I complained about the sex discrimination,

I believe that I and other females have been denied promotion to a higher Class in violation of Title VII and the Virginia Human Rights Act....

*See* Exhibit 37.

175.    On or about September 22, 2008, Ms. Aviles filed a grievance complaining of discrimination in allotment of overtime hours. *See* Exhibit 50. On or about October 21, 2008, Walker denied Ms. Aviles's grievance (#2008-0009) for overtime, stating that it was "reasonably

divided" among the employees. *See* Exhibit 51.

176. On or about February 2, 2009, BAE agreed to compensate Ms. Aviles for fourteen hours of overtime she had sought in her grievance #2008-037. *See* Exhibit 52.

177. On or about February 18, 2009, Ms. Aviles filed a grievance seeking promotion to the next job classification. *See* Exhibit 53. On or about April 15, 2009, Ms. Aviles was promoted to First Class shipfitter, "effective March 2, 2009." *See* Exhibit 54.

178. On or about February 4, 2011, the EEOC announced it had found probable cause to sustain Ms. Aviles's charge of discrimination. The EEOC offered the parties a Conciliation Agreement. *See* Exhibit 1. Caught red handed, BAE agreed to pay Ms. Aviles compensatory and punitive damages totaling $10,000. It also agreed to pay her the average amount of overtime granted to male employees that Ms. Aviles had been denied. BAE agreed to provide Ms. Aviles forklift training, and conduct $5,000 worth of training regarding Title VII violations for management and non-management employees. Id.

179. The Conciliation Agreement provided that BAE would "fully comply" with Title VII in the future. BAE agreed that "appropriate action will be taken and measures adopted to ensure there will be no recurrence of the violations of the law found in this matter." The EEOC would review BAE's compliance and would have the sole right to determine whether BAE had complied with the terms. Id.

180. On or about March 4, 2011, Ms. Aviles filed a grievance complaining of BAE's failure to post a loft position. *See* Exhibit 55. On or about March 18, 2011, Ms. Aviles filed a grievance for loss of overtime. *See* Exhibit 56.

181. On or about May 6, 2011, Ms. Aviles filed a grievance for failure to promote. *See* Exhibit 57. A hearing was held on June 9, 2011. By letter of February 3, 2012, Labor Relations

Manager Alan Walker denied Ms. Aviles's promotion grievance, listing "[a]reas that should be targeted for improvement to be considered for promotion[,]" including "teamwork." *See* Exhibit 58.

182.    In or about January or February 2012, a sign-up sheet was posted in the shop for employees to sign in order to be considered for a Leadperson position. On or about February 17, 2012, after the sheet had been posted several weeks, Ms. Aviles signed it. At the time she signed, she saw that there were only two other signatures. One individual had signed as "007 James Bond," as a joke; the second, Jake L. Knox, had subsequently crossed out his name. *See* Exhibit 59. Later Ms. Aviles observed that supervisor Billy Wilkins had signed the bottom of the sheet, and shortly thereafter the sheet was removed.

183.    Ms. Aviles was not given the Leadperson position.

184.    On or about February 23, 2012, Ms. Aviles filed a grievance complaining of gender discrimination, based upon the leadperson sign up sheet incident. *See* Exhibit 60.

185.    Ms. Aviles's supervisor Billy Wilkins granted Ms. Aviles's male coworkers' requests for overtime hours, but did not grant equivalent overtime to Ms. Aviles despite her requests. On or about April 13, 2012, Ms. Aviles asked Wilkins why everyone who had signed up for weekend overtime work was granted the overtime, except herself. Wilkins told her it was because she could not use power tools. On or about April 16, 2012 Ms. Aviles filed a grievance for loss of overtime based upon her conversation with Wilkins. *See* Exhibit 61.

186.    Ms. Aviles had again filed a grievance seeking promotion to Specialist on or about April 10, 2012. *See* Exhibit 62. A hearing was held on or about June 12, 2012. On or about August 21, 2012, the company responded, stating only that "John Pecsek stated that improvement has been noted in the past year. To date *no supervisory recommendations for*

35

*promotion have been made* and but [sic] Aviles does not meet the skill expectations of a specialist at this time." *See* Exhibit 63.

187.   On or about September 5, 2012, Ms. Aviles filed another grievance based upon the company's failure to promote her, citing Article IV, Discrimination. *See* Exhibit 64.

188.   Ms. Aviles was promoted to specialist in or about October 2012.

189.   This action followed.


## II. STEPHANIE JACKSON

190.   Stephanie Jackson is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a First Class Mechanic Electrician.

191.   She was hired in 1986 as a Trainee Electrician, and in 1993 was promoted to Second Class Mechanic Electrician. In or about 1993 or 1994 she was promoted to First Class. Ms. Jackson went through BAE'S Apprenticeship Program. Ms. Jackson additionally serves as a union shop steward.

192.   Ms. Jackson was supervised by Frank Bazemore, Craft Shop Supervisor in the Electric Shop.

A. Hostile Environment

193.   Since she began working at Defendant, approximately daily, Ms. Jackson has heard male coworkers, contractors and supervisors making offensive sexual statements regarding women. Ms. Jackson hears these comments in the shop she is working in, elsewhere in the shipyard, and when working on ships. They consist of men discussing their sexual conduct with women, e.g., what they did the night before, what they plan on doing with women, unwanted vulgar invitations to engage in sexual conduct, and sexually oriented observations about the

bodies of the women with whom they work. Supervisors are frequently within hearing range of the sexual comments made by coworkers and contractors.

194.    For example, Ms. Jackson was the only female working in a trailer along with male contractors.  The male contractors were talking about a female Navy employee who had been eating a lollipop at the work site.  One of the contractors stated to another, "what else she sucking on?"

195.    Ms. Jackson often hears offensive statements from male coworkers regarding female stereotypes.  For example, such statements have included, but are not limited to, the following:

     a.    Male coworkers refer to women as "bitches" on a daily basis.

     b.    Ms. Jackson often hears comments from male coworkers such as "this is a man's world," "well, she wanted to be here, she got to carry her own weight,"and similar statements meaning that women do not belong in the workplace at Defendant.

     c.    A supervisor told BAE employee Ms. Payton to clean a ship part in a toilet in the men's restroom.  He then told Ms. Payton, "well, if you get laid off now you can get a job cleaning septic tanks."  Ms. Payton complained of the assignment to Ms. Jackson in her role as union shop steward.  Ms. Jackson reported the incident to Bazemore.  He stated that he did not see anything wrong with it.

     d.    When asked when Ms Jackson would be promoted, Bazemore stated "she needs to crawl before she walks." Mr. Chowan Dennis described the incident in writing on June 21, 2011, stating:

> ....the subject was brought up about Ms Step[hanie] getting stripes[2] to Mr
> Bazemore. The subject was dismissed in a condescending manner where he told

---

2  Because of the striped hats worn by supervisors, "having stripes on one's hat" is the colloquial term used by employees to refer to being in a supervisory position.

Ms. Step[hanie] she needed to "craw [sic] before she could walk" and he would
see.

*See* Exhibit 65.

e.    In 2010, Bazemore attended a meeting of the Evaluation Committee.  Following

the meeting, a member of the employee informed Ms. Jackson that Bazemore had made

unfounded negative and derogatory comments regarding herself and her performance.  When Ms.

Jackson confronted Bazemore about his comments, he merely stated "I thought that what was

said in the evaluations was confidential."

B.  Discriminatory Failures to Promote

196.    Ms. Jackson was Crew Leader on a ship in or about 2010 for approximately one

year.  After work on the ship was complete, Ms. Jackson was moved to another ship to serve as

Crew Leader.  When work slowed, several Crew Leaders were demoted out of that position,

including Ms. Jackson.

When work picked up again, all of the other individuals, all men, were restored to their Crew

Leader positions.  Ms. Jackson was not.

197.    In or about June 2011, Ms. Jackson learned of an open Apprentice Instructor

position.  This position is supervisory, and only First Class Mechanics are eligible for the

promotion to that role.

Employees could sign up on a sheet hung in the workplace to be considered for the Apprentice

Instructor promotion.

198.    On or about June 29, 2011, Ms. Jackson signed up.  Only two other employees

signed the sheet on that date: Mr. Antonio Mirabel and Mr. Winston Dillard, both only Second

Class Mechanics.  *See* Exhibit 66.

199.    Paul H. Davidson, the employee who previously held the Apprentice Instructor

role, described in writing on July 5, 2011, what followed:

On Friday, July 1, 2011 around 8:30am I was informed by Frank Bazemore the Craft Supervisor that he wanted me to sit down for about an hour and discuss the duties of the Apprentice Instructor with employee Mirabel. .... I informed Bazemore that if he was to be my relief, he (Mirabel) needed to be at least a first class or a lead three to be eligible to replace me. I also stated that Mirabel being a Second class Mechanic was not eligible. Bazemore stated "That has already been resolved." He also informed me that after I spoke with Mirabel that they would be going over to HR and talking with Alan Walker.

I sat down and went over some of the criteria and responsibilities with Mirabel for about an hour or so. He seemed interested, but was [not] quite sure if he wanted the position. I don't think he fully realized the full requirements of this position. He told me he would have to think about taking the position.

....As of today, no official name for turnover has been put forward. However, I get the full impression that Mirabel has already been decided upon since according to Bazemore's statement the situation with him not being at least a first class mechanic had already been resolved. The reason for this assumption is Bazemore never asked me to sit down with Ms. Jackson, who also signed up for the position, and go over the job requirements with her.

*See* Exhibit 67.

200.    Ms. Jackson, who had 15 years of experience at BAE, and was a First Class Mechanic, was denied the promotion. It was instead given to Mr. Mirabel, who had only worked at BAE for approximately three years, and did not have any experience in shipboard repair, although instructing workers in that area was part of the job.

201.    Ms. Jackson learned that Bazemore had recalled Mirabel back to the Electric shop to sign up for the position even though he had been loaned out to work in Quality Assurance. Bazemore had promoted Mirabel from Second to First Class Mechanic in order to make him eligible for the Apprentice Instructor position, and then immediately promoted him to that position, all at the same time.

202.    On or about July 20, 2011, Ms. Jackson filed a union grievance alleging "discrimination/promotion" based upon Bazemore's denial of the promotion. *See* Exhibit 68. On or about November 1, 2011, a grievance meeting was held and attended by Ms. Jackson,

Bazemore, and Alan Walker, Labor Relations Manager.  During the meeting, Ms. Jackson asked

Bazemore, "what do you mean I have to crawl?" in reference to the comment he had made.

Walker stated "oh, he means you aren't seasoned."

