IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| JANET AVILES, | |
| 1173 Clydesdale Lane | |
| Virginia Beach, VA | CLASS ACTION COMPLAINT |
| | |
| JAMIEKA BROWN, | |
| 1709 Hodges Ferry Road | CASE NO.: 2:13-cv-00418 |
| Portsmouth, VA 23701 | |
| | |
| STEPHANIE JACKSON, | |
| 1609 Belafonte Drive | **JURY TRIAL DEMANDED** |
| Portsmouth, VA 23701 | |
| | |
| and | |
| | |
| KEL SHARPE, | |
| 3716 Kecoughtan Road, Suite C | |
| Hampton, VA 23664 | |

  On behalf of themselves and
  all others similarly situated,

  Plaintiffs,

vs.

BAE Systems Norfolk Ship Repair, Inc.,
  a wholly owned subsidiary of BAE Systems, Inc.,

and

BAE Systems Ship Repair, Inc.,
  a wholly owned subsidiary of BAE Systems, Inc.,

  Defendants.

SERVE:  CT Corporation System, Registered Agent
    4701 Cox Road, Suite 285
    Glen Allen, Virginia 23060

## <u>FIRST AMENDED COMPLAINT</u>

  Plaintiffs Janet Aviles, Jamieka Brown, Stephanie Jackson, and Kel Sharpe, on behalf of

themselves and all others similarly situated, allege, upon personal knowledge as to themselves and

upon information and belief as to other matters, violations of Title VII of the Civil Rights Act as follows:

## I.  NATURE OF THIS ACTION

1.       On July 29, 2013, nine women who work or have worked for BAE at its Norfolk shipyard commenced this lawsuit as a class action against BAE Systems Norfolk Ship Repair, Inc. ("BAE Norfolk"), which is a division of BAE Systems Ship Repair Inc. ("BAE Ship Repair") (referred to collectively as "BAE" unless otherwise specified), a wholly owned subsidiary of BAE Systems, Inc. ("BAE Systems"), a global defense, security, and aerospace company headquartered in Arlington, Virginia and one of the largest private employers in the Virginia Beach-Norfolk-Newport News, VA-NC metropolitan area.  BAE Ship Repair is headquartered in Norfolk, Virginia, and employs approximately 2,200 people at shipyards it operates in Norfolk, VA, San Francisco, CA, San Diego, CA, and Honolulu, HI.  The original complaint alleged that female employees of BAE Systems Norfolk Ship Repair were subjected to discrimination on the basis of their sex, including: denial of equal opportunities for advancement and promotion, denial of equal pay, and denial of equal access to overtime work; a hostile work environment on the basis of sex, and retaliation as a result of protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

2.       Plaintiffs Janet Aviles, Jameika Brown, Stephanie Jackson, and Kel Sharpe (hereinafter, "Class Representatives") file this Amended Complaint to clarify the nature of the class claims and class definition, amend the list of Class Representatives, and further specify the forms of relief sought in this action.  This Amended Complaint is filed as a matter of course pursuant to Rule 15(a)(1).

3.       The Class Representatives seek to represent a class comprised of presently and formerly employed female employees of BAE Norfolk who have been subjected to one or more aspects of the systemic gender discrimination described in this Complaint, including but not limited to:

a)      Gender-based hostility and other forms of hostile work environment harassment based on sex;

2

b)      Discriminatory policies, practices and/or procedures in initial classification and shop or department assignment for women working in production and maintenance positions, resulting in perpetual disparities in pay and advancement for women in these positions;

c)      Differential treatment and denial of equal opportunity with respect to shop or department assignment and hours (including overtime), resulting in less pay and fewer promotions for women employed in production and maintenance positions;

d)      Discriminatory policies, practices and/or procedures and denial of equal opportunity in advancement and promotion for women working in production and maintenance positions;

e)      Retaliation for complaining about these and other forms of gender discrimination in the workplace.

The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

4.      The Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief; back pay; front pay; compensatory and punitive damages; and attorneys' fees, costs and expenses to redress BAE's pervasive, discriminatory employment policies, practices and/or procedures.

## II.  JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., to redress and enjoin BAE's employment practices that violate this statute.

6.      Venue is proper in the Eastern District of Virginia pursuant to 42 U.S.C. § 2000e-5(f), 28 U.S.C. §§ 1331, 1343(a)(4) because the unlawful practices alleged herein were committed within this judicial district, and under 28 U.S.C. §§ 1391(b)(1) and 1391(c) because Defendants are subject to personal jurisdiction and are headquartered in Virginia.

## III.  PARTIES

**A.      Plaintiffs**

3

7.      Plaintiff Janet Aviles is a woman and a resident of Virginia Beach, Virginia.  She has been employed by BAE in Norfolk, Virginia from in or about 1987 to present in production and maintenance positions.  Ms. Aviles was hired by BAE's predecessor, Norshipco, to work as a Firewatcher in what was then the Fire Watch shop, and presently holds the position of Specialist in the Plate shop.

8.      Plaintiff Jamieka Brown is a woman and a resident of Portsmouth, Virginia.  She has been employed by BAE in Norfolk, Virginia from in or about March 2006 to present in production and maintenance positions.  Ms. Brown was hired by BAE to work as a Third Class Handyperson in the Pipe shop, and presently holds the position of First Class Handyperson in the Pipe shop.

9.      Stephanie Jackson is a woman and a resident of Portsmouth, Virginia.  She has been employed by BAE in Norfolk, Virginia from 1986 to present in production and maintenance positions.  Ms. Jackson was hired by BAE's predecessor, Norshipco, to work as a trainee electrician, and presently holds the position of First Class Mechanic in the Electric shop.

10.     Kel Sharpe is a woman and a resident of Hampton, Virginia.  She has been employed by BAE Systems in Norfolk, Virginia from April 2011 to present in production and maintenance positions.  Ms. Sharpe was hired by BAE to work in the Insulation shop as a Second Class Handyperson and is presently employed as a First Class Handyperson in the Insulation shop.

**B.      Defendants**

11.     Defendant BAE Systems Norfolk Ship Repair, Inc., is a Virginia corporation, headquartered in Norfolk, Virginia. It is a division of BAE Systems Ship Repair Inc., and a wholly owned subsidiary of BAE Systems, Inc., a Delaware corporation with its corporate headquarters in Arlington, Virginia.

12.     BAE Systems Ship Repair Inc. is a Virginia corporation headquartered in Norfolk, Virginia and operates shipyards in at least four locations across the United States, including the one located in Norfolk, Virginia, where Plaintiffs and members of the proposed class are and were employed.

13.     BAE Systems, Inc. is the parent company of BAE Systems Ship Repair Inc., and is the U.S. subsidiary of BAE Systems plc, a British company that is one of the largest defense contractors in the

world.

14.     Defendants are employers for the purposes of Title VII.

15.     Defendants BAE Norfolk and BAE Ship Repair operate as  a single integrated employer.


## IV.     PROCEDURAL HISTORY

16.     Class Representative Janet Aviles filed a Charge of Discrimination against BAE with the Equal

Employment Opportunities Commission ("EEOC") on July 31, 2008, alleging discrimination and

harassment based on her sex and retaliation for engaging in protected activity.  Aviles further alleged

that she and other female employees were denied promotion to higher class positions, in violation of

Title VII and the Virginia Human Rights Act, CA Code 2.2-3900, because of their sex.

17.     Class Representatives Aviles and Jackson timely filed Charges of Discrimination with the

EEOC on October 2, 2012.  Class Representative Brown timely filed a Charge of Discrimination with

the EEOC on October 21, 2012.  Class Representatives Aviles, Jackson and Brown received Notices of

Right to Sue on or after June 6, 2013.  This lawsuit was timely filed with 90 days of receipt of those

Right to Sue letters, which are attached as Exhibit A.

18.     The Class Representatives are relying on their own EEOC charges and/or those of other Class

Representatives.

## V.  CLASS CLAIMS

**A.     Organizational Structure at BAE's Norfolk, Virginia Facility**

19.     BAE operates a 109-acre shipyard facility providing ship repair services to customers including

the U.S. Navy fleet, cruise ship owners, liquefied natural gas tanker owners, ferries, and commercial

cargo ships.

20.     Defendants have a top-down, hierarchical organizational structure with clearly defined levels of

authority.  *See* Fig. 1.

***Fig. 1***

**UPPER MANAGEMENT**

Bill Clifford
President, BAE Systems Norfolk Ship Repair, 2007/08-present
President, BAE Systems Ship Repair, 2008 -

Russell "TJ" Tjepkema
Vice President, BAE Systems Norfolk Ship Repair
General Manager, BAE Systems Norfolk shipyard
Vice President of Business Operations, BAE Systems Ship Repair

Craft Manager (7 in total)
Each supervises approximately three of the 22 total shops

**MANAGEMENT WITHIN EACH SHOP**

Craft Shop Supervisor (1 per shop)

Assistant Craft Shop Supervisor (1 per shop)

Step 1 Supervisors

**PRODUCTION AND MAINTENANCE POSITIONS (BARGAINING UNIT)**

Step 2 and 3 Supervisors aka Leadpersons

Specialist (including Apprentice Instructor and Crew Leader positions)
Rank exists for most, but not all, shops

Mechanic (1st Class through 3rd Class, descending)

Handyperson (1st Class through 3rd Class, descending)

Helper (1st Class through 2nd Class, descending)

21. Broadly, beneath upper management, employees are divided into two categories: office workers, who perform administrative tasks; and production and maintenance workers.

22.     Production and maintenance employees work in dry docks, alongside piers in the shipyard, on board BAE customers' vessels, and inside buildings where work is performed on ship parts.  Since Defendant is a major military contractor, Navy employees and subcontractors' employees regularly interact with BAE employees in the shipyard.

23.     Shipyard employees perform demanding physical work such as shipfitting, welding, and installing insulation and rigging.  Many shipyard employees practice a specific trade, advancing their skills in that trade over the course of their careers through training and work experience.  Other employees perform physical labor in support of the workers who practice a trade.  As is customary in the industry, shipyard employees are divided into hierarchical job classifications, and are ranked within those classifications.  Employees work with the goal of being promoted in job classification and rank – which translates to higher pay -- over time as they attain greater skill and experience in their trade.