203.    Ms. Jackson's grievance was denied.  By his letter of February 3, 2012, Walker

stated:

> The most recent comment "crawl before you walk" was explained as more "seasoning"
> (experience) was needed before promotion.  There was also significant discussion on the
> shop's failure to promote Jackson recently (Crew Leader and Apprentice Instructor) and
> past incidents (Bazemore and Jackson).....In these instances, she was "passed over" for
> employees that management determined were better suited due to experience (CGs) and
> interpersonal skills....Based on the above information, the grievance for promotion and
> harassment is denied.

See Exhibit 69.  Walker told Ms. Jackson that she could instead have a position as Crew Leader,

and that she should just write her name on the list to be considered for a Crew Leader position

whenever the list was posted, and then give Walker a call. However, Crew Leader is a  temporary

position that is coterminous with BAE's work on a particular ship.  It ranks below, and is not

equivalent to, the position of Apprentice Instructor, which is permanent.

204.    Following the denial of her grievance, Ms. Jackson spoke again with Walker and

advised him that Mirabel, who had obtained the promotion to Apprentice Instructor, did not have

any experience in shipboard repair, although instructing workers in that area was part of his job.

Walker merely stated, "well, management made the decision."

205.    Management's refusal to promote Ms. Jackson was motivated by its

discriminatory belief that women do not belong in supervisory positions. Ms. Jackson filed an

EEOC Charge concerning the discriminatory denial of the promotion on or about March 23,

2012. See Exhibit 14.

### III. JAMIEKA BROWN

206.   Jamieka Brown is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a First Class Handyperson in the Pipe Shop.

207.   She was hired in or about March 2006.

208.   Ms. Brown's Craft Shop Supervisor was Eric Mallett.   Other supervisors were Victor Manuel, Barry McCoy, and Tony Featherstone.

A. Hostile Environment

209.   Beginning a few months into her employment, intensifying in 2007, and continuing through the present, Ms. Brown heard offensive sexual comments from her male coworkers and contractors on average approximately every other day.   Examples of such comments include, but are not limited to, the following:

a.   "Can I take you out?"

b.   "You shouldn't work weekends, I can pay you for your days off."

c.   "You're sexy."

d.   "I can imagine how you look without your work clothes on."

e.   "Oh, I fucked her so good last night."

f.   "She sucked my penis for $50."

g.   "You need some money, you can come and meet me after work."

When she heard such comments, Ms. Brown would reply with statements to the effect of: never, get lost, I don't do things like that, I come here to work, or I don't feel like hearing that today. She would then walk away to escape the comments. These comments were frequently made close enough to supervisors that the supervisors heard them.

210.   Beginning in or about 2007 and continuing to the present, Ms. Brown's supervisor Victor Manuel makes sexually offensive comments on average a couple times per month,

including, but not limited to, the following:

a.       Manuel asks Ms. Brown to come into his office, stating that he has some lotion and needs a massage.

b.       Manuel tells Ms. Brown "let's get off early" and suggests they engage in intimate acts

211.    Beginning in or about 2007 and continuing through 2008, Ms. Brown's supervisor Barry McCoy propositioned her regularly, making statements including, but not limited to, the following:

a.       Approximately a year into her employment, Ms. Brown asked McCoy for a one-year raise, since she had not received a six-month raise since becoming employed at BAE.  In response McCoy told Ms. Brown "let me bring you whatever you need for you and your kids."

b.       McCoy would ask Ms. Brown "can we go out sometime for drinks and meet up?" He would promise to speak with union president Mike Patterson about getting Ms. Brown a raise.

c.       McCoy told Ms. Brown, "I can help you, let's meet at the mall, I can buy your kids school shoes."

212.    During this time Ms. Brown was assigned to work with McCoy in his trailer.  She felt uncomfortable due to his comments, and worried about what he might do.

213.    Tony Featherstone, a supervisor, and Mr. [FNU] Anderson, a supervisor, were at times present and heard McCoy's offensive comments.  They would respond by laughing with McCoy.

214.    Ms. Brown asked McCoy to reassign her to work on a ship with the other workers, rather than in the trailer with McCoy.  However, he denied her request, claiming that "right now

we don't have anyone for the trailer job."

215.   Ms. Brown informed Tony Featherstone that she did not want to work in the

trailer, and requested that he reassign her to a job on on a ship.  However, Featherstone told her

"you have to ask McCoy."  Ms. Brown continued complaining to McCoy that she did not want to

work in the trailer and requesting to return to the boat.

216.   Supervisor John Blake called Ms. Brown back to work on a ship in the yard.

217.   In or about summer 2011, Ms. Brown's then supervisor Mr. Howard sent her a

series of Facebook messages requesting to take her out for drinks, to the effect of: "you know

you're sexy, let me take you out."  Ms. Brown told Howard that she would not go out for drinks

with him.

218.   Beginning in or about 2011 and continuing to the present, Ms. Brown's supervisor

Wendall Baynard made inappropriate sexual comments to Ms. Brown including, but not limited

to, the following:

a.   "Let me see your sexy body . . . I want you so bad."

b.   On several occasions Baynard attempted to grab Ms. Brown's arm.

c.   Baynard repeatedly asked Ms. Brown to meet him outside of work.

219.   Ms. Brown responds to Baynard's requests by telling him "no," but he continues

making the offensive comments.

220.   Ms. Brown's coworker Larry, nicknamed "Rock," made offensive sexual

statements towards her approximately every other day.  His statements included, but were not

limited to, the following:

a.   Rock stated, "hey, look at all that ass you have in those pants, let me unzip my

pants and stick it in there and show you how good you can feel, show you how to do it the right

way."

b.      Rock grabs his crotch and makes statements such as "here, get up on this."

221.    Rock often makes offensive statements loudly, and the supervisors who overhear him laugh. Rock at times makes such statements while Barry McCoy, the lead supervisor, is present, and McCoy hears the statements.

222.    Ms. Brown's male coworkers additionally would physically touch her from time to time. She was touched on occasions including, <u>but not limited to</u>, the following:

a.      A coworker grabbed Ms. Brown's arm and attempted to pull her back while she was walking to a boat.

b.      Ms. Brown felt a coworker touch her leg.

223.    When Ms. Brown asked who touched her, her male coworkers refused to tell her who did it.

224.    In or about December 2012, Ms Brown made a written complaint to Human Resources employee Sharon Debord:

> A few weeks ago in late November, I was walking out of the #1 drydock at around 2:00 in the afternoon with a contractor named Ronnie. We were talking about the mega millions lottery drawing that would happen the next day. I said to Ronnie that the drawing was for a lot of money. Ronnie said, "yeah, if I hit the mega millions you can come vacuum for me." I said, "vacuum for you? What do you mean, like work for you?" He said "no I mean I can use you as a vacuum, you can suck me off." He laughed about what he had said. I was extremely offended.
>
> This is not the first time something like this has happened: I have heard offensive comments like Ronnie's from co-workers and contractors at least two or three times a week for the whole time I have worked here, including sexual comments and comments about women not belonging in the workplace. I have also complained about comments like that. Most recently, I complained to Human Resources because my supervisor called me a stupid ass woman. Nothing has been done in response to that complaint. I do not want to have to hear offensive comments from men while at work.

Debord read it, handed it back and refused to accept it.

225.    Ms. Brown's supervisors made comments regarding their belief that women do not belong in the workplace at BAE.  For example, in or about 2006, not long after she began working at BAE, Ms. Brown's supervisor James Christian stated to her male coworkers that: "the only place for women is to be pregnant, home and in the kitchen."

B.  Discriminatory Failures to Promote

226.    Ms. Brown was not promoted from the beginning of her employment in 2006, until 2010, despite being qualified to move up to the next job classification, and despite her weekly requests to be considered for a promotion.

227.    In or about 2007, Ms. Brown asked Mallet and McCoy about two pipe planner positions she had seen posted in the shop. They told Ms. Brown that those jobs were taken, and that "you need a degree" to hold those positions.  Ms. Brown told them she was in the process of getting a degree, to no avail. The men who subsequently got the positions did not hold degrees.

228.    In 2011 Mr. Baker, a new supervisor, put Ms. Brown in for a raise.  She was promoted to Second Class Handyperson in or about January 2011.

229.    Approximately a year later in 2012 Ms. Brown sought a promotion to Third Class Mechanic, a position for which she was well qualified, and which was available.  She was denied the promotion, which on information and belief went to a less qualified man.

230.    In or about Spring 2012, Ms. Brown and co-plaintiff Sheila Fields sought promotions to two available Third Class Mechanic openings, for which both were qualified, and which were available.  The positions were given to less qualified men, Langevin and Ayers.

231.    In May Ms. Brown filed a grievance. Mallet recommended denial of the grievance on the grounds that Ms. Brown and Plaintiff Fields had not completed their trainee books and received recommendations from supervisors:

45

....Letter of recommendations [sic] from supervisors to promote to 3rd class [Ms. Brown's male coworkers] Langevin and Ayers,, [sic] no recommendations for [Plaintiff Sheila] Fields or [Plaintiff Jamieka] Mitchelle[-Brown].

[Jamieka] Mitchelle[-Brown] has no supervisor recommendations, no progress in trainee plan to advance to Handyperson 1st class, failed to bring any trainee book nor note books that was [sic] requested last week, nor any documents to support the college claim.

<u>My recommendation is to **NOT**</u> to [sic] promote either employee until they complete TRAINEE book to document their knowledge of pipe fitting and are recommended by their supervisors. (*all emphasis original*).

*See* Exhibit 70. Her grievance was denied. *See* Exhibit 71. However, Chris Ayers, mentioned by Mallet, had not gotten his booklet filled out, and had only been working at BAE for a year, when BAE promoted him.

232.   By grievance dated February 28, 2013, Ms. Brown renewed her prior grievance. When she gave the grievance to Mallet, he looked at her and then yelled "you will not get third class until you fill out the booklet."

233.   T.J. Pietrantonio, a man, was promoted to Third Class Mechanic without having his booklet filled out, and with less experience, fewer qualifications and less time working at BAE than Plaintiffs Brown and Fields. Another man, Jay Moore, was hired directly into the position of Third Class Mechanic, with less experience and fewer qualifications than Plaintiffs Brown and Fields.

## IV. SHIELA FIELDS

234.   Sheila Fields is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a Third Class Mechanic in the Pipe Shop.

235.   Ms. Fields was hired in or about March 2007, and worked in the Labor Shop as a Firewatcher. In or about summer 2008 she was moved to the Pipe Shop.

236.   Ms. Fields is supervised by Eric Mallett, Craft Shop Supervisor for the Pipe Shop.

A. Hostile Environment

237. Beginning when she began working in the Pipe Shop in 2008, and continuing to the present, Ms. Fields experienced offensive sexual conduct and heard offensive sexual language from male coworkers and contractors, and offensive language based on stereotypes of female behavior, approximately daily, including, but not limited to, the following:

a. Men comment on Ms. Fields's body and stare at her.

b. Male contractors and coworkers make unwanted advances to Ms. Fields.

c. Male workers will catcall Ms. Fields, and if she does not want to talk to them, they often yell something to the effect of "fuck you then, bitch."

d. Male workers make comments regarding women's bodies, such as: talking about a "girl's big titties," how "big her butt is," stating that they "didn't mess with a girl," and "how bad her cookies was."

e. Male workers use the words "pussy" and "bitch."

f. Male workers comment on the bodies of women walking past or make sexual comments about them, saying things such as "damn, look at that shorty."