24.      Production and maintenance employees work in shops or departments organized by trade or type of work performed.

25.     BAE maintains 22 shops where production and maintenance employees work at the Norfolk shipyard:  Plate Shop, Welding Shop, Blacksmith Shop, Boiler Shop, Sheetmetal Shop, Labor Department, Inside Machine Shop, Outside Machine Shop, Pipe Shop, Rigger Shop, NIE, Facilities Department, Dock Department, Storeroom, Transportation Department, Crane Department, Environmental Department, Quality Assurance Department, Insulation Shop, Paint Shop, Carpenter Shop, and Electric Shop.

26.     All shops within BAE's Norfolk, Virginia facilities operate under a single set of personnel, human resources, and promotion policies.

27.     The International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO, and its Local Lodge 684 (hereinafter "the union"), represents non-managerial production and maintenance workers from the job classifications Third Class Helper through Leadperson, as set forth in the collective bargaining agreement (CBA), entered into on or about May

13, 2010.  The CBA sets forth a pay scale for all covered production and maintenance employees which is based upon employees' job classification and rank.  As a result, production and maintenance employees' pay is tied directly to their position in BAE's hierarchy.

28.     An employee working in a trade (e.g. Pipefitter, Machinist, Welder, etc.) may progress upward through the classifications of Helper and Handyperson prior to attaining classification as a Mechanic. Employees strive to become Mechanics in their trade because Mechanics earn significantly higher pay, and are eligible to move up into Specialist (quasi-supervisory) or supervisory positions.

29.     Employees in the Labor Shop work in the yard, but do not learn a trade.  They perform lower-skilled tasks that support the other trades workers, such as firewatch and cleanup.  These tasks do not build an employee's skills in a manner that would increase their eligibility for promotion.  Only First and Second Class positions exist in the Labor Shop, and there is no "Specialist" Laborer title.  First Class Laborers therefore have no way to advance within the shop, and could only earn more pay by transferring to a different shop.

30.     In addition, Laborers are paid substantially less than workers assigned to skilled trade shops. For example, as of February 9, 2012, First Class Laborers earned $11.93 per hour.  At that same time, a Second Class Helper in a skilled trade shop, like the Pipe Shop, earned $12.42 per hour, even though that is the lowest position extant in a trade shop.  Helpers in the Pipe Shop also have the opportunity to advance over time to positions such as First Class Handyperson ($15.54 per hour) and First Class Pipefitter ($22.67 per hour), all the way up to Specialist Pipefitter ($23.19 per hour).

31.     From time to time production and maintenance employees may be loaned out from one shop to another.  In particular, employees learning a trade may be loaned out to the Labor Shop for a period of months.  If they are loaned out to the Labor Shop, they must perform firewatch or cleanup duties instead of practicing and building skills in their trade.

32.     In or about early fall of 2012, outside of the Labor shop, there were only two female supervisors in all of the production and maintenance shops.  Indeed, Class Representatives who have worked at

BAE Norfolk for over 25 years can only recall three other women *ever* holding supervisory positions in the production and maintenance shops, excluding the Labor shop.

33.     No woman has ever served as BAE Norfolk President or Vice President.  There has never been a female Craft Manager, nor has there ever been a female Craft Shop Supervisor in any of Defendant's shops.

34.     Defendant became aware that the Named Plaintiffs intended to bring this lawsuit in the fall of 2012 when it was served with their EEOC charges. Following its receipt of the EEOC charges defendant made additional women supervisors, and promoted some of the class members in rank.


**B.      Assignment Discrimination in Production and Maintenance Positions**

35.     BAE has a policy and/or practice of assigning newly hired female employees to lower-level job classifications and ranks than equally or less qualified male employees.

36.     The union's Collective Bargaining Agreement does not provide criteria for nor govern the mode of assigning new hires to a particular job classification or rank.

37.     BAE has a policy and/or practice of permitting subjective discretionary decisions to be made about initial assignments, and discriminatory bias against women is the common mode of exercising discretion in those initial assignments.

38.     Because pay is directly tied to job classification and rank, this practice results in women in the proposed class earning lower initial rates of pay than equally or less qualified men.

39.     Due to the hierarchical system for advancement in the trades, which requires workers to move up through job classifications (and ranks within those classifications) over time, this practice also causes women in the proposed class, including the Class Representatives, to continue earning less pay than equally or less qualified men on a long-term, ongoing basis.

40.     Production and maintenance workers' pay rates are set by their job classification, and their rank within that classification, up to and including Leadperson, according to the union's pay scale.

Employees' pay level increases with a promotion in rank or a change to a higher-paid job classification.[1]

41.     Workers in the trades are promoted up the job hierarchy one step at a time.  For example, a worker initially assigned to work as a First Class Helper would have to proceed through promotion to Third Class Handyperson, Second Class Handyperson, First Class Handyperson, Third Class Mechanic, and Second Class Mechanic, in order to ultimately work as a First Class Mechanic.

42.     An employee's initial assignment has a long-term, continuing impact upon pay and promotion, because it determines how far down the hierarchy the employee starts, and therefore affects the length of time it will take the employee to attain higher-level job classifications and more pay.

43.     New hires apply to work in a specific shop.  At the time a new employee is hired, the Craft Shop Supervisor and/or Craft Manager for that shop decides upon his or her initial job classification and rank.

44.     The Craft Manager has final authority to approve this assignment, after which the decision is submitted to Personnel.

45.     When an employee wishes to transfer to a different shop, either laterally or into a lower-ranked position, the employee submits transfer paperwork.  The Craft Managers for both the shop the employee is leaving and the shop to which he or she is transferring must approve the request.  Subject to both managers' approval, the transfer is sent to Personnel and put into effect.


**C.      Overtime Discrimination in Production and Maintenance Positions**

46.     BAE has a policy and/or practice of distributing more overtime work to male than to female employees.

47.     The CBA provides that BAE should assign the [production and maintenance] employees

---

[1]      Some additional factors, such as a shift differential paid to employees working on the second or third shift, may affect an employee's ultimate compensation rate.  However, the table contained in the union's Collective Bargaining Agreement is the foundation of an employee's pay rate.

assigned to particular work to overtime associated with that work, where practicable. Where this is not possible, the agreement provides that management should divide overtime as equally as possible among employees within each seniority unit in each shop, taking into account the skill, ability and attendance records of the employees, and the desirability of continuity on a job.

48.     The agreement provides that BAE should post overtime volunteer lists, which are required to be uniform for all shops, and seek volunteers to work overtime. However, BAE regularly fails to provide female employees with overtime even when they have signed up on volunteer lists, which is part of its pattern and/or practice of providing male production and maintenance employees with access to more overtime hours than comparably situated female employees.

49.     It further provides that contractors' employees should only work overtime in emergencies or when BAE employees are not available. However, BAE has a pattern or practice of offering male contractors' employees access to overtime work while denying access to those opportunities to female BAE employees.

**D.  Promotion Discrimination in Production and Maintenance Positions**

50.     BAE has a policy or practice of promoting class members through the job hierarchy more slowly than similarly or less qualified men, and/or denying class members promotions for which they are qualified, resulting in correspondingly lower pay.

51.     BAE has a policy or practice of failing to post position openings on bulletin boards in its facilities, and/or only posting such openings after promotion decisions for the position have already been made, denying class members a meaningful opportunity to apply for promotion.

52.     BAE has a policy or practice of requiring class members to meet standards or prove they have attained skills that are not required of men for promotion to the same position.

53.     BAE has a policy or practice of loaning out class members to the Labor Shop more frequently and/or for longer periods than similarly qualified male employees are loaned out to the Labor Shop,

resulting in class members having fewer opportunities for training, work experience and skill-building that would increase their eligibility for promotion.

54.     BAE has a policy or practice of giving class members fewer opportunities for training in the skills required to increase their eligibility for promotion.

55.     BAE has a policy or practice of discouraging and deterring class members from seeking promotion by creating additional prerequisites for promotion, which do not exist in writing, and which are not imposed upon men seeking promotion, and/or changing such prerequisites.

56.     BAE has a policy or practice of requiring class members to file union grievances to obtain promotions for which they are qualified, whereas male employees are not required to do so.

57.     Generally, for an employee to obtain a promotion, she must approach her Craft Shop Supervisor or Craft Manager.  If she approaches the Craft Shop Supervisor and he supports her application, he sends notice to the Craft Manager.  If the Craft Manager approves the promotion, it is sent to Personnel. If Personnel approves the promotion, it will be put into effect.

58.     Bias against women is BAE's common mode of exercising discretion in promotion decisions.

59.     BAE maintains an Apprenticeship Program.  Employees must apply for the program, which lasts four years.  In addition to working day shift, apprentices must attend evening community college classes.  Stepped raises are awarded every six months.  Employees who complete the program graduate as First Class Mechanics in their trade.

60.     Pursuant to the union's Collective Bargaining Agreement, BAE additionally maintains a Trainee Program.  First or Second Class Helpers are eligible to apply for the program with a recommendation from their Craft Manager.  The program lasts 24 months and includes a step up in salary every three months.  A trainee who completes the program will emerge as a Second Class Handyperson.

61.     The Collective Bargaining Agreement provides that after 90 working days, a Second Class Laborer shall be raised to First Class, but does not set criteria for promotion in the shops practicing a trade.

62.     When a Craft Shop Supervisor or Craft Manager wants to fill a position, they inform Human

Resources about the opening.  Human Resources is responsible for posting notice of the job opening.

**E.  BAE Managers' Role in Creating and Perpetuating a Sexually Discriminatory and Hostile Work Environment**

63.     Senior BAE executives, and supervisors following their lead, engage in conduct which is

offensive to and openly hostile to women.  Senior executives, supervisors and managers regularly make

statements which show a lack of respect for their female colleagues, and often express the belief that

women do not belong in the shipyard. Male managers make women feel less valued as workers,

demoralize them, and signal to male colleagues they are worthless except as sex objects, by engaging in

such conduct.