238. Supervisors are present walking around in the yard while Ms. Fields hears such comments, and hear some of the comments.

239. Ms. Fields hears offensive comments regarding women not belonging in the workplace from male coworkers and supervisors, including, but not limited to, comments such as the following:

a. In or about July 2012 Albert White, a weld supervisor, was talking about women and men working in the shipyard. He stated "women should be home cooking my dinner while I'm out working."

b.      In the labor shop during summer 2012, a group of coworkers were conversing during lunch time. A male welder stated "a woman should be home pregnant and barefoot, a shipyard ain't no place for a woman to be working."

c.      In the shipyard in or about May 2012, a male fitter stated that "if it was up to me, a woman would never be able to work period, a woman should stay home."

B. Discriminatory Failures to Promote

240.    When Ms. Fields applied for a position at BAE, she applied to work as a fitter in the Pipe Shop.

241.    However, when she was hired, she was instead placed in the Labor Shop, where she was required to work for 90 days.

242.    Following the 90 days Ms. Fields requested from Human Resources, and received, a transfer to the Pipe Shop. She entered the Pipe Shop as a Third Class Helper.

243.    Ms. Fields became eligible for and sought a promotion to Second Class Helper after 60 days in the Pipe Shop. However, she was not promoted. Ms. Fields filed a grievance in or about summer 2008 seeking her promotion.

244.    No meeting was held about Ms. Fields's grievance, but she subsequently received the promotion. Each time Ms. Fields became eligible for and sought a promotion from Craft Supervisor Mallett, she was not promoted until she had filed a grievance. She was forced to do so for her promotions to First Class Helper, and Third, Second, and First Class Handyperson.

245.    Plaintiffs are aware that male employees reporting to Mallet have not had to file a grievance to receive every one of their promotions, because Plaintiff Janet Aviles is the shop steward who would have submitted their grievances.

246.    In or about mid-2012, Ms. Fields became eligible for and sought promotion to

48

Third Class Mechanic, a position for which she was qualified. Mallett told Ms. Fields that she had to take a training class to be eligible for promotion to Third Class Mechanic. However, the class in question was only designed for workers seeking promotion to positions up to First Class Handyperson. It was therefore inapplicable to the position Ms. Fields sought.

247. Mallett additionally gave Ms. Fields a booklet which he said she was required to complete to be eligible for promotion to Third Class Mechanic. After completion, the booklet had to be signed by a supervisor and a mechanic.

248. To complete a latter portion of the booklet, the worker had to take a class to learn to bend pipe. Night shift workers could take this class on the clock, but day shift workers, including Ms. Fields, were required to take this class off the clock. Ms. Fields observed that her male coworkers did not attend this class, and received their promotions. Therefore, she did not attend the class either.

249. Ms. Field's male coworkers, including "TJ" Pietrantonio and Chris Ayers, were not required to turn in this booklet to receive the same promotion.

250. Mallett also told Ms. Fields that she had to turn in recommendations from supervisors. However, Ms. Fields's male coworker "TJ" Pietrantonio was not required to turn in letters of recommendation to be promoted.

251. Ms. Fields's male coworkers "TJ" Pietrantonio and Chris Ayers both received promotions, although they were less qualified, and had less seniority at BAE than Ms. Fields.

252. "Jason," another male coworker, was hired in or around late 2010 as a Third Class Handyperson, and had been promoted to First Class Mechanic by summer 2012.

253. Ms. Fields again did not receive the promotion, and she filed a grievance on that basis. On or about August 14, 2012 a grievance meeting was held and attended by Eric Mallett,

"Terry" (Human Resources), Jim Savage, and Barry McCoy.  Union president Mike Patterson attended with Ms. Fields.

254.   At the meeting, the Human Resources representative asked Mallett why Ms. Fields had not been promoted. He repeated his claims in the memo *supra*. During the meeting, Ms. Fields asked Mallett why TJ Pietrantonio got his promotion with only one year of work experience at BAE, while Ms. Fields was unable to get hers despite over five years of experience at BAE. Mallett had no answer.

255.   Plaintiff Brown had previously told union president Mike Patterson about TJ Pietrantonio and Ayers's promotions. Mallett had previously claimed that the two male workers had previous pipe fitting experience that justified their promotion over Ms. Brown and Ms. Fields, who had more seniority. During the meeting, Patterson told Mallett, "I'm asking you again to show me documents showing they [TJ and Ayers] have previous pipe fitting experience." Mallett could not produce any proof supporting this claim.

256.   On or about August 14, 2012, Aaron Brown, one of Ms. Field's immediate supervisors, emailed Mallett stating:

> I have worked Mrs. Fields-2915 and she always accomplished the tasks that I gave her she was starting to understand the prints. [sic]  I have given her small jobs on her o[w]n and she had no problem getting them done.  I have observed Mrs. Fields practice braze and I think she could pass the brazing test and with that I would be willing to recommend her for third class pipefitter. *We all had to start some where* [sic]. [italics added]

*See* Exhibit 72. A couple days after this meeting, Mallett sent out an email specifying that Plaintiff Brown and Plaintiff Fields were not to be promoted due to not turning in their notes, booklets, and letters of recommendation.

257.   A couple weeks after the email, and without explanation, a large number of employees were promoted including Ms. Fields.

## V. ALFREDA DUPREE

258.    Alfreda Dupree is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a First Class Mechanic in the Sheet Metal Shop. Ms. Dupree was hired in or about August 1986, and initially worked in the Labor Shop. In or about 1999 she was moved to the Sheet Metal Shop.

259.    Ms. Dupree is supervised by Anthony Smith, Craft Shop Supervisor for the Sheet Metal Shop.

A.    Hostile Environment

260.    Ms. Dupree heard offensive sexual language from male coworkers and contractors approximately daily, including, but not limited to, the following:

a.    Approximately daily, male workers make comments on women walking by, to the effect of "ooh, I'd like to have that."

b.    On March 28, 2013, Ms Dupree found in her workplace an offensive cartoon picture of a woman, nude, with the image of Bart Simpson trapped in her rear cleft. It carried the caption: Crack kills. *See* Exhibit 73. Ms. Dupree made a written complaint to Ms. Kight in Human Resources which stated:

> On March 28, 2013 in the afternoon, I found an offensive picture propped up against a board in the back of the sheet metal shop. It was on the fourth table. It was a picture of a woman with a cartoon character coming out of her nude rear end, and it said "crack kills." You can tell the person in the picture is a woman because of her hair. I took this picture and made a copy of it, which I am including with this letter. It is offensive to women to have this kind of picture displayed at work. I would like to know who put this picture up and I do not want to have to see this type of thing at work in the future.

261.    Ms. Dupree repeatedly hears offensive comments regarding women not belonging in the workplace from male coworkers and supervisors, and offensive female stereotypes, including, but not limited to, the following:

    a.     Comments that women are lazy, or statements to the effect of "you women don't know what you're doing."

    b.     While working on a ship, a male coworker stated "this is not a place for women."

    c.     While working on a ship, a male coworker told Ms. Dupree "well you shouldn't be here working anyway, this is no place for a woman."

## B.   Discriminatory Denial of Overtime and Retaliation

262.    In or about fall 2012, Ms Dupree filed a complaint alleging that she was being denied overtime because of her sex.

263.    In or about early 2013, Ms. Dupree submitted a written complaint to Vice President Russell Tjepkema concerning retaliation for her complaints of discrimination:

> To Mr. Tjepkema,
>
> I have several pending grievances for overtime, including discriminatory giving out of overtime based on sex. On February 1, 2013 Sandra Kight and Terry from HR called me in to a meeting, along with my supervisor Ms. Eason. Ms. Eason accused me of not getting along with others in the shop. She said I was "causing confusion and making the young people uncomfortable." I told Ms. Kight about Ms. Eason's recent comment that "you black people need to be ashamed of yourselves, always filing a grievance over overtime." I had already turned in a complaint about this comment.
>
> Ms. Kight said I had been asking others in the shop about whether they're working overtime. I told her yes, I did. Ms. Kight said, "well you made them feel uncomfortable." I said I didn't know anyone was uncomfortable and just wanted to know whether they were working overtime. Ms. Kight asked why I was asking people about overtime. But she knows why, because I have several pending grievances for overtime. Terry from HR is the one who sits in on grievance hearings, and I have also talked to both her and Sandra Kight about overtime issues in the past.
>
> I do not want to fear discipline because of complaining about discrimination in access to overtime work on the basis of my sex.

*See* Exhibit 74.

## VI. KEL SHARPE

264.    Kel Sharpe is an African-American woman currently employed at BAE's Norfolk,

Virginia facilities as a First Class Handyperson in the Insulation Shop.

265.    Ms. Sharpe was hired in or about April 2011 as a Second Class Handyperson. From in or about October 2011-December 2011, and again from in or about April 2012-June 2012, Ms. Sharpe was loaned out to the Labor Shop, where she was a Firewatch.

266.    Ms. Sharpe is supervised by Roger Gibson, Craft Shop Supervisor for the Insulation Shop, Benny Goddard and Walter Davis.

A.    <u>Hostile Environment</u>

267.    Beginning shortly after her hire, and continuing to the present, Ms. Sharpe heard offensive sexual language from male coworkers, supervisors and contractors approximately a couple times per week, including, <u>but not limited to</u>, the following:

a.    At least ten times on paydays, Ms. Sharpe's supervisor "Barry" (Shop 27) has pretended to be a "pimp" requesting money from Ms. Sharpe, who he pretends is a prostitute working for him.  For example, he makes statements to the effect of "you got my money? I'm tired of waitin' on you to give me my money."

b.    Ms. Sharpe's coworker Kenny Smith, a first class welder, made sexually offensive comments to Ms. Sharpe, for example: "what do you wear under your coveralls?  Do you have boy shorts or bikinis?"  "Tell that man to get out [of your house] cause I'm coming over."

c.    Smith on several occasions physically touched Ms. Sharpe, for example: placing himself behind her, blocking her from passage, touching her pants leg while stating "I'm coming over to your house." Ms Sharpe made a verbal complaint about Smith to her supervisor, Joe Tatum, on or about June 2012.

d.    In or about April or May 2012, a male contractor asked Ms. Sharpe if she is gay. She replied "no."  The contractor then made an approach to her, and while laughing he asked

"can we go out?" in front of another contractor.

    e.     A coworker stated "I'm not into black girls, but she has a nice rack on her."

    f.     Two female coworkers suggested to Ms. Sharpe that she should "lose the

coveralls" if she wanted to get a raise.