64.     Russell Tjepkema, who is both Vice President of Business Operations and General Manager of

the  Norfolk shipyard, as well as Vice President of Business Operations of BAE Ship Repair, made

demeaning statements to female subordinates, in public situations, which told men and women who

were present, or who were told about the comments, that the most senior manager on-site approved of

disparaging and stereotyping women. Mr. Tjepkema stated loudly and publicly to class member Ann

Marie Cutrell "SHAKE IT." Vice President Tjepkema was commenting on the way Ms. Cutrell's rear

end moved, as she ascended stairs. This was shouted outdoors, for all present to hear.  On another

occasion he told her "you don't know what your long blonde ponytail does for me." Mr. Tjepkema told

a female subcontract administrator that it was "a little nipply" outside, commenting on her breasts in a

way to suggest it was cold out.  While speaking to two female employees in an open office area,

Tjepkema loudly stated in a manner that could be heard by many of the people present, "everyone

knows that you are the two most beautiful women in the room."

65.     Adhering to company policy or practice, exemplified by Tjepkema's comments, supervisors

within the shops openly state their discriminatory belief that women do not belong in the shipyard,

making comments such as "women should be home cooking my dinner while I'm out working;" "you

don't look like a pipefitter, you look like a secretary;" and "the only place for women is to be pregnant, home and in the kitchen."

66.     Managers and supervisors frequently share and/or display sexual photographs at work, and make sexual comments to class members such as "let me see your sexy body...I want you so bad."

67.     Although such conduct is well known to BAE senior management, which also has engaged in it, BAE has failed to take effective measures to end it.

**F.  BAE'S Knowledge of Widespread Sex-Based Harassment by Non-Supervisory Employees**

68.     Male BAE employees make offensive sexual comments and/or engage in sexually offensive behavior towards class members on a daily or near-daily basis.

69.     Such workers frequently and regularly use the words "bitch" and "whore" to refer to women, and discuss what they did sexually with women, including graphic descriptions of sex acts.

70.     Plaintiffs hear the offensive comments in the shop they are working in, elsewhere in the shipyard, and when working on ships.

71.     BAE Managers and supervisors have actual knowledge of the offensive sexual remarks and conduct, because managers frequently make such comments themselves, or laugh at or reply favorably to the comments made by male workers.

72.     Plaintiffs and other class members have frequently complained to their supervisors, upper management, and Human Resources over the years about sexually offensive speech and conduct, both verbally and in writing.

73.     BAE Managers and supervisors additionally have actual knowledge of the harassment because it occurs openly on a daily basis in common work areas where supervisors are present and able to observe and hear the sexually offensive speech.

**G.  BAE'S Ineffective Anti-Discrimination Efforts**

74.     BAE is aware that class members who work in the shipyard are denied promotion while equally or less qualified men are promoted. BAE is aware that class members who work in the shipyard can be employed for literally a decade without being promoted. BAE is aware that such women frequently file grievances complaining that less qualified colleagues, who are men, are given promotions for which class members applied. BAE is aware that many women have no means of being promoted other than bringing repeated grievances.

75.     BAE is aware of class members' complaints to the EEOC, and the EEOC's admonitions to stop discriminating against women.  On or about February 4, 2011, the EEOC announced it had found reasonable cause to believe sex discrimination had occurred, in response to a 2008 Charge of Discrimination filed by Class Representative Janet Aviles.  BAE entered into an EEOC Conciliation Agreement with Ms. Aviles, under which it was obligated to fully comply with Title VII.  Because it has continued to engage in discrimination on the basis of sex, Defendant BAE has failed to comply with and is in violation of the terms of the Conciliation Agreement.

76.     BAE had a specific practice of perpetuating discrimination in promotion, including through an unofficial policy that a shipyard employee must obtain the "recommendation" of a supervisor, in order to be promoted. Such a recommendation may be based purely on subjective factors, since it need not be based upon job-related criteria.  As a result, sexually discriminatory beliefs about and attitudes towards women are the common mode of exercising discretion in promotion decisions.  Subjective factors may include how attractive, docile or flattering to the supervisor the class member is, since there are no written BAE criteria, and no policing by BAE of recommendations. Some class members who are qualified for promotion have been stuck in a particular job classification for years, simply because the supervisors to whom they have access subscribe to the stereotypes advocated by Tjepkema and other senior managers, who degrade women.

77.     Procedures available under the union's Collective Bargaining Agreement are not an adequate

route for complaints.  While there is an anti-discrimination provision in the CBA, even when it is cited, no anti-discrimination remedy accompanies the resolution of a grievance. At most—this is the exception not the rule—it is found that a class member should have received a promotion, and eventually, she  is promoted. Normally, the grievance is denied. In no case does the grievance result in an examination of the reason for the failure to promote, namely, the institutional discrimination.

78.     Where a class member brings a grievance for discriminatory denial of promotion, even if she wins the grievance, she is not compensated with back pay for the time during which she should have been and was not promoted.

79.     Further, Step 2 and 3 Supervisors within the shops are also union members under the Collective Bargaining Agreement, and may serve as officers of the union.  Union President Patterson is himself a Step 2 Supervisor.  As a result, class members complaining of a supervisor's discriminatory acts may be forced to rely upon, for union representation, the individual about whom they are complaining to grieve their complaints.

80.     BAE has a pattern or practice of ignoring and/or failing to act promptly to investigate harassment complaints.

81.     Procedures available under the union's Collective Bargaining Agreement are not an adequate route for such complaints, for the reasons stated above.

82.     Where it does conduct an investigation into a harassment complaint, BAE has a pattern or practice  of conducting inadequate and non-independent investigations, which are biased against finding any violation.

83.     Where there is a finding of discrimination following a harassment complaint, BAE consistently fails to implement or carry out any effective disciplinary or other deterrent or corrective measures.

84.     BAE has a policy or practice of retaliating against class members who complain about gender-based discrimination or harassment.

16

**H.  Retaliation Against Production and Maintenance Employees on the Basis of their Complaints**

85.     BAE maintains a pattern, policy and/or practice of retaliating against the Named Plaintiffs and members of the proposed class for opposing sex discrimination (including by bringing proceedings pursuant to Title VII), by taking action against workers who complain about sex discrimination, including but not limited to: denying them promotions for which they were qualified; subjecting them to disparate terms and conditions of employment; subjecting them to gender discrimination, sexual harassment and a hostile work environment based upon sex; subjecting them to discipline in response to their complaints; and/or terminating them in retaliation for their complaints.

86.     BAE maintains a policy and/or practice of condoning known retaliatory actions taken against workers who complain about sex discrimination, such as male employees leaving dead mice in a microwave used by a complaining worker; disturbing or sabotaging a complaining worker's tools and/or work area; increasing surveillance of complaining employees' workstations; damaging the vehicles of complaining workers; instructing coworkers not to speak to complaining workers; and other forms of retaliation.

87.     For example, on November 13, 2013, less than four months after the filing of the instant lawsuit, and without prior notice, BAE suspended Ms. Kim Davis and Ms. Vernita Thurman, indefinitely without pay, and gave them a short deadline to prove that they had not provided false medical information in connection with their job applications. Ms Davis was a named plaintiff in the original Complaint in this action. Vernita Thurman is a member of the proposed class described in the complaint.

88.     Two male employees against whom BAE made the same accusation, and who were therefore similarly situated to Ms. Davis and Ms. Thurman, were not suspended, and continued to be paid. Upon information and belief, these two employees were not given a short deadline to prove their innocence.

89.     On information and belief, a third male employee who was suspended at the same time as Ms. Davis and Ms. Thurman was accused of falsifying a workers compensation claim and therefore was not

17

similarly situated to Ms. Davis and Ms. Thurman.

90.     BAE's actions were intended to chill participation in opposing discrimination by other proposed class members.

91.     Following contact with BAE's counsel by Plaintiffs' counsel, on or about November 22, 2013 BAE suspended the two male employees who had not previously been suspended, and retroactively paid Ms. Davis for her suspension to that date.

92.     Ms. Davis provided BAE with information demonstrating that she had not had not falsified her information concerning her medical history on her job application, including but not limited to via a letter from Plaintiffs' counsel sent on November 27 to counsel for BAE..

93.     However, by letter dated December 6, BAE notified Ms. Davis through her counsel that she was terminated.

94.     By way of further example, in or about 2006 Ms. Davis complained to several managers and supervisors concerning gender discrimination in access to training, including but not limited to: Bill Clifford, three supervisors, and Sandra Kight.

95.     In response to Ms. Davis's complaint, Kight took Ms. Davis out of work for two weeks, and made an EAP (Employee Assistance Program) referral requiring her to meet with a Clinical Director purporting to evaluate her on behalf of BAE.

96.     The Clinical Director wrote a letter stating that Ms. Davis had "made strident complaints that there is gender discrimination in the apprenticeship program" and that "her advocacy is viewed by some as inappropriately disruptive and aggressive."

97.     BAE required Ms. Davis to attend "anger management" counseling in retaliation for her complaints of gender discrimination.

98.     Ms. Davis's counselor informed BAE that she was being discriminated against and should not be in anger management counseling.

99.     Defendant's retaliatory actions deterred members of the proposed class from complaining about

sex discrimination.

## VI.  CLASS ACTION ALLEGATIONS

### A.      Class Definition

100.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf

of themselves and on behalf of a class of all women who are or were employed at the BAE Norfolk

shipyard at any time during the class period.  Each of the Class Representatives is a member of the

class.

101.    The class consists of all female citizens of the United States who are, or have been, employed

by BAE at the Norfolk Shipyard and have experienced gender discrimination at any time during the

applicable liability period.  Upon information and belief, there are more than 100 members of the

proposed class.

102.    The proposed classes do not include managerial or supervisory positions which are excluded

from membership in the collective bargaining unit.

### B.      Numerosity and Impracticability of Joinder

103.    The members of the classes are sufficiently numerous that joinder of all members is

impracticable.  Plaintiffs are informed and believe that the proposed class consists of more than 100

women during the liability period.