    268.    On or about March 15, 2013, Ms. Sharpe submitted a written complaint

concerning sex harassment to Human Resources:

> I have been hearing a lot of offensive sexual comments and comments about women from men at work. Some examples are the things I have been hearing from a man named George Killebrew who works in the weld shop. About three months ago, we were in the drydock of the USS Cook in the afternoon. I was working and Mr. Killebrew was standing around waiting. A female forklift operator drove by on a forklift, and Mr. Killebrew said to me, "I suck the hell outta her pussy." I said, "what? Why are you saying that to me?" Mr. Killebrew just laughed and said "cause I would!" He thought it was funny and was laughing. I thought his comments were offensive and stupid.

> On a Saturday sometime in the first part of December, at about 11 in the morning, I was with Mr. Killebrew around the sonar dome in the bottom of the USS Normandy. Two other younger men were there, an apprentice welder and a contractor firewatch. Mr. Killebrew was talking to them while we were all working in the same area. Mr. Killebrew was talking about a female employee in the pipe shop and called her a "bull dagger." Then he looked at me and asked if I knew what that meant. I said, "no." Then he said, "it's a dyke," and he said that the girl he was referring to had told him not to say that but instead to say "gay or lesbian." The other men there were laughing and said "why didn't you just say that." Mr. Killebrew just laughed.

> Then he said, because I can't go to work on Sunday (which was the next day), I will go out, get drunk, and find me some Jezebels. The other men there asked him what were Jezebels. Mr. Killebrew said, "Ho's." Then one of the young men there said that he needs to change all the names in his phone because he has a bunch of Jezebels in his phone. They thought it was funny.

> On December 17th, I was walking across the gangway getting off the USS Normandy to go eat lunch. Mr. Killebrew was walking behind me and lots of other coworkers and contractors were around us, coming off the ship at the same time. Then Mr. Killebrew called out from behind me, "must be your ass, because it's not your face!" I looked back at him and said "I knew that was you because you always say something stupid, you don't ever know what to say out your mouth."

> On Monday December 23rd, we were walking off the boat again. Mr. Killebrew said to me, "oh, I better watch what I say around you." I told him he needs to watch what he

says around everybody.

These are just examples of the kind of things I have to listen to at work. These comments are offensive to me. Hearing these sorts of things is not why I go to work. It's degrading to women even when it's not about me specifically. I don't want to have to hear these types of comments from Mr. Killebrew or other men at work any more.

*See* Exhibit 75.

269.     Ms. Sharpe continues to hear offensive sexual speech at work.

B.     Discriminatory Failures to Promote

270.     In or about January 2012, Ms. Sharpe complained to William Goings, her shop steward, that she had not yet received a promotion to First Class Handyperson, for which she was well qualified.  Goings told Ms. Sharpe that she should be patient, because he got a male coworker a raise.

271.     Ms. Sharpe asked Benny Goddard about getting her promotion each Monday. However, when Goddard loaned her out to different shops, she was unable to see him, which prevented her from pursuing the promotion. She learned that Mr. Goddard was loaning her out because he was prejudiced against her because of her gender.

272.     Ms. Sharpe was recommended for promotion by her first line supervisor, Walter Davis. *See* Exhibit 76.

273.     Goddard never submitted the required paperwork for Ms. Sharpe to get the promotion, even though she had a strong letter of recommendation. Goddard told Ms. Sharpe, "As long as you're in the shop you won't get a raise." He then laughed.

274.     Ms. Sharpe filed a grievance on or about April 30, 2012. She cited Article IV of the CBA, Discrimination. The basis of the discrimination grievance was that men were being promoted ahead of her. *See* Exhibit 77.

275.     In or about July 2012, a hearing was held to discuss Ms. Sharpe's grievance.

Goddard, Roger Gibson and union president Mike Patterson were in attendance. At the hearing, Goddard and Gibson told Ms. Sharpe that she could not be promoted because work was slow.

276.    One male coworker, Eugene Coffee, was hired on the same date as Ms. Sharpe; however, as of the grievance hearing he had received three promotions. During the grievance hearing, Patterson stated to Goddard, "it sounds like some sexist bullshit to me" in reference to Goddard denying Ms. Sharpe the promotion. He further stated, "you know, we've been through this before."

277.    Ms. Sharpe received a promotion on October 1, 2012.

## VII.  KIM DAVIS

278.    Kim Davis is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a First Class Mechanic in the Pipe Shop.

279.    Ms. Davis was hired in or about September 2004. When she began working at BAE Ms. Davis was a Pipe Shop Apprentice. In 2008 she became a First Class Mechanic, Night Shift. In 2010 she became a Pipefitter on light duty. From July 2012 she has been loaned out to different departments.

A.    Hostile Environment

280.    Beginning in 2004, Ms. Davis frequently heard offensive sexual language and experienced offensive conduct from male coworkers and contractors, including, but not limited to, the following:

a.    The manager who hired Ms. Davis commented, "we're not hiring you for your looks."

b.    In or about 2005 or 2006, Apprentice Instructor Tom Ehret told Ms. Davis, "you don't look like a pipe fitter, you look like a secretary." Ms. Davis reported this comment to

supervisor Aaron Brown, who took no action.

     c.     Ms. Davis's male coworkers comment daily on the bodies of women they observe walking by.

     d.     Male coworkers talk daily and graphically about women they are sleeping with.

     e.     Supervisor Aaron Brown displayed pictures of women in bikinis and thongs on his work computer screen.

     f.     Beginning in or about 2010, Ms. Davis's supervisor Barry McCoy followed Ms. Davis around in the Pipe Shop, staring at her and watching her.

     g.     In or about July 2010, Ms. Davis was removing her coveralls at the end of her shift. She noticed McCoy was staring at her. McCoy told Ms. Davis that she looked good, and then told her "I want to have sex with you." Ms. Davis was taken aback. Following Ms. Davis's refusal to sleep with him, McCoy engaged in retaliatory behavior, including writing Ms. Davis up and assigning her to tasks not in conformity with her physical work restrictions.[3] In or about 2010 Ms. Davis complained of McCoy's behavior to Human Resources representative Sandra Kight, who responded that McCoy was "not that type of guy." On or about December 1, 2011, Ms. Davis filed a union grievance alleging harassment, citing Article IV, discrimination. She asked for an end to the harassment and "work employee within restrictions." *See* Exhibit 78. On or about May 1, 2012, Ms. Davis filed another union grievance alleging harassment. *See* Exhibit 79.

     281.     On or about May 4, 2012, Ms. Davis wrote a letter to Alan Walker complaining of McCoy's behavior, including his harassing sexual statements and his retaliatory behavior. *See* Exhibit 80.

     282.     Also on or about May 4, Ms. Davis's coworker Alison Wilson wrote a statement

---

3   Ms. Davis was placed on light duty on or about August 5, 2010.

regarding her conversation with Reggie Black on May 2, 2012. Wilson wrote that:

> Reggie Black ask[ed] me (Alison Wilson) about the meeting that took place the day before between Kim and human Resources. He ask if anyone would be called over to give statement I said yes probably you he said "why." I said because you point out to Kim how Barry McCoy be looking and or watching her. Reggie said "in my opi[ni]on sexually that How Barry McCoy be watching her (Kim).["] [sic]

*See* Exhibit 81.

283. In or about July 2012, Ms. Davis was put on loan to the Crane Shop. Even while Ms. Davis was in the crane shop, McCoy would appear approximately every two weeks and stare at her. On or about September 13, 2012 Ms. Davis filed another union grievance alleging harassment. *See* Exhibit 82. On that same day, Eric Mallett issued a decision on the grievance finding "no contract violation." *See* Exhibit 83.

B.    <u>Discriminatory Failure to Train and Retaliation</u>

284. From the beginning of her employment with BAE, Ms. Davis's Apprentice Instructor, Tom Ehret, refused to train Ms. Davis in the same manner as her male coworkers. Ehret told her she looked like a secretary not a pipe fitter.

285. Ms. Davis was assigned to unrelated jobs, whereas her male coworkers were assigned to work on core tasks that would improve their pipe fitting skills, making them eligible for further promotion. Two male workers in Ms. Davis's apprentice class, Troy Aubuchon and A. Paulidis, received better work assignments than Ms. Davis, and as a result of receiving those superior training opportunities, both employees had been promoted to management positions as of summer 2012.

286. Also in reliance on Bill Clifford's announced "Open Door Policy," in 2006 Ms. Davis attempted to speak to him about the fact that she was not receiving necessary job training that her male coworkers were receiving. His response was that he did not deal with those types

of issues, and that she should speak to Ms. Kight.

287.   After her brief meeting with Mr. Clifford, BAE President, Ms. Davis complained to three supervisors concerning the lack of training. None took any action. On or about August 16, 2006, Ms. Davis complained to Human Resources representative Sandra Kight that she was not being trained in the same manner as her male co-workers.

288.   In response to Ms. Davis's complaint, Kight took Ms. Davis out of work for two weeks, and made an EAP referral. The August 25, 2006 EAP referral form issued regarding Ms. Davis stated that she was being referred due to "work performance/behavior," and indicated that Ms. Davis's "patterns of behavior" were "physical illness on the job" and "work requires unusual amount of effort." *See* Exhibit 84.  Ms. Davis was required to meet with Michael E. Nahl, Clinical Director at Personnel Assessment Systems, who purported to evaluate her on behalf of BAE.

289.   Nahl wrote a letter dated September 10, 2006, noting:

....[Davis] has received consistently good evaluations.  However, Kim has made strident complaints that there is gender discrimination in the apprenticeship program.  Her advocacy is viewed by some as inappropriately disruptive and aggressive. ....She would, I believe, benefit from counseling and anger management classes.

*See* Exhibit 85.

290.   On or about September 11, 2006, Ms. Davis was required to sign a "6 Month Agreement for Performance Behavior" setting forth the counseling requirement, and requiring Ms. Davis to "agree to avoid potential conflicts with supervisors and co-workers, including verbal and physical confrontation." *See* Exhibit 86.  It required Ms. Davis to engage in six months of counseling, from August 25, 2006 to February 2, 2007. By letter of September 14, Ms. Davis was referred to an "anger management program" for the required counseling, "due to performance and behavior in the workplace." *See* Exhibit 87. On or about September 25, 2006,

Ms. Davis left a message for Barbara Maury, EAP counselor, advising her that she wanted to select her own counseling program.

291. Ms. Davis found a private counselor. She attended sessions with him. The counselor told Ms. Davis that she was experiencing discrimination at work, did not have an anger management problem, and that she should complain to the EEOC. The counselor informed BAE that Ms. Davis was being discriminated against and should not be in anger management classes. Ms. Davis was removed from the EAP program on December 8, 2006. *See* Exhibit 88.