### C.      Common Questions of Law and Fact

104.    The prosecution of the claims of the Class Representatives will require the adjudication of nu-

merous questions of law and fact common to both their individual claims and those of the proposed

class they seek to represent.  The common questions of law include, *inter alia:* (a) whether BAE has

engaged in unlawful, systemic gender discrimination in its assignment, classification, pay, promotion,

advancement, transfer, and training policies, practices and/or procedures, and in the general terms and

conditions of work and employment for female employees in production and maintenance positions at

its Norfolk facility; (b) whether BAE has engaged in unlawful, systemic sexual harassment at the Nor-

folk facility; (c) whether BAE has unlawfully retaliated against female employees for complaining about gender discrimination; and (d) whether BAE is liable for a continuing systemic violation of Title VII; and (e) a determination of the proper standards for proving a pattern and/or practice of discrimination by BAE against its female employees at the Norfolk facility.

105.    The common questions of fact would include, *inter alia*: whether, through its policies, practices and/or procedures: (a) BAE has denied females in production and maintenance positions at the Norfolk shipyard equal assignments and classifications at the time of hire compared with equally or less qualified men, resulting in lower pay and longer timelines for promotion to higher class positions than comparably situated male employees; (b) BAE has denied or delayed the promotion of female employees in production and maintenance positions at the Norfolk shipyard and/or precluded females in these positions from eligibility for promotions by denying them training or hours that male employees in such positions are afforded, failing to inform them of positions when they become available, selecting men for open positions without or before posting them or notifying employees of their availability, and/or by imposing additional requirements and prerequisites on women in order to be considered eligible for promotion as compared to those imposed on or required of men; (c) Discriminatory animus against women was and is the common mode of exercising discretion regarding the initial assignment of and promotion of women in production and maintenance positions at the Norfolk shipyard; (d) BAE has subjected females in production and maintenance positions at the Norfolk shipyard to differential treatment, including, but not limited to, giving less preferable work assignments, loaning female employees out to the Labor Shop more frequently than male employees, and providing female employees with fewer opportunities to work overtime hours and/or fewer opportunities to receive the hours and type of work assignments they need to advance to higher class production and maintenance positions; (e) BAE has maintained a hostile work environment based on gender at the Norfolk shipyard; (f) BAE has subjected female employees to sexual harassment and/or a sexually hostile work environment at the Norfolk facility; (g) BAE has a policy or practice of retaliating against women for complaining about the

gender discrimination described in (a) through (f) above; (h) senior BAE managers, up to and including the CEO of BAE Systems, Inc., Linda Hudson, were aware of the pervasive sexual harassment and other gender discrimination at the Norfolk shipyard; (i) BAE has engaged in a pattern or practice of failing to take prompt and effective action to remedy the gender discrimination and pervasive sexual harassment in its Norfolk workplace; and (j) whether injunctive relief and punitive damages are warranted.

106.    The employment policies, practices and/or procedures to which the Class Representatives and the class members are subject are set at BAE Norfolk and/or BAE Ship Repair and/or BAE Systems corporate level and apply universally to all class members.   These employment policies, practices and/or procedures are not unique or limited to any particular department or shop at the Norfolk facility; rather, the discriminatory assignment, promotion, and pay policies and practices apply to all production and maintenance departments and shops. The policies and practices that give rise to and perpetuate the hostile work environment based on sex apply to all departments at the Norfolk facility.   The discriminatory policies, practices, and/or procedures therefore affect the Class Representatives and proposed class members no matter the department, area, or position in which they work.

107.    Throughout the liability period, the overwhelmingly majority of the managers and supervisors at the Norfolk Shipyard have been male.

108.    Discrimination based on sex in assignment, promotion and advancement occurs as a pattern or practice throughout the production and maintenance shops or departments at the Norfolk shipyard. Assignment, promotion, and advancement opportunities are driven by discriminatory animus as the common mode of exercising discretion in these acts, rather than by merit or equality of opportunity.  As a result, male employees have begun at higher classes, advanced and continue to advance more rapidly to better and higher-paying jobs than female employees.  This discrimination in initial classification and pay grade, subsequent assignments, promotion and advancement affects the compensation of Class Representatives and all the class members in production and maintenance positions in similar ways.

109.    Differential treatment between male and female employees occurs as a pattern or practice

throughout the production and maintenance shops or departments at the Norfolk shipyard. BAE's overwhelmingly male managers hold female employees, including the Class Representatives and class members, to stricter and different standards than male employees and therefore are promoted less frequently than their male counterparts. Additionally, male employees more often receive preferential treatment and are not loaned out to the Labor Shop as often as female employees. Being loaned to the Labor Shop has an adverse effect on promotion. Further, male employees are given overtime more often than female employees, resulting in less pay. These policies and practices affect the compensation of Class Representatives and all the class members in production and maintenance positions in similar ways.

110.    BAE's policies, practices and/or procedures have had an adverse impact on females seeking assignment or advancement to better and higher paying positions in production and maintenance. In general, a higher job classification correlates with a lower percentage of female employees holding those positions.

111.    Discrimination in the form of a hostile work environment occurs as a pattern or practice throughout the production and maintenance positions in the Norfolk Shipyard and affects the Class Representatives and the members of the class in the same way. BAE, from its Vice President down through Plaintiffs' co-workers, have engaged or engage in in various forms of the following conduct: make hostile comments and jokes; hold sexually explicit conversations; comment on female employees' bodies; comment on females' bodies generally; inappropriately touch female employees; make unwelcome sexual advances on female employees; harass and intimidate female employees; make clear that male employees are favored; make clear that female employees do not belong in the workplace; and have otherwise created a working environment hostile to female employees.

**D.    Typicality of Claims and Relief Sought**

112.    The claims of the Class Representatives are typical of the claims of the proposed class. The Class Representatives assert claims in each of the categories of claims they assert on behalf of the pro-

posed class. The relief sought by the Class Representatives for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the proposed class.

113.    The Class Representatives are, like the members of the proposed class, all female employees who have worked for the Defendants at the Norfolk facility during the liability period.

114.    Several of the Class Representatives and other female employees in the proposed class have complained about gender discrimination, including by using the company's established internal grievance procedure, and through informal and formal complaints to supervisors and managers up to and including Bill Clifford, President of BAE Ship Repair.   Complaints have at times been refused/rejected and therefore not investigated.   Other Company investigations into these complaints have been inadequate, and Class Representatives and class members have been affected in the same ways by BAE's failure to take adequate remedial measures to correct this pattern or practice of gender discrimination.

115.    Some of the Class Representatives and members of the class have experienced retaliation from managers after complaining about gender discrimination, including the termination of one originally-named Class Representative (now class member) following the filing of this lawsuit.

116.    BAE has failed to create adequate incentives for its managers to comply with equal employment opportunity laws and has failed to adequately discipline its managers and other employees when they violate the anti-discrimination laws, which has affected the Class Representatives and the class members in similar ways.

117.    Consequently, the claims alleged by the Class Representatives are typical of the claims of the classes.  Each plaintiff has worked in BAE's Norfolk shipyard during the class period and has been subjected to the discriminatory policies or practices alleged herein.  The relief sought by the Class Representatives for gender discrimination is also typical of the relief which is sought on behalf of the proposed class.

**E.     Adequacy of Representation**

118.     The Class Representatives' interests are co-extensive with those of the members of the proposed class they seek to represent, and the Class Representatives will fairly and adequately represent and protect the interests of the class. The Class Representatives seek to remedy BAE's discriminatory employment policies, practices and/or procedures so that women at BAE will no longer be prevented from advancing into higher paying and more desirable positions, will not experience disparate pay and treatment, will not be subjected to a hostile environment , and will not be retaliated against for complaining about discrimination. The Class Representatives are willing and able to represent the proposed class fairly and vigorously as they pursue their individual claims.

**F.     Efficiency of Class Prosecution of Common Claims**

119.     Certification of a class of female employees similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the Class Representatives and the proposed class.  The individual claims of the Class Representatives require resolution of the common question of whether BAE has engaged in a systemic pattern and/or practice of gender discrimination against female employees.  The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers and working conditions and in the lives, careers and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.  The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female employees of BAE generally.  In order to gain such relief for themselves, as well as for the proposed class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed class of females who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such

questions for the Class Representatives, the proposed class and BAE.

120.    The Class Representatives' individual and class claims are premised upon the traditional

bifurcated method of proof and trial for disparate impact and/or systemic disparate treatment claims of

the type at issue in this case.  Such a bifurcated method of proof and trial is the most efficient method

of resolving such common issues.

**G.      Requirements of Rule 23(b)(2)**

121.    Claims for injunctive relief are properly maintainable under Federal Rule of Civil Procedure

Rule 23(b)(2) because defendant has acted on grounds generally applicable to the Class

Representatives and the proposed class by adopting and following systemic policies, practices and/or

procedures which are discriminatory on the basis of gender, thereby making appropriate final injunctive

relief or corresponding declarative relief with respect to this class as a whole.  Gender discrimination is

standard operating procedure and a top-down policy and/or practice at BAE's Norfolk facility, rather

than a sporadic occurrence.  BAE has refused to act on grounds generally applicable to the class by,

*inter alia:* (a) refusing to adopt and apply assignment, promotion, training, and other policies, practices

and/or procedures which do not have a disparate impact on, or otherwise systemically discriminate

against, female employees in the production and maintenance departments; (b) refusing to provide

equal terms and conditions of employment for female employees; (c) refusing to provide a working

environment  which is free of gender hostility and sexual harassment; and (d) refusing to take effective

measures to correct and remedy sexual harassment and other forms of gender discrimination.  BAE's

systemic discrimination against female employees and its refusal to act on grounds that are not

discriminatory have made appropriate the requested final injunctive and declaratory relief with respect

to the class as a whole.

122.    Injunctive and declaratory relief are the predominant relief sought in this case because they are

the culmination of the proof of BAE's individual and class-wide liability at the end of Stage I of a

bifurcated trial and the essential predicate for the Class Representatives' and class members'

entitlement to monetary and non-monetary remedies at Stage II of such trial.  Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic gender discrimination against female employees at BAE's Norfolk facility.  Declaratory and injunctive relief are the factual and legal predicates for the Class Representatives' and the class members' entitlement to monetary and non-monetary remedies for individual losses caused by, and for exemplary purposes necessitated by, such systemic discrimination.

## H.   Requirements of Rule 23(b)(3) and Rule 23(c)(4)

123.    Claims for monetary relief are properly certified under Rule 23(b)(3) because questions of law and fact common to the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

124.    Additionally, the cost of proving BAE's pattern or practice of discrimination at the Norfolk shipyard makes it impracticable for the Class Representatives and members of the proposed class to pursue their claims individually.