292. On October 4, 2006, Ms Davis made a complaint to the National Labor Relations Board against BAE. It states that she was denied training based on her sex, and that after complaining to the President and head of Human Resources at BAE, she was required to undergo counseling through an EAP program in retaliation for her complaints. *See* Exhibit 89.

293. Still not receiving the training her male colleagues were getting, by letter dated October 10, 2007, Ms. Davis made a second attempt to get help from Defendant's President, Bill Davis. Again he refused to be involved. Ms. Davis received a letter dated October 23, 2007 from Ms. Kight—the same Ms. Kight who had sent her for anger management treatment following her first complaint to Mr. Clifford—saying Ms. Kight would schedule a meeting with Alan Walker, head of labor relations, to go over her findings. *See* Exhibit 90.

294. In 2008, Crystal Swanner, a pipe fitter supervisor, gave Ms. Davis a poor performance evaluation. She said "nigger, I'm sick of you," and told Ms. Davis the poor evaluation was because she was black and female. Ms. Davis reported this to Human Resources head Sandra Kight, who investigated. She informed Ms. Davis that Ms Swanner acknowledged making the statements, but claimed Ms. Davis took them the wrong way. Human Resources took no action in response.

295.    In 2010 Ms. Davis applied for a promotion to Planner. In response, BAE told her the job had been "closed." On information and belief, BAE gave the job to a man, who quit.

296.    In 2011 she applied for a crew leader position on a ship by signing up. She got no response and was not informed who obtained the position.

297.    In or about early 2013, Ms. Davis complained about being transferred to another department, while her male coworkers received the light duty work she was requesting:

> I, Kim Davis was released from my doctor to go to the pipe shop on 1-4-13 for light duty work. Eric Mallet (Pipe shop craft supervisor) stated he did not have light duty work. So I was sent to an another dept. (Transportation in the crane dept.) But Eric Mallet finds light duty work for men. George Francis, Reginald Black and Gorden Van Allen (who just recent retired).

*See* Exhibit 91.

298.    Ms Davis has yet to receive the training received by her male colleagues.

## VIII.   RITA HOBBS

299.    Rita Hobbs is an African-American woman who was hired by BAE in 2009, and who is currently employed at BAE's Norfolk, Virginia facilities as a Second Class Helper in the Electric Shop.        300.    Bazemore is the Craft Shop Supervisor. Electric Shop supervisors reporting to Bazemore include Andre Turner, Ike Stevens, Sebastian, Jorado Cruz, Carl Frasier, James Mallet, Benny Green, Donovan, James Jones, and Antonio Mirabel.

A.    Hostile Environment

301.    Beginning in 2009 and continuing to the present, Ms. Hobbs heard offensive sexual language and experienced offensive conduct from male coworkers and contractors approximately daily, including, but not limited to, the following:

        a.    Approximately every day, male contractors and coworkers gather in groups and make sexual comments about women, such as "that girl bad."

b.     Butler, an electrician, and "Tim," another coworker, make sexual comments to females in the shop, including Ms. Hobbs. They made such comments while Ms. Hobbs worked daily in the electrical shop. After Ms. Hobbs worked in other physical locations, Butler made such comments to Ms. Hobbs approximately each time she returned to the electrical shop, which was about one to two times per month.

c.     Butler told Ms. Hobbs he would like to take her out. He then stated explicitly sexual things he wanted to do to her. Ms. Hobbs continued walking and did not respond. Tim was listening and said "Rita! Did you hear what he said?"

d.     In or about September 2012, Ms. Hobbs went to the electrical shop and encountered Butler and Tim. Butler said "mm, there she go, there she go!" and grabbed her, placing his arms around her so that she was facing towards him. Butler attempted to pull Ms. Hobbs toward himself so that her breasts would be touching him. She tried to wiggle away from him. Butler said "yeah girl, I just really want them thighs all up on me." Tim said "mm, what are you doing hugging my woman." Ms. Hobbs told Butler, "turn me loose." Butler said, "this here woman, she ain't going nowhere because I'm gonna put this tongue on her. She knows what big daddy gonna do." Tim said "you're gonna put the syrup on her?" Butler said, "yeah I'm gonna start calling you log cabin." Ms. Hobbs was then able to struggle free, and left the electrical shop.

e.     James Jones, one of Ms. Hobbs's supervisors, listens to her male coworkers while they comment sexually on women in groups, and he laughs along or joins in with the comments.

f.     On several occasions, male coworkers or contractors have grabbed or touched Ms. Hobbs. For example, some of them intentionally brush themselves up against her, and then pretend as though it were an accident. When males touch her, she tells them to stop by saying

things to the effect of "don't touch me" or "don't think you can come up and be feeling on me."

g.     In or about 2012, Ms. Hobbs's coworker Tony Brown approached her and told her "you is a sexy lady, I liked you from the first time..." She put him off, and Brown responded "oh nothing like that, I'm a happily married man." Brown attempted to touch Ms. Hobbs on her legs and back, and stated he was trying to see how soft she was.

302.    "Paula," Ms. Hobbs's coworker and a Firewatch for welders, complained to Ms. Hobbs that men in the shop were constantly making sexual comments to her, and talking about what they want to do to her. She said she got sick and tired of it, and had only been there one and a half years. She said it makes her feel very uncomfortable, and she did not know the job was going to be like that.

303.    In or about spring 2012, Ms. Hobbs told her supervisor Andre Turner that her coworker Butler was making sexual comments regarding what he was going to do to her. Turner stated, "he's always doing stuff." Ms. Hobbs told Turner, "that's why I'm coming to you, because you're a supervisor." Turner told Ms. Hobbs that if it was a continuing problem for her, "maybe you need to go ahead and file charges or do what you need to do." Turner did not say who to file charges with, nor did he state he would take any action. Ms. Hobbs is unaware of any action taken in response to her complaint.

B.     Failures to Promote

304.    When she was first hired by BAE, Ms. Hobbs was given a test for a position as Handyperson Electrician. She was never told her test results, or given a copy of the graded test.

305.    Instead of entering as a Handyperson, Ms. Hobbs was hired in as a Second Class Helper, a lower ranking position with lower pay. Ms. Hobbs had three years experience working as an electrician and should have been hired as at least a Handyperson. Bazemore told Ms.

63

Hobbs that he "needed someone for office work, so that's what I'm hiring you in for."

306.    Although her title was Helper in the Electric Shop, Ms. Hobbs was actually assigned to assist Andre Turner, such as by helping with office paperwork, assisting with timesheets, and entering data into the computer. These tasks were unrelated to work as an electrician, and therefore did not build her skills in the trade.

307.    Ms. Hobbs's supervisor Bazemore hired male employees in at a higher seniority level and pay grade than Ms. Hobbs, even though the male employees had less work experience than Ms. Hobbs.

308.    For example, Ms. Hobbs's coworker Mr. Welch entered the Electric Shop as a Handyperson, two to three seniority levels above Ms. Hobbs, who was a Helper.  However, he had never worked in a shipyard prior to beginning work at BAE, whereas Ms. Hobbs had worked in the Navy Yard for about one year, and had worked on a carrier in Newport News for approximately two years.

309.    Similarly, Ms. Hobbs's coworker "Boogie" was hired in or about 2011.  He entered the Electric Shop as a Third Class Mechanic, far above Ms. Hobbs's seniority level. However, he had never worked in a shipyard prior to beginning work at BAE, nor had he ever worked as an electrician.

310.    Ms. Hobbs's coworker "Devonte" was hired in or about 2010, and began working in the Electric Shop as a Handyperson.  At the time of his hiring he had no relevant experience.

311.    BAE at times failed to post job openings on the Human Resources board designated for that purpose, making it impossible for Ms. Hobbs and other female employees to apply for higher-level positions. For example, BAE did not post the position for which Devonte was hired. Ms. Hobbs later saw that the position was only posted on the website. Ms. Hobbs was

qualified for the Handyperson position, and would have applied for it had she known about the opening.

312.   Jay Mallett and Bazemore were aware that Ms. Hobbs was qualified for the Handyperson position, and that she wanted the promotion, but they did not consider her for it.

313.   From January 2009 through late 2009, Ms. Hobbs never received a promotion, even though she should have been considered for promotions.

314.   Ms. Hobbs's supervisor Turner submitted the paperwork necessary to seek a promotion for Ms. Hobbs. However, Bazemore denied Ms. Hobbs the promotion.  Ms. Hobbs filed a grievance seeking the promotion.

315.   In or about early 2010, Bazemore put Ms. Hobbs on loan for approximately three months. In or about mid-2010, when she returned to the Electric Shop, Ms. Hobbs began working on ships rather than in the office.

316.   After a few months' work on the ship, Ms. Hobbs developed a leg injury which prevented her from climbing up to the dry dock to work on the ship.  She explained this to Bazemore, providing him with the necessary medical documentation. In response, Bazemore put Ms. Hobbs on loan to the shipyard at Metro Machine.

317.   In or about 2010 or 2011, Ms. Hobbs applied for a promotion to a position as a shop clerk in the Machine Shop by submitting the required paperwork to Human Resources. Ms. Hobbs never heard back regarding her application.

318.   In or about 2010, Ms. Hobbs applied for a position as a Third Class Mechanic in the Insulation Shop, for which she was well qualified.

319.   When she followed up on her application, Human Resources told Ms. Hobbs that if the position was not posted on the board, it had been filled.  Ms. Hobbs never heard anything

further about her application. Ms. Hobbs learned that Bazemore, in his position as Craft Shop Supervisor, had the authority to prevent her promotion to a higher position in another shop, even if the shop to which she had applied wished to hire her.

320.    Approximately January through early March 2012, Ms. Hobbs was on medical leave from BAE. After Ms. Hobbs's return, Bazemore put her on loan to the Labor Shop, where she again worked as a Firewatch. In or about May 2012, Superintendent Cote approached Ms. Hobbs and asked why she was working as a Firewatch in the Labor Shop. She explained that Bazemore had put her on loan. Cote stated that he had requested that Ms. Hobbs serve as his assistant on the boat, and Bazemore had told him that would not be a problem, but she had never come. Bazemore had never told Ms. Hobbs that Cote had requested she work as his assistant.

321.    Bazemore discriminated against Ms. Hobbs because of her sex by denying her a position working as an electrician, which could have led to promotion.

322.    In or about 2012, Ms. Hobbs filed an EEOC charge alleging sex discrimination, stating:

> ....Although I had experience prior to being hired, a male employee was hired after me at a higher rate. I am the only female Helper in my department. During approximately 2010, I applied for the position of shop clerk, but I was not selected. I have also been denied a raise and had to go to the union shop steward to get the raise. I have complained about Mr. Bazemore but nothing has happened.

> The females in the shop went to Human Resources about Mr. Bazemore, but it was swept under the rug. Three females received raises during September and/or October 2010.

See Exhibit 2.