125.    Alternatively, class-wide liability on the Title VII claims and punitive damages liability under the theories advanced in this action are properly certified under Rule 23(c)(4) because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## VII.  ALLEGATIONS OF NAMED PLAINTIFFS

## A.  JANET AVILES

Hostile Environment

126.    Janet Aviles is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a Specialist Shipfitter.

127.    She was hired in or about 1987[2] as a part time Firewatcher.[3]

---

[2]    At this time the company was named Norshipco.  Norshipco was subsequently acquired by two companies, followed by acquisition by BAE in 2005.
[3]    At that time Fire Watch was a shop.  Today this position falls within the Labor Shop.

128.    She became full time in or about 1988.

129.    In or about 1999, the Fire Watch shop was merged into the Labor Shop, and Ms. Aviles began working in the Labor Shop under the supervision of Mr. Lynch.

130.    From at least the time that Ms. Aviles began in the Labor Shop, through the present, Ms. Aviles has been subjected to and/or heard offensive sexual language and experienced frequent offensive conduct from male coworkers and supervisors. The offensive conduct has included having hear rear end grabbed by a co-worker (Mr. Cross), and being called or exposed to graphic sexual language and language disparaging women in general and women in the workplace, including but not limited to: "bitch," and "whore,"  "man I fucked that bitch last night," "she ain't nothing but a whore," "I'm trying to do what I can to her," and frequent talk about what male co-workers did sexually with women, including graphic descriptions of oral sex.

131.    In 2000, Ms. Aviles transferred to the Plate Shop, in Building 620.  At that time, Ms. Aviles was the only female assigned to work on a permanent basis in Building 620. While working in Building 620, Ms. Aviles would find dead mice left in the microwave by men, which was another form of gender harassment.

132.    In or about late 2005 or early 2006, a male supervisor entered the rest room where Ms. Aviles was undressed. In her capacity as a union shop steward, other female employees would report offensive sexual conduct by male coworkers to Ms. Aviles, as well.  By way of example only, a female apprentice named Helena Brown reported to Ms. Aviles that a male welder, "JR," had approached her in the locker room and told her he "wanted to fuck her."

133.    Throughout her employment, BAE was on notice of the hostile environment but failed to take prompt and adequate remedial measures.

134.    BAE knew or should have known about the offensive conduct, because supervisors regularly walked past while men were making offensive sexual comments.  When supervisor Billy Wilkins would walk past men making such comments, Ms. Aviles made it clear that she was offended and

wanted assistance, calling his attention to the comments and asking him "did you hear that?"

135.    BAE additionally knew or should have known of the conduct because supervisors participated in it.  For instance, supervisor John Pesick took pictures of young women he had gotten to accompany him to a hotel, and posted them on his locker.

136.    Another supervisor, Luther Sutton, made offensive "jokes" regarding where women's "place needs to be," implying that women do not belong in the workplace, approximately two times per month.

137.    Ms. Aviles was offended by the conduct.

138.    BAE additionally knew or should have known about conduct because Aviles regularly complained to BAE, including to Clifford, Ian King, the Union (by way of grievances) and to her supervisors, regarding the offensive sexual language and behavior.

139.    Beginning in or about 2006, Ms. Aviles complained at least once a month to her supervisors Carson, Pesick, Marvin, or Wilkins, in their office.  She repeatedly informed that she and others were offended and should not have to tolerate the offensive comments. Despite her complaints, coworkers continued engaging in the same behavior.

140.    On or about January 11, 2006, Ms. Aviles filed two grievances for sexual harassment and retaliation for her complaints.

141.    On information and belief BAE conducted an inadequate investigation.  Ms. Aviles' greivances were denied on or about March 6, 2006.

142.    In or about 2006, Ms. Aviles made an appointment with Bill Clifford, BAE Ship Repair President, who had previously expressed he had an "open door" policy, explaining to his secretary she wished to discuss the way she was treated as the only female in her shop.  Union shop steward Joe Tatum and Human Resources representative Sandra Kight attended the meeting.

143.    Ms. Aviles complained to Clifford about the discrimination, including the mice left in microwaves, and her supervisor walking in to the restroom while she was changing.  She explained that

she was the only female.

144.     Clifford stopped Ms. Aviles, stating that he could not do anything because the company had a union.

145.     Ms. Aviles continued to experience harassment because of her sex.  For example, her work shoes were stolen, and Step 2 Supervisor Harold Marvin told her male coworkers not to help her lift material.  The material in question generally required two people to carry it.

146.     In or about April 2008, Ms. Aviles complained to Human Resources Manager Sandra Kight about sex discrimination.  Ms. Kight told her she should leave things in the past.

147.     On or about July 31, 2008, Ms. Aviles filed an EEOC Charge complaining of harassment on the basis of her sex, female.

148.     In response to another grievance Ms. Aviles had filed complaining of discrimination, on or about October 21, 2008, BAE sustained the grievance, admitting that "Aviles was treated inappropriately in regards to the communication of work assignments."

149.     Discrimination on the basis of gender continued after the October 2008 determination.

150.     In or about 2008 or 2009, Ms. Aviles wrote a letter to Ian King, Chief Executive of BAE Systems, containing the same complaints she had previously voiced to Clifford.  She received no response.

151.     Ms. Aviles continued to file union grievances concerning the ongoing sex discrimination, including on or about the following dates: April 21, 2010; May 27, 2010; August 20, 2010; May 18, 2011; February 14, 2012; February 15, 2012; March 23, 2012, and September 17, 2012.

152.     On or about October 26, 2012, Ms. Aviles complained in writing about offensive sexual and sexist language, copying multiple supervisors and specialists: Pesick, Wilkins, Carson, Sutton, Spruill, Rick Scott, Michael Patterson (union president), Mike Holt, and Walker.

153.     In retaliation for her complaints, in or about late 2012 to early 2013, Ms. Aviles's car tires were deflated, and a second car she drove to work was keyed.  Ms. Aviles filed a statement with Human

Resources requesting access to security video be made available so that she could determine who was damaging her vehicles.  The video was not made available.

154.    The offensive language continued despite Ms. Aviles's complaints.

155.    On or about January 15, 2013, Ms. Aviles filed another written complaint concerning the offensive sexual and sexist remarks she was hearing at work.

156.    In or about  Spring 2013, Ms. Aviles's coworker Kenneth "Sam" Adams repeatedly vandalized her work area by cutting down her lines.

157.    Ms. Aviles complained to her supervisors Pesick and Wilkins about Adams' vandalism, advising them that Adams did not like to work with women.  His behavior continued.

158.    Ms. Aviles renewed her complaints to her supervisors.  However, they refused to stop Adams, issued no discipline and ignored her complaints.

159.    Adams circulated a defamatory petition concerning Ms. Aviles to her coworkers, asking them to sign it.

160.    On or about April 3, 2013, Ms. Aviles filed a grievance complaining of Adams' discriminatory behavior.  The grievance was denied on April 8, 2013.

161.    In or about April 2013, Ms. Aviles filed a written complaint concerning Adams' discriminatory behavior and her supervisors' inaction, copying Craft Shop Manager Spruill, Alan Walker, Patterson, and BAE Systems Headquarters, with no result.

Failures to Promote

162.    While in the Labor Shop Ms. Aviles learned that workers in the shops practicing a trade earned better benefits and higher pay.  She therefore sought and received a transfer to the Pipe Shop in or about 2000.  After working there for approximately several months, Ms. Aviles transferred to the Plate Shop in or about late 2000.

163.    When Ms. Aviles began working in the Plate Shop in December 2000 as a First Class Helper, she had barely progressed within BAE since her hire twelve years prior in 1988 as a Second Class

Laborer.  In order to earn more pay, she needed to be promoted to the next job classification.

164.    She asked her supervisor Pesick what she needed to do to move to the next step.  Pesick

outlined training Ms. Aviles needed to undergo.

165.    Ms. Aviles completed all of the training Pesick had listed, and again sought a promotion.

However, Pesick once more told her she did not qualify.  Pesick then explained to Ms. Aviles that

someone had to recommend her for a raise, a requirement he had never mentioned before, and told her

no one had ever done so.

166.    Foreman[4] Lindsey Copeland told Ms. Aviles that she could not be promoted because there

needed to be an opening at the next level.  However, Ms. Aviles's male coworkers regularly received

promotion regardless of openings at the next level.  For example, her coworker Cecil was a first class

handyperson and was promoted up one step to third class mechanic, even though there was no opening

for that position, and even though he could not read blueprints and was less qualified than Ms. Aviles.

167.    In or about 2003 Ms. Aviles applied to become a First Class Handyperson.  Her request for

promotion was denied.  Ms. Aviles was told she had to wait one year before becoming eligible for

promotion to that position.

168.    However, her male coworkers were not required to wait a full year.  For example, Ms. Aviles's

male coworker Todd Wells was promoted from Third to First Class Mechanic Shipfitter over a period

of under six months.  That same advancement would take Ms. Aviles more than two  and a half years.

169.    Ms. Aviles subsequently discovered that there was no requirement in the Collective Bargaining

Agreement that candidates for promotion obtain a supervisor's recommendation, a point she repeatedly

made in her grievance hearings.

170.    BAE Managers continued to use this and other non-existent requirements as a pretext to deny

Ms. Aviles and other women promotions.

171.    In or about 2004 Ms. Aviles was a First Class Handyperson.  She asked Copeland  what she

---

[4]    The position presently called "Craft Manager" was called "Foreman" at that time.

must do to be promoted to Third Class Mechanic, and eventually First Class. Copeland told Ms. Aviles to enter the apprenticeship program. Ms. Aviles told Copeland that she did not want to go back to school, and should not have to do so to be eligible for promotion.

172.    Ms. Aviles was aware that Mr. Rollins in her shop, who had been a First Class Mechanic for years, could not read blueprints. To this day there are male fitters who cannot read blueprints. Nonetheless, on September 27, 2004, Ms. Aviles began the apprenticeship program her employer required that she take in order to advance. She was promoted to Apprentice upon entering the class.