## IX. ANN MARIE CUTRELL

323.    Ann Marie Cutrell is a Caucasian woman formerly employed at BAE's Norfolk, Virginia facilities as a Second Class Handyperson in the Electrical Shop. She was hired in or about December 2008, and separated from employment with BAE on or about December 10,

2012.

324.    Ms. Cutrell's supervisor was Bazemore, Craft Shop Supervisor for the Electric

Shop.  Ms. Cutrell's other supervisors have included Craft Manager Eddie Goldman, William

"Bill" Scold, Kurt Barnes, Mike Walker, Electrical Superintendent Paul Stokes, Jay Beeler, Bill

Patterson, and Billy Hoenig.

A.    Hostile Environment

325.    Beginning in or about December 2008, and continuing through about December

2011, while she was in the Facilities Maintenance shop supervised by Kurt Barnes, Ms. Cutrell

heard discriminatory comments regarding the status of women at BAE.  Examples of such

comments include, but are not limited to, the following:

a.    On an occasion during the first six months of Ms. Cutrell's employment, several

employees were standing around in the morning, when supervisor Barnes commented in regards

to the women's restroom: "that was MY office before BAE had to go hire women in Shop 10."

b.    Barbara Bolden, the female employee who had been in Shop 10 the longest,

repeatedly warned Ms. Cutrell that Barnes hated women.

326.    As a part of her employment in housekeeping, Ms. Cutrell cleaned the office

building containing offices of several supervisors, including Eddie Goldman, Paul Stokes,

Hoenig, Jay Beeler, and Bill Patterson.   These supervisors had a personal bathroom in the

building.

327.    When Ms. Cutrell was first assigned to clean the building, she opened the vanity

cabinet in the bathroom to retrieve cleaning products.  She found two pornography magazines in

the cabinet.  Ms. Cutrell threw out the magazines.  However, more magazines shortly appeared in

their place.  Ms. Cutrell gave up and left them there.

328.     Beginning in or about December 2008, and continuing through about December 2011, while she was in the Facilities Maintenance shop supervised by Kurt Barnes, Ms. Cutrell heard offensive sexual comments from her male coworkers on average approximately daily. Examples of such comments include, but are not limited to, the following:

a.     Men in the shop snickered to each other and displayed sexual photographs to each other on their cell phones.

b.     In or about October 2010, Ms. Cutrell received an offensive text message from Rob Jones, a male employee who performed electrical work in the drydock department. The text message contained a moving picture of a naked woman and a naked man having sexual intercourse standing up, but the woman had a line of breasts similar to a female pig. Ms. Cutrell told Jones "don't you ever call my phone again and don't ever send me any more text messages." Ms. Cutrell showed the sexual text message to union president Mike Patterson. He did not state that he would take any action.  She also showed the text message to her female coworker Cindy.

c.     Jones frequently talked about "doing" young women and made graphic sexual comments, such as stating that he "ate up" a woman.  He discussed having sex with specific young women, such as teenagers or twenty-somethings, including his ex-wife's daughter.

d.     One of Ms. Cutrell's coworkers looked up Jones on the internet to attempt to find out whether he was a sex offender, because of his comments regarding sex with young women.

e.     Ms. Cutrell's male coworkers frequently discussed going to "the titty bar."

f.     In or about October 2010, Paul Stokes sent several text messages to Ms. Cutrell from his work-issued cell phone, stating among other things that he was "sorry to feel the way I do for you but I can not help the way I feel" and that he "feel[s] falling in love with someone is some times like being on a one way highway."

329.    BAE Vice President Russell "TJ" Tjepkema on several occasions made offensive sexual comments to Ms. Cutrell.  His comments included, but were not limited to, the following:

a.      Ms. Cutrell, who worked in facilities at the time, became acquainted with Tjepkema when she began working at BAE.  She met Tjepkema in the yard while walking. Tjepkema told her, "Ann Marie, you don't know what your long blonde ponytail does for me."

b.      When Tjepkema would see Ms. Cutrell, he would frequently ask her "when are you going motorcycle riding with me?" or "when are you going to ride on the bike with me?"

c.      While she was still working in facilities, on one occasion Paul Stokes brought Ms. Cutrell to building 620 to check on something in the building.  Ms. Cutrell and Stokes were walking upstairs in the back of the building, near Tjepkema's office, and other female employees were nearby.  Tjepkema stated to Ms. Cutrell, "I want you!" Stokes and the other employees turned to look.   Ms. Cutrell and Stokes continued walking and left the building without responding.

d.      On or about September 2, 2010, a large number of BAE managerial employees were set to hold a meeting in a trailer conference room regarding preparations for a hurricane that was forecast to arrive the following day.  Russell Johnson requested that Ms. Cutrell bring more coffee before the meeting began.  Ms. Cutrell was carrying a wrapped box of coffee while walking up the steps when she heard Tjepkema say, "Ann Marie!  Ann Marie!  Shake it!"  She turned and observed Tjepkema standing at the bottom of the stairway she had ascended, looking at her rear end.  Ms. Cutrell was angered by the comment, and said nothing, instead turning around and entering the building.  Ms. Cutrell subsequently reported this comment to Sandra Kight of Human Resources.

330.    Jesse Cohn, a government employee and shipbuilding specialist, began working at

69

BAE in or about December 2008. He worked in Building 423, in Quality Assurance. In or about late December 2008 or early January 2009, Ms. Cutrell was assigned to clean Building 423. Hoenig walked Ms. Cutrell over to show her around, and briefly explain her responsibilities. During the course of the day she met Cohn. Ms. Cutrell's coworker Reggie Byrum began using the nickname "J Dog" for Cohn, and other employees picked up on it and used it as well.

331.    Beginning when Ms. Cutrell met Cohn and continuing until the end of his work at BAE, Cohn repeatedly made offensive sexual remarks, and engaged in offensive sexual conduct, directed at Ms. Cutrell. These remarks and conduct included, but were not limited to, the following:

a.    Cohn, who was married at the time, told BAE employees in the office that Ms. Cutrell was "going to be his next wife."

b.    Ms. Cutrell saw an email in which he had described her in great detail, which Cohn had sent to a male employee urging him to ask Ms. Cutrell to date him.

c.    From in or about June 2009 forward, Cohn's behavior of "hitting on" and sexually propositioning Ms. Cutrell intensified.

d.    Ms. Cutrell's desk, paperwork, cleaning supplies, and locker were located in a large closet in Building 423. One morning Ms. Cutrell was working in this closet, and Cohn was present leaning against a large cabinet. Ms. Cutrell bent down to access her locker. When she looked up, Cohn was exposing his genitals to her. He said, "touch it, please touch it Ann Marie." Ms. Cutrell screamed, "put it away!" She was in shock. Following this incident, she tried to avoid Cohn.

e.    Regularly during approximately the next two months, Cohn groped Ms. Cutrell's crotch when she would walk down the aisle between desks.

70

f.      Cohn followed Ms. Cutrell about.  He would bring her coffee in the morning, and would be present in the parking lot where she parked.  While she collected trash in the morning as a part of her work, Cohn would drive his truck behind her, following Ms. Cutrell where she was walking, and would say "I just want to see my baby this morning."

g.      Numerous times Cohn made statements to the effect of "I want to lick your pussy" or "when can I lick your pussy."

h.      One morning Ms. Cutrell found a figurine which Cohn left for her, on top of her locker at work.  It bore the signature "♥ J Dog."  Later in the day, Ms. Cutrell encountered Cohn and he asked her "did you get your gift that I left for you?"

i.      Cohn followed Ms. Cutrell into enclosed spaces; for example, while she rolled a large trash can into bathrooms to clean them, Cohn would follow her into the bathroom.

j.      During approximately two months, Cohn relocated to NOB, and was not present where Ms. Cutrell worked.  During that period Ms. Cutrell changed her phone number so that he could not contact her.  One day at work, Cohn called her coworker Bob Buhr's phone.  In front of several other employees, Buhr called out to Ms. Cutrell that Cohn wanted to talk to her.  Ms. Cutrell was extremely embarrassed, and took the phone so as not to cause a scene.  Cohn was angry that he could not reach Ms. Cutrell since she had changed her number.  He told Ms. Cutrell that he wanted to take her out to buy her some new furniture, because he had heard she had moved.  Ms. Cutrell had never told Cohn about the fact that she had moved.

k.      After the two months, Cohn returned to working at Building 423.  When he would see Ms. Cutrell, Cohn would ask "what are you doing, trying to avoid me?"  She would say yes.

l.      Cohn left trash around and under his desk, and created a mess, so that Ms. Cutrell would have to come to his area to clean it up.

m.      Ms. Cutrell kept supplies including boxes of coffee in the cleaning closet. She found that someone had written "TCohn1.net" on a box of coffee.

332.    In or about 2009 Ms. Cutrell went to Human Resources and spoke with "Mike," a Human Resources employee. She filled out an application for transfer to a storeroom helper job. Mike told Ms. Cutrell that the storeroom position would pay less, but she nonetheless applied for it. However, she was not granted the transfer. *See* Exhibit 92.

333.    When Cohn returned to working in building 423, Ms. Cutrell went to supervisor Eddie Goldman to request a transfer. She told Goldman, "something really bad is going on over there [in building 423], and I don't want to be involved in it." Goldman told Ms. Cutrell he could not transfer her because he needed her in that building.

334.    Several times, Goldman had told Ms. Cutrell "we don't kiss and tell in this office."

335.    Ms. Cutrell called a number she had found on a poster, where she believed she could report discrimination to the EEOC. The number was in fact for the US Navy EEO, and a woman named Beverly Whitehurst spoke with Ms. Cutrell about her complaint of sexual harassment.

336.    On or about June 16, 2010, Ernest Marshall, EEO Counselor for the Navy at Norfolk Naval Shipyard, met with Ms. Cutrell, who complained to him about the harassment. He had her sign a Notice of Rights and Responsibilities for the Department of the Navy. *See* Exhibit 93. Marshall told Ms. Cutrell that he could not do anything to address her complaint because it had been 45 days since Cohn had done something physical to her. He recommended that she speak with a union representative.

337.    On or about June 17, 2010, Ms. Cutrell met with shop steward Ricky Linkas. Linkas brought her to BAE Human Resources to meet with Sandra Kight and Mike Patterson.

Ms. Cutrell complained of the harassment, displaying the figurine and giving the coffee box to Kight.

338.    Kight told Ms. Cutrell that Cohn would not be in the shipyard for the duration of the investigation into her complaints.

339.    Following her complaints, Ms. Cutrell was removed from Building 423 and reassigned to clean six trailers, in addition to multiple buildings, at one time as many as ten. This was a substantial increase in her workload.

340.    On or about August 2-3, 2010, Ms. Cutrell told Goldman that she was still experiencing problems. Goldman said he didn't know anything about that, and didn't pursue the matter.