173.    On July 25, 2005, BAE demoted her to First Class Handyperson, purportedly because she had failed academically. In fact, Ms. Aviles was already reading blueprints before she started the class.

174.    On August 3, 2005, Ms. Aviles filed a grievance alleging that she was qualified to be promoted to Second Class Mechanic. On September 26, 2005, while her grievance was pending, BAE promoted her to Third Class Mechanic, conceding that her demotion, rather than promotion, was unwarranted. But by letter dated October 5, 2005, BAE claimed Third Class Mechanic was the appropriate rank for Ms. Aviles, and denied her grievance.

175.    Notwithstanding her obvious ambition and drive to improve herself, after 25 years of service, Ms. Aviles has yet to achieve even a low level supervisory position, while dozens of less ambitious, less qualified men who were hired after her are now supervising her, and others.

176.    On or about October 9, 2006, Ms. Aviles filed a grievance based on the company's failure to promote her to Second Class Mechanic. Labor Relations Manager Ron Rusnak ruled on the grievance on or about January 16, 2007. He claimed that Ms. Aviles had failed to complete the apprenticeship program due to unsatisfactory academics, including by failing to get a passing grade in blueprint reading. He concluded that Ms. Aviles could have a 90 day trial period to do the tasks of a Second Class Mechanic, after which a decision would be made on the promotion. On or about July 31, 2008, Ms. Aviles filed an EEOC Charge complaining of harassment and discrimination on the basis of her sex, as well as retaliation for her complaints.

177.    BAE regularly failed to allocate as many overtime hours to Ms. Aviles as to its male employees. She filed a grievance complaining about discriminatory allocation of overtime hours on or about September 22, 2008.

178.    On or about February 18, 2009, Ms. Aviles filed a grievance seeking promotion to First Class. She won her grievance and was finally promoted to First Class Shipfitter in or about March 2009.

179.    On or about February 4, 2011, the EEOC announced it had found probable cause to sustain Ms. Aviles's Charge of Discrimination. BAE agreed to sign a Conciliation Agreement, in which among other things, it agreed to provide Ms. Aviles forklift training, and conduct training regarding Title VII violations for management and non-management employees, and further, to adopt measures to ensure there would be no recurrence of BAE's violations.

180.    Defendant BAE has failed to comply with and is in violation of the terms of the Conciliation Agreement, because it has continued to engage in discrimination on the basis of sex, .

181.    BAE failed to post positions for which Ms. Aviles would have applied, had she known about them.  For instance, in or about February or March 2011, it failed to post a loft position.  Ms. Aviles filed a grievance complaining of the failure to post the position.

182.    Ms. Aviles sought but was denied promotion to the position of Specialist.

183.    On or about May 6, 2011, Ms. Aviles filed a grievance for failure to promote.  It was denied.

184.    In or about January or February 2012, a sign-up sheet was posted in the shop for employees to sign to be considered for a Leadperson position. On or about February 17, 2012, after the sheet had been posted several weeks, Ms. Aviles signed it.  At the time she signed, she saw that there were only two other signatures.  One individual had signed as "007 James Bond," as a joke; the second, Jake L. Knox, had subsequently crossed out his name.  Later Ms. Aviles observed that supervisor Billy Wilkins had signed the bottom of the sheet, and shortly thereafter the sheet was removed.

185.    Even though she had expressed interest, and was the only qualified individual to sign up, Ms. Aviles was not given the Leadperson position.

186.    On or about February 23, 2012, Ms. Aviles filed a grievance complaining of gender discrimination, based upon the leadperson sign up sheet incident.

187.    On or about April 10, 2012, Ms. Aviles filed another grievance seeking promotion to Specialist.

188.    Ms. Aviles's supervisor Billy Wilkins continued to grant Ms. Aviles's male coworkers' requests for overtime hours, while not granting equivalent overtime to Ms. Aviles despite her requests. On or about April 13, 2012, Ms. Aviles asked Wilkins why everyone who had signed up for weekend overtime work was granted the overtime, except herself.  Wilkins told her it was because she could not use power tools. Ms. Aviles filed a grievance for loss of overtime based upon her conversation with Wilkins.

189.    On or about August 21, 2012, Ms. Aviles's promotion grievance was denied, in part on the grounds that no supervisor had recommended Ms. Aviles for promotion.

190.    Ms. Aviles filed another grievance for promotion on or about September 5, 2012.

191.    On or about October 2, 2012, Ms. Aviles filed a new Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant with unlawful sex discrimination and retaliation on behalf of herself and a class of similarly situated women.

192.    On information and belief, Defendant became aware that the Named Plaintiffs intended to bring this lawsuit in the fall of 2012 when it was served with their EEOC charges.  Shortly afterward, in October 2012, Ms. Aviles was finally promoted to Specialist.


**B.  STEPHANIE JACKSON**

193.    Stephanie Jackson is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a First Class Mechanic Electrician.

194.    She was hired in 1986 as a Trainee Electrician, and in 1993 was promoted to Second Class Mechanic Electrician.  In or about 1993 or 1994 she was promoted to First Class.  Ms. Jackson went through BAE's Apprenticeship Program.  She additionally serves as a union shop steward.

195.    Since she began working at Defendant, approximately daily, Ms. Jackson has heard male coworkers, contractors and supervisors making offensive sexual statements regarding women.  Ms. Jackson hears these comments in the shop she is working in, elsewhere in the shipyard, and when working on ships. They consist of men discussing their sexual conduct with women, e.g., what they did the night before, what they plan on doing with women, unwanted vulgar invitations to engage in sexual conduct, and sexually oriented observations about the bodies of the women with whom they work. Ms. Jackson has heard comments about a female Navy employee eating a lollipop to the effect of "what else is she sucking on." Men routinely make statements in Ms. Jackson's presence about women not belonging in the shipyard, such as "this is a man's world," or "she wanted to be here, she got to carry her own weight."

196.    Frequently, Ms. Jackson is the only female present when offensive sex- and gender-based comments are made.

197.    Supervisors are frequently within hearing range of the sexual comments made by coworkers and contractors.

198.    In 2010, supervisor Bazemore attended a meeting of the Evaluation Committee, a group of supervisors and co-workers who evaluate employees', which evaluations may be used for lay-offs. Following the meeting, a member of the committee informed Ms. Jackson that Bazemore had made unfounded negative and derogatory comments regarding Jackson and her performance. When Ms. Jackson confronted Bazemore about his comments, he did not deny them; he merely stated "I thought that what was said in the evaluations was confidential."

199.    Ms. Jackson was Crew Leader on a ship in or about 2010 for approximately one year.  After work on the ship was complete, Ms. Jackson was moved to another ship to serve as Crew Leader. When work slowed, several Crew Leaders were demoted out of that position, including Ms. Jackson.

200.    When work picked up again, all of the other individuals, all men, were restored to their Crew Leader positions.  Ms. Jackson was not.

35

201.    In or about June 2011, when supervisor Bazemore was asked when Ms. Jackson would be promoted, he stated "she needs to crawl before she walks."

202.    In or about June 2011, Ms. Jackson learned of an open Apprentice Instructor position.  This position is supervisory, and only First Class Mechanics are eligible for the promotion to that role.

203.    Employees could sign up to be considered for the Apprentice Instructor promotion.

204.    On or about June 29, 2011, Ms. Jackson signed up.  Only two other employees signed the sheet on that date: Mr. Antonio Mirabel and Mr. Winston Dillard, both only Second Class Mechanics.

205.    Ms. Jackson, who had 15 years of experience at BAE, and was a First Class Mechanic, was denied the promotion.  It was instead given to Mr. Mirabel, who had only worked at BAE for approximately three years, and did not have any experience in shipboard repair, although instructing workers in that area was part of the job.

206.    Ms. Jackson learned that Bazemore had recalled Mirabel back to the Electric shop to sign up for the position even though he had been loaned out to work in Quality Assurance.  Bazemore had promoted Mirabel from Second to First Class Mechanic in order to make him eligible for the Apprentice Instructor position, and then immediately promoted him to that position, all at the same time.

207.    On or about July 20, 2011, Ms. Jackson filed a union grievance alleging "discrimination/promotion" based upon Bazemore's denial of the promotion.  On or about November 1, 2011, a grievance meeting was held and attended by Ms. Jackson, Bazemore, and Alan Walker, Labor Relations Manager.  During the meeting, Ms. Jackson challenged Bazemore's comment about having to crawl. Despite her tenure, Walker stated, "Oh, he means you aren't seasoned."

208.    BAE denied Ms. Jackson's grievance in or about February 2012.  Walker told Ms. Jackson that she could instead have a position as Crew Leader, and that she should just write her name on the list to be considered for a Crew Leader position whenever the list was posted, and then give Walker a call.  However, Crew Leader is a  temporary position that is coterminous with BAE's work on a particular

ship.  It ranks below, and is not equivalent to, the position of Apprentice Instructor, which is permanent.

209.    Ms. Jackson filed an EEOC Charge concerning the discriminatory denial of the promotion on or about March 23, 2012.

210.    BAE management maintains policies that deny Ms. Jackson access to restroom facilities of a similar quality to the men's facilities.

211.    Ms. Jackson works in a building containing the electric shop, the machine shop, and the pipe shop.  Each of these shops contains one men's restroom.  There is one women's restroom located in the upper level of the building, outside the boundaries of the three shops.

212.    Each of the three shops is awarded a fund it may use for purposes including cleaning.  The supervisor of each shop maintains a cleaning schedule for the men's restroom in that shop.  Each man in the shop takes a turn cleaning the restroom.  When it is a man's turn to clean the restroom, his time is billed to the shop's fund.  Necessary bathroom supplies such as toilet paper and soap are also purchased out of each shop's fund.

213.    No analogous system is maintained for cleaning the women's restroom shared among the three shops.

214.    When women ask to be permitted to institute a similar cleaning schedule, they are told that their time cannot be charged to any of the shops, because the women's restroom is outside of the three shops.  They are told that their time would instead have to be charged to BAE's customers, which would be fraudulent.  The women are therefore prohibited from cleaning the women's bathroom.

215.    As a result, the women's bathroom is not cleaned at all.

216.    The women's bathroom also has no toilet paper or soap, because women's bathroom supplies cannot be purchased using the fund of any of the three shops.