341.    On August 17, 2010, BAE Vice President Tjepkema circulated a memorandum warning employees and contractors not to engage in sexual harassment. It stated that "several of our customer's [sic] female members have been made the victim of sexual harassment through "cat calling."" *See* Exhibit 94.

342.    On or about August 21, 2010, around the time her shift ended, Ms. Cutrell was walking past building 300 to return to her car. BAE Vice President Tjepkema approached her as she was walking, and called her over.

343.    Tjepkema asked Ms. Cutrell who knew about Cohn's harassment. She named several government contractors who worked at BAE. Tjepkema asked whether anyone else had mentioned having a problem with Cohn, and Ms. Cutrell stated that Pam Rick, another government contractor, had also had problems with him. Tjepkema stated that he was "not happy with the way Kight was handling the investigation," and that he was going to have her removed.

344. Ms. Cutrell met multiple times with Sandra Kight and "Terry" from Human Resources concerning her complaints. She additionally met with John Kowalczyk, Director of Human Resources and Labor Relations in Ship Repair. In these meetings she complained of harassment, including both Cohn's and Tjepkema's offensive statements.

345. On or about September 25, 2010, Ms. Cutrell was walking out the front door of Eddie Goldman's building while talking with Goldman's assistant, William. She observed Tjepkema approaching them from the sidewalk. Tjepkema beckoned Ms. Cutrell over, saying "Ann Marie, I need to talk to you."

346. Ms. Cutrell approached Tjepkema. He stated that Ms. Cutrell did not have any witnesses to anything that had gone on, nor anything that she had complained of, including her complaints about Cohn and her complaints about Tjepkema himself. Ms. Cutrell responded that may be true, but that it did not "change the fact of who and what you are."

347. Ms. Cutrell further told Tjepkema "don't ever stop me going to my car, or in the yard, or on the sidewalk. If you want to talk to me, go to HR and tell them you want to have a meeting with me, and I'll be at the table." Tjepema became extremely angry, and stated "Ann Marie, this conversation is over! You need to look for other employment!"

348. BAE subsequently hired Ann Falon, an independent investigator. On or about October 8, 2010, Ms. Cutrell met with Falon, Kight, Walker, Patterson, and others in Human Resources. Falon questioned Ms. Cutrell concerning her complaints. On or about October 20, Falon called Ms. Cutrell at home one evening. They spoke for over an hour about Cohn's harassing behavior. Ms. Cutrell faxed Falon the harassing text messages she had received from Stokes and Jones.

349. In or about late October, Ms. Cutrell took one week off. During this time she saw

that Falon had called her cell phone. When she returned in or about the first week of November, 2010, Ms. Cutrell told Kight that Falon had called her cell phone. Kight became angry and said, "what are you doing talking to her? She doesn't work for us anymore!" Ms. Cutrell never heard from Falon after this incident.

350.    In or about December 2010, Kight gave Ms. Cutrell a series of questions to answer, which she said were "interrogatories from the government."

351.    In or about May 2011, Ms. Cutrell was brought in to Kight's office. Eddie Goldman was present. Kight informed Ms. Cutrell that "the investigation was complete" and that Cohn was being allowed back into the shipyard. Kight stated that Ms. Cutrell would just be moved away from wherever Cohn was working.

352.    Ms. Cutrell protested that she should not be the one who was moved, since Cohn was the one who had exposed himself, and she should not be punished. She asked, "who's going to protect women at BAE from people like Jesse Cohn?" Kight responded, "Eddie [Goldman] is going to."

353.    Ms. Cutrell subsequently requested a copy of the investigation report from Kight. Kight told Ms. Cutrell that she needed a letter from an attorney in order to give her a copy. Ms. Cutrell never received a copy of the report.

354.    Beginning in or about December 2011, and continuing through her separation from employment, while she was in Paul Stokes' shop-Electrical, Ms. Cutrell heard offensive sexual comments from her male supervisor and coworkers on average approximately daily. Examples of such comments include, but are not limited to, the following:

a.      Over a dozen times, Ms. Cutrell witnessed her coworker Sean "PJ" Olah make the statement "we rape 'em and they scrape 'em" to her other male coworkers, an extremely offensive

reference to women being raped and undergoing an abortion.

b. One evening, Ms. Cutrell walked in the door of the shop and heard her male coworkers discussing a wine festival, and talking about a wine tasting there. Supervisors Paul Stokes and Bill Scold were present. Olah stated, "oh, you mean a wife tasting!"

c. In or about late winter or early spring 2012, Olah was bragging to Ms. Cutrell's male coworkers about having sex with his family's 13-year-old babysitter. Supervisor Stokes was "joking" with Olah on this subject, and the two were laughing. Bill Scold and Trevor Allman were also present. Olah laughed and stated, "well she wanted it!"

d. Ms. Cutrell's coworker Jake Johnson frequently made comments with sexual content.

e. Approximately daily, several of Ms. Cutrell's male supervisors and coworkers showed each other sexual photos on their cell phones, while snickering. Individuals who participated in this included supervisor Stokes, Scold, Olah, Johnson, Zack Mix, and Bertrell Jones.

f. Ms. Cutrell's male supervisors and coworkers passed around nude photographs of Cindy Polack, a Shop 10 employee, which were available on the internet.

g. Stokes asked Ms. Cutrell, "do you have any pictures?" meaning sexual photographs of herself posted on the internet.

h. Stokes talked about sexual photographs coworker Brad Williams brought in to work. The subject of the photos was Williams' wife.

i. Ms. Cutrell's male coworkers, and Stokes, discussed the wives, girlfriends and ex-girlfriends of Duane Olah, brother of Sean Olah, and discussed the fact that some of them were exotic dancers.

j.      Stokes and Ms. Cutrell's male coworkers discussed pornography and exotic dancing.  Stokes discussed where one can buy costumes for exotic dancing, and stated that the place to go was Ocean View.

k.      On multiple occasions, supervisor Stokes told Ms. Cutrell that she was "stupid" in front of her male coworkers, and told her that she "is nothing and will never be anything."

l.      In or about late winter or early spring 2012, Stokes told Ms. Cutrell: "Ann Marie, women are second class citizens.  They shouldn't even have a right to vote!"  Some of Ms. Cutrell's male coworkers including Allman, Armistead, Johnson, and others were present.  Ms. Cutrell responded, "well how did you get here then?  Your mom was a woman."  Ms. Cutrell's male coworkers snickered and laughed about Stokes's comment.  Ms. Cutrell walked away because she felt so angry and upset.

m.      In or about winter 2010-2011, one of Ms. Cutrell's male coworkers brought in a tattoo magazine which contained sexual photographs of women.  The magazine remained in the lunchroom for a approximately a month, during which her male coworkers talked about it and passed it around.

n.      Approximately three to five times, supervisor Stokes brought up a story about a former coworker.  Stokes stated that a former BAE employee named Fred Layne was called in to Human Resources along with another male employee, because a woman had gotten pregnant and gone to Human Resources regarding who was the father.  Stokes stated that Human Resources said Layne was the father, and that the woman had slept with one of the men on a ship, and on the same day she had slept with the other man in the Pier 3 powerhouse.  Stokes and Ms. Cutrell's male coworkers laughed uproariously about this alleged incident.

o.      On or about October 15, 2012 Ms. Cutrell was leaving the USS Vella Gulf to go to

the restroom.  She walked past three men who work for General Dynamics.  One of the men, E. Anthony, began singing the Billy Ray Cyrus song "Achy Breaky Heart" to Ms. Cutrell, and his companions began laughing.  When she turned around to confront Anthony, he asked her, "do you ride horses?"  She did not respond, and he said "I was only trying to give you a compliment."

p.      Later that day, Ms. Cutrell walked onto the ship with leadperson Henry Ayers to check on a heater.  Anthony was present, along with several other men.  When Anthony saw her he announced "female on deck!"  A second man who was with him said, "she's the original Barbie."  The group of men all began laughing.  Ms. Cutrell became angry and said, "that's enough, I don't want to hear anymore."  The man who made the "Barbie" comment became upset and said, "are you telling me to shut my mouth?"  His companions convinced him to depart with them.  Ayers was present and witnessed the entire encounter.

355.   Ms. Cutrell reported the singing incident and the "Barbie" incident to Mike Lutz.

356.   On or about October 19, 2012, Lutz informed Ms. Cutrell that Stokes was requesting her in his office, so she went to see him.  Stokes walked Ms. Cutrell to Human Resources, and when they arrived he loudly announced "I need to speak to someone about a sexual harassment claim."  Another man waiting in the HR office turned and stared at Ms. Cutrell as a result of the announcement. Stokes and Ms. Cutrell met with Alan Walker in Human Resources. Walker asked Ms. Cutrell if she felt comfortable working on the ships by herself, and she said "no." Stokes said that Ms. Cutrell would be taken off work on the ship the Vella Gulf, and would not go onto any ship unless a male mechanic escorted her.  Zach Mix was subsequently assigned to accompany Ms. Cutrell onto the ships. Stokes further stated that Ms. Cutrell would be given a shop radio so that she could immediately contact the shop if in need of

help while working on a ship.

357.   However, as of October 25, 2012, Ms. Cutrell had been assigned to work on the ship the USS Normandy, yet still had not been given a shop radio. Although Mix at times accompanied Ms. Cutrell onto the ships, he frequently came in late for work and needed to leave the ship while Ms. Cutrell was working on it.  He would simply tell Ms. Cutrell what to do while he was gone, and leave her there.  As a result, Ms. Cutrell spent most of her shift alone on the ship.

358.   Ms. Cutrell complained to Alan Walker concerning offensive sexual remarks in the shop.  Carol Mallory, a Human Resources employee or office assistant, was present.  Ms. Cutrell complained of Olah's "wife tasting" comment.  Walker told her, "it's really a blue collar world workplace over there [in the shipyard].  People are going to say things."  Ms. Cutrell told him, "that's why I am here, for you to counsel me."  Walker simply said that  "people are different than we are [in the shipyard]."

359.   Walker did not state he would do anything about the offensive sexual language in Ms. Cutrell's shop. Several days after her complaint, Walker gave Ms. Cutrell a piece of paper showing other open jobs within the company, as well as a card containing a website address where the company posted internal job openings. *See* Exhibit 95.

360.   Walker stated to Ms. Cutrell "so you pretty much appreciated being around civilized people, right?" in reference to her three months in Facilities Temp Services on light duty.

361.   On or about November 16, 2012, Ms. Cutrell complained in writing to Alan Walker regarding continued sexually harassing language in the workplace:

I am reporting an incident on the USS Normandy this morning approx. 8:30am.  There were three men with CRC hard hats on.  Two black males and one white male.  I was in

79

space 2-382-2L fixing some Light Stringers up when I over heard a man talking about what him and a woman did last night, Very, Very Vulgar: "She came and I came." "We had sex so much we were both sore." "I told her, didn't she know she was in Bang Cock." He said to the two other men in the space with him something about her being oriental.