217.    In or about early 2013, Ms. Jackson complained to BAE Vice President Dave Thomas regarding this problem.  She told him that if women were not going to be permitted to clean the bathroom, someone from the Labor Shop should be hired to clean the women's bathroom.  Thomas told her, "that

would be an issue for the supervisor of the Labor Shop."

218.    The women's bathroom is still not being cleaned at present.

219.    As a union shop steward, Ms. Jackson is responsible for receiving complaints from coworkers and reporting them to her superiors.  Multiple female coworkers have reported to her offensive discriminatory and/or harassing statements based upon their sex.  For example, a female coworker complained to Ms. Jackson that a male coworker had told her "the only thing she can do for him is shine his shoes."  The female employee complained about the statement, but nothing was done and no discipline was imposed upon the male employee.

220.    By way of further example,  a supervisor told BAE employee Ms. Payton to clean a ship part in a toilet in the men's restroom.  He then told Ms. Payton, "well, if you get laid off now you can get a job cleaning septic tanks."  Ms. Jackson reported the incident to Bazemore, who said he did not see anything wrong with it.

221.    On or about October 2, 2012, Ms. Jackson filed a second Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant with unlawful sex discrimination and retaliation on behalf of herself and a class of similarly situated women. .


**C.  JAMIEKA BROWN**

222.    Jamieka Brown is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a First Class Handyperson in the Pipe Shop.

223.    She was hired in or about March 2006.

224.    Beginning a few months into her employment, intensifying in 2007, and continuing through the present, Ms. Brown has heard offensive sexual comments from her male supervisors, coworkers and contractors on average approximately every other day.

225.    Ms. Brown's supervisor Victor Manuel made sexually offensive comments to Ms. Brown on average a couple times per month beginning in or about 2007 and continuing to the present.  For

example, Manuel asks Ms. Brown to come into his office, stating that he has some lotion and needs a massage; Manuel additionally tells Ms. Brown "let's get off early" and suggests they engage in intimate acts.

226.    Coworkers and contractors made unwelcome sexual advances toward Ms. Brown, at times implying they would pay her for engaging in prostitution.  For example, coworkers asked told her: "you shouldn't work weekends, I can pay for your days off;" "you're sexy;" "I can imagine how you look without your work clothes on;" "you need some money, you can come and meet me after work."

227.    Men also made offensive comments regarding sex acts with other women, such as "oh, I fucked her so good last night," and "she sucked my penis for $50."  Ms. Brown was offended.

228.    When she heard such comments, Ms. Brown replied with statements to the effect of: never, get lost, I don't do things like that, I come here to work, or I don't feel like hearing that today.  She  walked away to escape the comments.

229.    These comments were frequently made close enough to supervisors that the supervisors heard them.

230.    Ms. Brown's male coworkers physically touched her from time to time, including but not limited to a male coworker grabbing her arm to try to pull her back when walking to a boat, and another male co-worker, whom she didn't see, touching her leg. On that occasion, none of her male co-workers would tell her who touched her.

231.    Beginning in or about 2007 and continuing through 2008, Ms. Brown's supervisor Barry McCoy  propositioned her regularly, often implying that his support for her advancement was continent on sexual or romantic involvement.

232.    For example, when Ms. Brown asked for a one-year raise in or about spring 2007, McCoy told her "let me bring you whatever you need for you and your kids."  He frequently asked her, "can we go out sometime for drinks and meet up?" and promised to speak with union president Mike Patterson about getting Ms. Brown a raise.

233.    During this time Ms. Brown was assigned to work with McCoy in his trailer.  She felt

uncomfortable due to his comments, and worried about what he might do.

234.    Tony Featherstone, a supervisor, and Mr. [FNU] Anderson, a supervisor, were at times present

and heard McCoy's offensive comments.  They laughed along with McCoy.

235.    Ms. Brown asked McCoy to reassign her to work on a ship, rather than in the trailer with

McCoy.  He denied her request, claiming that "right now we don't have anyone for the trailer job."

236.    Ms. Brown informed Featherstone that she did not want to work in the trailer, and requested

that he reassign her to a job on on a ship.  However, Featherstone told her "you have to ask McCoy."

Ms. Brown continued complaining to McCoy that she did not want to work in the trailer and requesting

to return to the boat.

237.    Eventually, Supervisor John Blake called Ms. Brown back to work on a ship in the yard.

238.    In or about 2007, Ms. Brown asked Mallet and McCoy about two pipe planner positions she had

seen posted in the shop. They told Ms. Brown that those jobs were taken, and that "you need a degree"

to hold those positions.  Ms. Brown told them she was in the process of getting a degree, to no avail.

The men who subsequently were given the positions did not hold degrees.

239.    From the beginning of her employment in 2006 until 2010, Ms. Brown was not promoted at all,

despite being qualified to move up to the next job classification, despite her weekly requests to be

considered for a promotion and despite the advancement of similarly or less qualified men.

240.    In or about January 2011, Ms. Brown was finally promoted to Second Class Handyperson after

a new supervisor, Mr. Baker, put her in for a raise.

241.    In or about summer 2011, Ms. Brown's then-supervisor Mr. Howard sent her a series of

Facebook messages requesting to take her out for drinks, to the effect of: "you know you're sexy, let me

take you out."  Ms. Brown told Howard that she would not go out for drinks with him.

242.    Beginning in or about 2011 and continuing to the present, Ms. Brown's supervisor Wendall

Baynard made inappropriate sexual comments to Ms. Brown, such as "let me see your sexy body....I

want you so bad."  He repeatedly asked Ms. Brown to meet him outside of work, and on several occasions attempted to grab her arm.

243.    Ms. Brown refused Bayard's requests, but he continues to make  offensive comments.

244.    Ms. Brown's coworker Larry, nicknamed "Rock," made offensive sexual statements towards her approximately every other day. For example, Rock stated, "hey, look at all that ass you have in those pants, let me unzip my pants and stick it in there and show you how good you can feel, show you how to do it the right way;"  Rock also grabbed his crotch and mades statements such as "here, get up on this."

245.    Rock often makes offensive statements loudly, and the supervisors who overhear him laugh. Rock at times makes such statements while Barry McCoy, the lead supervisor, is present, and McCoy hears the statements.

246.    In or about early 2012, Ms. Brown sought a promotion to Third Class Mechanic, a position for which she was well qualified, and which was available.  She was denied the promotion, which on information and belief went to a less qualified man.

247.    In or about spring 2012, Ms. Brown again sought a promotion to Third Class Mechanic, while there were two openings for the position.  The positions were given to two of her less qualified male coworkers, Langevin and Ayers.  Ayers had only been working at BAE for one year.

248.    In or about May 2012 Ms. Brown filed a grievance seeking the promotion.  The grievance was denied based upon her supervisor Mallet's claim that she did not complete trainee books and get recommendations from supervisors.  However, Ayers had never filled out his booklet.

249.    In or about late November 2012, Ms. Brown's coworker Ronnie told her, "yeah, if I hit the mega millions you can come vacuum for me."  When Ms. Brown asked if he meant she would work for him, he said "no I mean I can use you as a vacuum, you can suck me off."  Ms. Brown was extremely offended.

250.    In or about December 2012, Ms. Brown made a written complaint to Human Resources

employee Sharon Debord concerning sexual harassment.  Debord read it, handed it back and refused to accept it.

251.    In or about February 2013, Ms. Brown renewed her prior grievance seeking promotion to Third Class Mechanic.  When she gave the grievance to supervisor Mallet, he yelled "you will not get third class until you fill out the booklet."  She was denied the promotion.

252.    T.J. Pietrantonio, a man, was promoted to Third Class Mechanic without having his booklet filled out, and with less experience, fewer qualifications and less time working at BAE than Ms. Brown. Another man, Jay Moore, was hired directly into the position of Third Class Mechanic, with less experience and fewer qualifications than Ms. Brown.

253.    On or about October 21, 2012, Ms. Brown filed a Charge of Discrimination against BAE with the Norfolk Local Office of the EEOC, charging Defendant with unlawful sex discrimination and retaliation on behalf of herself and a class of similarly situated women.


**D.  KEL SHARPE**

254.    Kel Sharpe is an African-American woman currently employed at BAE's Norfolk, Virginia facilities as a First Class Handyperson in the Insulation Shop.

255.    Ms. Sharpe was hired in or about April 2011 as a Second Class Handyperson.

256.    Beginning shortly after her hire, and continuing to the present, Ms. Sharpe hears offensive sexual language from male supervisors, coworkers and contractors approximately a couple times per week.

257.    Coworkers made offensive sexual comments about women's bodies.  For example, a male coworker stated "I'm not into black girls, but she has a nice rack on her," and two female coworkers suggested to Ms. Sharpe that she should "lose the coveralls" if she wanted to get a raise.

258.    Ms. Sharpe's coworkers frequently used derogatory sexual language or slurs to refer to women. For instance, they referred to women as "bitches," "dykes" and "ho's."

259.     From the beginning of her employment, Ms. Sharpe's coworker Kenny Smith, a first class

welder, made sexually offensive comments to Ms. Sharpe, for example: "what do you wear under your

coveralls?  Do you have boy shorts or bikinis?"   "Tell that man to get out [of your house] cause I'm

coming over." On several occasions he physically touched Ms. Sharpe, for example: placing himself

behind her, blocking her from passage, touching her pants leg while stating "I'm coming over to your

house."

260.     On at least ten  paydays, Ms. Sharpe's supervisor "Barry" pretended to be a "pimp" requesting

money from Ms. Sharpe, who he pretended was a prostitute working for him.  He made statements to

the effect of, "you got my money?  I'm tired of waitin' on you to give me my money."

261.     Ms. Sharpe was recommended for promotion to First Class Handyperson by her first line

supervisor, Walter Davis, in or about October 2011.

262.     In about October 2011, supervisor Benny Goddard loaned Ms. Sharpe out to the Labor Shop,

where she was a Firewatch.  While working as a Firewatch she was not gaining work experience or

training in her chosen trade.  She was brought back to the Insulation Shop in or about December 2011.

263.     In or about January 2012, Ms. Sharpe complained to William Goings, her shop steward and on-

site supervisor at Metro Shipyard, that she had not yet received a promotion to First Class

Handyperson, for which she was well qualified.