[Noted in margin:] Marleon or Marlon was the name on his hard hat.

I walked over to him and walked past him thinking he would stop talking vulgar but he never did. The other men didn't say anything to him to stop the vulgar conversation either. I finally after about 10 min left the space. It was sickening! Ann Marie Cutrell

I went to the CRC trailer and talked to the men there about this. JR was not there.
Main talker – Marlon – Steelers lanyard
1 – White male – Red Camel pack on his back – Name?
1 – Black male – Older – Name?

*See* Exhibit 96.

362.   Ms. Cutrell was told that her complaint would be investigated. However, Ms.

Cutrell is unaware of any action taken in response to her complaint.

363.   Ms. Cutrell was overwhelmed by the continued sexual harassment and

discrimination at work, and as a result, she was constructively discharged.

364.   On or about December 9, 2012, Ms. Cutrell sent a letter of resignation to her

supervisor Stokes:

I am resigning my position with BAE Systems/ Norfolk Ship Repair effective today, because I can no longer endure the constant sex discrimination and sexual harassment which has continued despite my repeated complaints. Over the past four years I have been subjected to frequent vulgar language, offensive comments about women's bodies, offensive physical contact and romantic come-ons, bigoted statements about women's role in the workplace, and more, from management, coworkers and contractors working at BAE. I have complained over and over again to my supervisors, from about fall 2009 to the present time, but the behavior has not stopped. Most recently I complained about two weeks ago about extremely offensive sexual remarks made by several men, and while I was told the incident would be investigated, no one has gotten back in touch with me since then to follow up.

Being exposed to this behavior every day has made me feel extremely stressed, anxious, and depressed, and at this point there is no way a reasonable person could tolerate it anymore. Doctors have advised me that I should seek other work because of how this has

affected me.  For all these reasons, I am forced to resign my position effective immediately.

*See* Exhibit 97.

B.      Discriminatory Failures to Promote

365.    Following her complaints of harassment, Ms. Cutrell had been reassigned to clean six trailers and multiple buildings, which was a substantial increase in her workload.  On or about June 29, 2010, Ms. Cutrell gave supervisor Eddie Goldman a letter requesting an evaluation and pay raise on the basis of that higher workload:

> ....On July 1, 2010, I will be at BAE Systems nineteen months....My last pay increase from you was on April 13, 2009....
>
> I have come to you many times asking for a pay increase.  However, I believe you took me for a joke. You made the statement to me that you didn't see me as "a housekeeper," but you said you see me "more as customer service." ....

*See* Exhibit 98.

366.    On or about July 1, Goldman called Ms. Cutrell into his office.  He told her that the letter was a "personal attack" on himself, and refused to approve the raise. The following day, Ms. Cutrell met with Patterson at the union hall concerning the letter, and gave him a copy. On or about August 2, 2010, Goldman informed Ms. Cutrell that he had signed for her raise.

### Count One

### Hostile Work Environment in Violation of Title VII

367.    Plaintiffs incorporate Paragraphs 1 through 366.

368.    This claim is brought on behalf of all Named Plaintiffs and the classes they seek to represent.

369.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964. Defendant BAE has engaged in illegal, intentional discrimination on the basis of sex, by creating

81

a hostile work environment based on sex, female, and a hostile work environment based on sexual harassment.

Plaintiffs have regularly complained to supervisors and Human Resources employees regarding harassment, including but not limited to Bill Clifford, former President of BAE; Vice President Russell Tjepkema; Union President Michael Patterson; Labor Relations Manager Rusnak; Labor Relations Manager Alan Walker; Human Resources representatives; and other supervisors and managers.

370.    BAE has allowed the discrimination and harassment to continue.

371.    As a consequence of Defendant's conduct, the Named Plaintiffs have suffered severe emotional distress.

372.    Defendant's actions proximately caused the Named Plaintiffs' and the classes' injuries.

373.    Plaintiffs request relief as provided in the Prayer for Relief below.

## Count Two

## Sex Discrimination in Violation of Title VII

374.    Plaintiffs incorporate Paragraphs 1 through 373.

375.    This claim is brought on behalf of all Named Plaintiffs and the classes they seek to represent.

376.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964. Defendant BAE has engaged in a pattern or practice of discriminating against its female employees, including in compensation and promotion decisions, training decisions, and distribution of overtime, at its Norfolk, Virginia facilities.

377.    BAE's discriminatory practices have denied female employees promotional

82

opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

378. As a consequence of Defendant's conduct, the Named Plaintiffs have suffered severe emotional distress.

379. Defendant's actions proximately caused the Named Plaintiffs' and the classes' injuries.

380. Plaintiffs request relief as provided in the Prayer for Relief below.

## Count Three

## Sex Discrimination in Violation of Title VII

381. Plaintiffs incorporate Paragraphs 1 through 380.

382. This claim is brought on behalf of all Named Plaintiffs and the classes they seek to represent.

383. The foregoing conduct violates Title VII of the Civil Rights Act of 1964.

384. BAE has maintained a system for making decisions about compensation, training decisions, distribution of overtime and promotion decisions that has had an adverse impact on its female employees at its Norfolk, Virginia facilities. Such system/policies include its failure to require or use job related criteria for making promotion and compensation decisions, its regular failure to post open positions in its facilities, and its arbitrary and inconsistent imposition of unwritten requirements for promotion of women such as obtaining supervisor recommendations.

385. The challenged policies are not job related or consistent with business necessity.

386. BAE's discriminatory practices have denied female employees promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

83

387.   As a consequence of Defendant's conduct, the Named Plaintiffs have suffered severe emotional distress.

388.   Defendant's actions proximately caused the Named Plaintiffs' and the classes' injuries.

389.   Plaintiffs request relief as provided in the Prayer for Relief below.

**Count Four**

**Retaliation in Violation of Title VII**

390.   Plaintiffs incorporate Paragraphs 1 through 389.

391.   This claim is brought on behalf of all Named Plaintiffs.

392.   Plaintiffs engaged in protected activity by complaining to supervisor-level employees and above and Human Resources employees of Defendant about the hostile work environment and sex discrimination.

393.   As a result of their complaints, Plaintiffs experienced retaliation including but not limited to: cars being vandalized, receiving worse assignments than male counterparts or employees who have not complained, refusal to promote despite eligibility and being equally or better qualified than employees who have not complained of illegal practices, being referred to the Employee Assistance Program for making complaints about discrimination and being referred to anger management classes for complaining about discrimination, having lines cut and having work interfered with, receiving unjustified disciplinary write ups, being assigned to tasks outside of work duty parameters, being told to find other employment, and otherwise being treated differently as a result of the complaints made on behalf of themselves and others about discrimination and/or harassment.

394.   Defendant's actions proximately caused the Named Plaintiffs' injuries.

395.    As a consequence of Defendant's conduct, the Named Plaintiffs lost past and future wages and other job benefits, and suffered severe emotional distress.

396.    Defendant's actions proximately caused the Named Plaintiffs' and classes' injuries.

397.    Plaintiffs request relief as provided in the Prayer for Relief below.

## Count Five

## Violation of the Equal Pay Act – 29 USC 206(d)

398.    Plaintiffs incorporate Paragraphs 1 through 397.

399.    This claim is brought on behalf of all Named Plaintiffs and the classes they seek to represent.

400.    The foregoing conduct violates the Equal Pay Act.

401.    Female employees are paid less than similarly-situated male employees, for equal work requiring equal skill, effort and responsibility, performed under similar working conditions.

402.    Defendant's actions were willful and taken in bad faith.

403.    Defendant's actions proximately caused the Named Plaintiffs' and the classes' injuries.

404.    Plaintiffs request relief as provided in the Prayer for Relief below.

## JURY DEMAND

405.    Plaintiffs demand a trial by jury for all issues in this action for which a jury is available.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed class respectfully request that this Court grant the following relief:

A.    Certification of the Injunctive Relief and Monetary Relief Classes as class actions

under Rule 23 (b)(2) and (3), and designation of the Named Plaintiffs with the exception of

Plaintiff Cutrell as representatives of the Injunctive Relief class, and all Named Plaintiffs as

representatives of the Monetary Relief class and their counsel of record as Class Counsel for

both classes;

      B.     All damages which the Named Plaintiffs and the Monetary Relief Class have

sustained as a result of Defendant's conduct, including back pay, front pay, general and special

damages for lost compensation and job benefits that they would have received but for the

discriminatory practices of Defendant;

      C.     For Plaintiffs' individual, non-class claims, all damages that they have sustained

as a result of Defendant's conduct, including back pay, front pay, general and specific damages

for lost compensation and job benefits they would have received but for the discriminatory

practices of defendant, damages for emotional distress, and punitive damages, according to

proof;

      D.     For plaintiffs and the Monetary Relief Class exemplary and punitive damages in

any amount commensurate with Defendant's ability to pay and to deter future conduct;

      E.     A preliminary and permanent injunction against Defendant and its directors,

officers, owners, agents, successors, employees and representatives, and any and all persons

acting in concert with them, from engaging in each of the unlawful practices, policies, customs

and usages set forth herein. Such relief at a minimum should include nondiscriminatory criteria

for compensation and promotion decisions, record keeping that requires documentation of

compensation and promotion decisions, open application and job posting procedures for

promotion, and adjustment of the wage rates and benefits for Plaintiffs and the Injunctive Relief

Class to that level which Plaintiffs and the Injunctive Relief Class would be enjoying but for

Defendant's discriminatory practices;

F.      A declaratory judgment that the practices complained of in this Complaint are

unlawful and violate 42 U.S.C. Sec. 2000(e), et. seq., Title VII of the Civil Rights Act of 1964;

G.      Liquidated damages pursuant to the Equal Pay Act;

H.      Costs incurred, including reasonable attorneys' fees, to the extent allowable by

law;

I.      Pre-Judgment and Post-Judgment interest, as provided by law; and

J.      Such other and further legal and equitable relief as this Court deems necessary,

just and proper.

Dated:  July 29, 2013

Respectfully submitted,

By: _____
James H. Shoemaker, Jr., VSB No. 33148
Jason E. Messersmith, VSB No. 77075
Patricia A. Melochick, VSB No. 80694
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: (757) 223-4500
Facsimile: (757) 223-4518
jshoemaker@pwhd.com
jmessersmith@pwhd.com
pmelochick@pwhd.com

By: ___/s/ Giselle Schuetz___
Giselle Schuetz, Esq.
Law Offices of Joshua Friedman, P.C.
1050 Seven Oaks Lane
Mamaroneck, New York 10543
Telephone: (212) 308-4338 x8
Facsimile: (866) 731-5553
Email: giselle@joshuafriedmanesq.com
*To Be Admitted Pro Hac Vice*

ATTORNEYS FOR PLAINTIFFS