264.     Goddard never submitted the required paperwork for Ms. Sharpe to get the promotion, even

though she had a strong letter of recommendation and a good attendance record.  Fourteen other

employees were promoted in or about February 2012, thirteen of whom were male.

265.     While she was working in the Insulation Shop, each Monday, Ms. Sharpe asked supervisor

Benny Goddard about getting her promotion.  Goddard just laughed.

266.     In or about April 2012, Ms. Sharpe was again loaned out to the Labor Shop.

267.     When Goddard loaned Ms. Sharpe out to different shops, she was unable to see him, which

prevented her from pursuing her promotion.

268.    On or about April 30, 2012, Ms. Sharpe filed a grievance complaining that men were being promoted ahead of her.

269.    In or about April or May 2012, a male contractor asked Ms. Sharpe if she is gay. When she said "no," the contractor laughingly asked if they could go out, in front of another contractor.

270.    In June 2012, Ms. Sharpe made a verbal complaint about Kenny Smith's regular harassment to her shop steward, Joe Tatum.

271.    Almost immediately after, also in or about June 2012, Ms. Sharpe was temporarily laid off.

272.    Ms. Sharpe was called back to work in or about July 2012, and once again she was loaned out, this time to the Rigger Shop.

273.    In or about July 2012, a hearing was held on Ms. Sharpe's grievance.  Goddard, Insulation Craft Shop Supervisor Roger Gibson, and union president Mike Patterson attended.  At the hearing, Goddard and Gibson told Ms. Sharpe that she could not be promoted because work was slow.  Goddard told Ms. Sharpe, "as long as you're in the Rigger Shop you ain't gonna get no raise," and laughed.

274.    Ms. Sharpe's male coworker Eugene Coffee was hired on the same date as Ms. Sharpe; however, as of the grievance hearing, he had received three promotions whereas Ms. Sharpe had never been promoted.

275.    As a result of Ms. Sharpe's grievance, she finally received a promotion on October 1, 2012, but she received no back pay for the months during which she had been denied the promotion.

276.    In or about December 2012, Ms. Sharpe's coworker Killebrew stated "I suck the hell outta her pussy" about a woman driving by on a forklift.

277.    Killebrew went on to say he planned to "go out, get drunk, and find me some Jezebels." Killebrew said Jezebels were "ho's."

278.    On or about December 17, 2012, Killebrew was walking behind Ms. Sharpe across the gangway coming off the USS Normandy.  Killebrew called out to her, "must be your ass, because it's not your face!"

279.    That same month, Killebrew was talking about a female BAE employee in the pipe shop and called her a "bull dagger."  He asked Ms. Sharpe if she knew what that meant, and then told her "it's a dyke."

280.    Ms. Sharpe remained on loan to the Rigger Shop until in or about February 2013.  That month Coffee received another promotion.  Ms. Sharpe was not promoted.

281.    On or about March 15, 2013, Ms. Sharpe submitted a written complaint to Human Resources concerning sexual harassment, however, the harassment continues.

282.    Ms. Sharpe continues to hear offensive sexual speech at work.

## VIII.  CLAIMS FOR RELIEF

### Count One

### Discrimination in Violation of Title VII

### On Behalf of the Class

283.    Plaintiffs incorporate Paragraphs 1 through 282.

284.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964.

285.    Defendant BAE has engaged in illegal, intentional discrimination on the basis of sex, by creating a hostile work environment based on sex with respect to all women employed at BAE's Norfolk, Virginia facilities, including both the shipyard and the office.

286.    Defendant BAE has engaged in a pattern or practice of disparate treatment on the basis of sex against women working in the shipyard (bargaining unit members) in both assignment at the time of hire (and as a consequence, pay), and in promotion.

287.    Plaintiffs have regularly complained to BAE regarding discrimination and harassment.

288.    BAE has allowed the discrimination and harassment to continue.

289.    Defendant's actions proximately caused the Classes' injuries.

290.    Plaintiffs request relief as provided in the Prayer for Relief below.

## Count Two

## Discrimination in Violation of Title VII

## On Behalf of the Named Plaintiffs

291.    Plaintiffs incorporate Paragraphs 1 through 290.

292.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964.  Defendant BAE has engaged in illegal, intentional discrimination on the basis of sex, by creating a hostile work environment based on sex with respect to all women employed in production and maintenance at BAE's Norfolk, Virginia facilities; and by engaging in a pattern or practice of disparate treatment on the basis of sex against women working in the shipyard (bargaining unit members) in both assignment at the time of hire (and as a consequence, pay), and in promotion.

293.    Plaintiffs have regularly complained to supervisors and Human Resources employees regarding discrimination and harassment.

294.    BAE has allowed the discrimination and harassment to continue.

295.    As a consequence of Defendant's conduct, the Named Plaintiffs have suffered emotional distress.

296.    Defendant's actions proximately caused the Named Plaintiffs' injuries.

297.    Plaintiffs request relief as provided in the Prayer for Relief below.

## Count Three

## Retaliation in Violation of Title VII

## On Behalf of the Class

298.    Plaintiffs incorporate Paragraphs 1 through 297.

299.    BAE retaliated against the Class Representatives and the members of the proposed class because they insisted upon a work environment free of sex discrimination and also because they

complained about sex discrimination.

300.     BAE retaliated against the Class Representatives and the members of the proposed class by subjecting them to adverse employment actions, including but not limited to, denying them promotions for which they were qualified; subjecting them to disparate terms and conditions of employment, gender discrimination, sexual harassment, a hostile work environment and/or other forms of discrimination in violation of Title VII; disciplining them in response to their complaints; and/or terminating them in response to their complaints.

301.     BAE's actions proximately caused the injuries of the Class Representatives and the members of the proposed class.

302.     The Class Representatives and the proposed class request relief as provided in the Prayer for Relief below.

**Count Four**

**Retaliation in Violation of Title VII**

**On Behalf of the Named Plaintiffss**

303.     Plaintiffs incorporate Paragraphs 1 through 302.

304.     Plaintiffs engaged in protected activity by complaining to supervisor-level employees and above and Human Resources employees of BAE about the hostile work environment and sex discrimination.

305.     As a result of her complaints, Plaintiffs experienced retaliation including but not limited to: cars being vandalized, receiving worse assignments than male counterparts or employees who have not complained, refusal to promote despite eligibility and being equally or better qualified than employees who have not complained of illegal practices, having lines cut and having work interfered with, being loaned out to shops, and otherwise being treated differently as a result of the complaints made on behalf of themselves and others about discrimination and/or harassment.

306.     As a consequence of Defendant's conduct, Plaintiffs lost past and future wages and other job

benefits, and suffered severe emotional distress.

307.     Defendant's actions proximately caused Plaintiffs injuries.

308.     Plaintiffs request relief as provided in the Prayer for Relief below.

## IX.  RELIEF ALLEGATIONS

309.     Plaintiffs and the Class they represent have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief. Plaintiffs and the Class they represent are now suffering and will continue to suffer irreparable injury from Defendant's discriminatory acts and omissions.

310.     The actions on the part of Defendant have caused and continue to cause Plaintiffs and all Class members substantial losses in earnings, promotional opportunities another employment benefits, in an amount to be determined according to proof.

311.     Defendant acted or failed to act as herein alleged with malice or reckless indifference to the protected rights of Plaintiffs' and Class members. Plaintiffs and class members are thus entitled to recover punitive damages in an amount to be determined according to proof.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed Class pray for relief as follows:

1) Certification of the Class as a class action under Rule 23 (b)(2) and (3), and designation of the Named Plaintiffs Janet Aviles, Jamieka Brown, Stephanie Jackson and Kel Sharpe as representatives of the Class and their counsel of record as Class Counsel;

2) All damages which the Named Plaintiffs and the Class have sustained as a result of Defendant's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discriminatory practices of Defendant;

3) For Plaintiffs' individual, non-class claims, all damages they have sustained as a result of defendant's conduct, including back pay, front pay, general and specific damages for lost compensation

48

and job benefits they would have received but for the discriminatory practices of defendant, damages for emotional distress, and punitive damages, according to proof;

4) For plaintiffs and the Class exemplary and punitive damages in an amount commensurate with Defendant's ability to pay and to deter future conduct;

5) A preliminary and permanent injunction against Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs and usages set forth herein. Such relief at minimum should include professional designed job analyses of all job positions and identification of objective, nondiscriminatory criteria for compensation and promotion decisions, record keeping that requires documentation of compensation, training and promotion decisions, open application and job posting procedures for promotion, training and accountability measures to ensure consistent, nondiscriminatory decision-making, adjustment of the wage rates and benefits for Plaintiffs and the Class to that level which Plaintiffs and the Class would be enjoying but for Defendant's discriminatory practices, and affirmative action to provide lost promotion opportunities to Plaintiffs and Class members.

6)  A preliminary and permanent injunction against Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from maintaining a hostile work environment on the basis of sex.  Such relief at minimum should include implementation of effective policies to prevent and correct sexual harassment, including effective avenues for reporting harassment and measures to prevent retaliation; implementation of mandatory training regarding harassment for all of Defendant's managerial and non-managerial employees.

7) A declaratory judgment that the practices complained of in this First Amended Complaint are unlawful and violate 42 U.S.C. § 2000(e), et. seq., Title VII of the Civil Rights Act of 1964;

8) Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

9) Pre-Judgment and Post-Judgment interest, as provided by law; and

10) Such other and further legal and equitable relief as this Court deems necessary, just and proper.


Dated:  December 17, 2013

Respectfully submitted,

By:   /s/ James H. Shoemaker, Jr.
James H. Shoemaker, Jr., VSB No. 33148
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: (757) 223-4500
Facsimile: (757) 223-4518


By:   /s/ Giselle Schuetz
Giselle Schuetz, Esq.
Law Offices of Joshua Friedman, P.C.
1050 Seven Oaks Lane
Mamaroneck, New York 10543
Telephone: (212) 308-4338 x8
Facsimile: (866) 731-5553
Email: giselle@joshuafriedmanesq.com
*Admitted Pro Hac Vice*

ATTORNEYS FOR PLAINTIFFS